**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

| | |
|---|---|
| ANGELA READING, | |
| Plaintiff, | |
| v. | |
| NORTH HANOVER TOWNSHIP, NEW JERSEY; | |
| ROBERT DUFF, in his individual capacity and in his official capacity as Chief of Police for North Hanover Township; | Docket No. |
| HELEN PAYNE, in her individual capacity; | |
| COLONEL WES ADAMS, in his individual capacity and in his official capacity as Commander, Joint Base McGuire-Dix-Lakehurst (JB MDL) and 87th Air Base Wing, JB MDL, New Jersey; | |
| COLONEL ROBERT GRIMMETT, in his individual capacity and in his official capacity as Commander of the 87th Mission Support Group of the U.S. Air Force; | **VERIFIED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND INJUNCTIVE AND DECLARATORY RELIEF** |
| MEGAN HALL, in her individual capacity and in her official capacity as a Lieutenant Colonel in the U.S. Air Force and Deputy Commander of the 87th Security Forces Squadron; | |
| NATHANIEL LESHER, in his individual capacity and in his official capacity as a Major in the U.S. Air Force; | |
| CHRISTOPHER SCHILLING, in his individual capacity and in his official capacity as a Major in the U.S. Army Reserve; and | |
| JOSEPH VAZQUEZ, in his individual capacity and in his official capacity a Civilian U.S. Department of the Air Force Employee, and | |
| COLONEL MITCHELL WISNIEWSKI, in his individual capacity and in his official capacity as Deputy Commander, Joint Base McGuire-Dix-Lakehurst and Commander, Army Support Activity; | |
| Defendants. | |

Plaintiff Angela Reading, by and through her counsel, complains as follows:

## INTRODUCTION

1.      Angela Reading is the mother of two minor daughters.  She is also a Villanova law student and was—until the events giving rise to this suit—Vice President of the Northern Burlington County (New Jersey) Regional School District Board of Education.  When she expressed her natural parental concern by means of a simple Facebook post about the sexual nature of content on display in an elementary school, Defendants commenced a far-reaching campaign of retaliation against her, enlisting the aid of local, state, and federal government agencies.

2.      For no reason other than that they detested her constitutionally protected expression of her point of view on an issue of public concern, Defendants abused the power of governmental offices to censor Mrs. Reading's speech and retaliate against her with a campaign of smears, lies and referrals to assorted law enforcement agencies for investigation as a "threat," using the instrumentalities and tools of their official positions to create a public fury specifically directed against Mrs. Reading.

3.      Defendants acted singularly and in conspiracy with one another to deprive and chill the exercise of Mrs. Reading's rights, including rights protected by the United States and New Jersey constitutions, as well as other laws.

4.      The steps taken by Defendants against Mrs. Reading lacked any legitimate purpose.  In fact, Defendants continued their actions apace even after they learned of the growing danger to Mrs. Reading that caused her to fear for the physical safety of herself and her family due to the community outrage the Defendants had incited.

5.     Therefore, Mrs. Reading sues for injunctive and declaratory relief, as well as an award of damages as appropriate, to prevent Defendants from continuing to engage in this campaign against her.

## PARTIES

6.     Plaintiff Angela Reading is a citizen and resident of North Hanover Township, New Jersey.  Mrs. Reading is the mother of two minor children and is a third-year law student at Villanova University's Charles Widger School of Law.   While in law school, she has been involved in the Villanova Civil Justice Clinic and the Pro Bono Society, and she has interned with both the New Jersey School Boards Association and the New Jersey Attorney General's Office.  From 2018 to December 2022, when she was forced to resign to protect her family, Mrs. Reading served as an elected member of the Northern Burlington County Regional School District Board of Education for North Hanover Township. She was also Vice President of the Board of Education at the time of her resignation.

7.     Defendant North Hanover Township, New Jersey, is a local governmental municipal entity established and organized under and pursuant to the laws of the State of New Jersey with the authority to sue and be sued in its own name.  This defendant is suable under 42 U.S.C. § 1983.

8.     Defendant Robert Duff was, at all times relevant to this complaint, and remains an adult resident of the State of New Jersey and the Chief of Police for North Hanover Township, New Jersey.   He is a policymaker and/or final decision-maker for the Township's police department.  He is sued in both his individual capacity and his official capacity as Chief of Police of North Hanover Township. He is suable under 42 U.S.C. § 1983 because, at all times relevant to this complaint, he acted under color of state law in taking action against Mrs. Reading.

9.     Defendant Helen Payne was, at all times relevant to this complaint, and remains the Superintendent of the North Hanover Township School District.  North Hanover Township School District is a public entity established and organized under and pursuant to the laws of the State of New Jersey.  She is a policymaker for the District who was involved in communications with the other Defendants respecting Mrs. Reading and the suppression of her protected speech, which communications the District is refusing to disclose, citing various frivolous claims of exemption from disclosure under New Jersey's Open Public Records Act (OPRA). She is sued in her individual capacity only.  She is suable in her individual capacity under 42 U.S.C. § 1983 because, at all times relevant to this complaint, she acted under color of state law in taking action against Mrs. Reading.

10.     Defendant Colonel Wes Adams was, at all times relevant to this complaint, and remains Commander of Joint Base McGuire-Dix-Lakehurst ("Joint Base") and of the 87th Air Base Wing, JB MDL, New Jersey.  He is a policymaker and/or final decision-maker for the Joint Base and thus the U.S. government, and has supervisory liability for the Defendants named herein who are under his jurisdiction and command.  He is sued in his official capacity as to the federal constitutional and statutory claims herein, seeking injunctive and declaratory relief, and also in his individual capacity as to the damages claim under the Religious Freedom Restoration Act.

11.     Defendant Adams was and is responsible for monitoring and supervising Defendants Grimmett, Hall, Lesher, Schilling, and Vazquez, who are each answerable to him within their service's chain of command as he is Joint Base Commander.  As more particularly pleaded below, as Joint Base Commander and supervisor of all U.S. Air Force personnel at the Joint Base, Defendant Adams knew of, ratified, and approved the actions of Defendants

Grimmett, Hall, Lesher, Schilling, and Vazquez that have deprived, are depriving, and threaten to continue to deprive, Mrs. Reading of her rights.

12.     Defendant Colonel Robert Grimmett was, at all times relevant to this complaint, and remains Commander of the 87th Mission Support Group of the U.S. Air Force and thus Commander of the 87th Security Forces (JB MDL Police) Commander of the Joint Base.  He is sued in his official capacity as to the federal constitutional and statutory claims herein, seeking injunctive and declaratory relief, and also in his individual capacity as to the damages claim under the Religious Freedom Restoration Act. Defendant Grimmett was and is responsible for the supervision of Defendant Hall, as Commander of the Joint Base Security Squadron. As more particularly pleaded below, Defendant Grimmett knew of, ratified, and approved the actions of Defendant Hall that have deprived, are depriving, and threaten to continue to deprive, Mrs. Reading of her rights.

13.     Upon information and belief, Defendant Megan Hall was, at all times relevant to this complaint, and remains a Lieutenant Colonel in the U.S. Air Force and a Deputy Commander of the 87th Security Forces Squadron. She is an adult citizen and resident of the State of New Jersey.  She is sued in her official capacity as to the federal constitutional and statutory claims herein, seeking injunctive and declaratory relief, and also in her individual capacity as to the damages claim under the Religious Freedom Restoration Act.

14.     Upon information and belief, Defendant Nathaniel Lesher was, at all times relevant to this complaint, and remains a Major in the U.S. Air Force and an adult resident of the State of New Jersey. He is sued in his official capacity as to the federal constitutional and statutory claims herein, seeking injunctive and declaratory relief, and also in his individual capacity as to the damages claim under the Religious Freedom Restoration Act.

15.     Upon information and belief, Defendant Christopher Schilling was, at all times relevant to this complaint, and remains a Major in the U.S. Army Reserve and an adult citizen and resident of the State of New Jersey. He is sued in his official capacity as to the federal constitutional and statutory claims herein, seeking injunctive and declaratory relief, and also in his individual capacity as to the damages claim under the Religious Freedom Restoration Act.

16.     Upon information and belief, Defendant Joseph Vazquez was, at all times relevant to this complaint, and remains a civilian employee of the U.S. Department of the Air Force and an adult resident of the State of New Jersey.  As Joint Base "Antiterrorism Program Manager," he acts as a policymaker and/or final decision-maker for the Joint Base and, thus the U.S. government.  He is sued in his official capacity as to the federal constitutional and statutory claims herein, seeking injunctive and declaratory relief, and also in his individual capacity as to the damages claim under the Religious Freedom Restoration Act.

17.     Defendant Colonel Mitchell Wisniewski was, at all times relevant to this complaint, and remains Deputy Commander of Joint Base McGuire-Dix-Lakehurst and Commander of Army Support Activity at the Joint Base.  He is a policymaker and/or final decision-maker for the Joint Base and thus the U.S. government, and has supervisory liability for the Defendants named herein who are under his jurisdiction and command, including Defendant Schilling.  He is sued in his official capacity as to the federal constitutional and statutory claims herein, seeking injunctive and declaratory relief, and also in his individual capacity as to the damages claim under the Religious Freedom Restoration Act.

18.     Defendant Wisniewski was and is responsible for monitoring and supervising Defendant Schilling, who is answerable to him within the U.S. Army and Army Reserve's chain of command.  As more particularly pleaded below, as Deputy Base Commander and supervisor of all U.S. Army and Army Reserve personnel at the Joint Base, Defendant Wisniewski knew of,

ratified, and approved the actions of Defendant Schilling that have deprived, are depriving, and threaten to continue to deprive, Mrs. Reading of her rights.

19.     Defendants and their officials are responsible for creating, adopting, approving, ratifying, and enforcing the pertinent rules, regulations, laws, policies, practices, procedures, and/or customs that were the moving force behind the actions that deprived, are depriving, and threaten to continue to deprive, Mrs. Reading of her rights as set forth in this complaint.

20.     As more particularly pleaded below, Defendants approved of, directed, ratified, and/or carried out the acts, policies, practices, customs, and/or procedures that deprived, are depriving, and threaten to continue to deprive, Mrs. Reading of her rights as set forth in this complaint.

21.     As more particularly pleaded below, Defendant Payne acted under color of state law in depriving Mrs. Reading of her rights under the Constitution and laws of the United States and Constitution and laws of the State of New Jersey by means of the retaliatory acts alleged and her cooperation with the other defendants in the punishment of Mrs. Reading's protected speech. Defendant Payne used the powers of her office, though as a rogue actor with a personal vendetta and personal motives, to target Mrs. Reading, as more particularly pleaded below.

## JURISDICTION AND VENUE

22.     This action raises federal questions under the First and Fourteenth Amendments of the United States Constitution and under federal law, 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgments), as well as 42 U.S.C. §§ 1983, 1988, and 1920.

23.     This Court has jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343.

24.     Mrs. Reading's state law claims are properly before this Court pursuant to 28 U.S.C. § 1367(a) because those state law claims are so related to the claims in the action that are

within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

25.     Pursuant to N.J. Stat. § 10:6-2d, Mrs. Reading's state law claims under the New Jersey Civil Rights Act are triable in this Court.

26.     This Court has authority to grant the requested injunctive relief under 28 U.S.C. § 1343(3).

27.     This Court has authority to grant the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as N.J. Stat. § 2A:16-50 *et seq.*

28.     This Court has authority to grant Mrs. Reading's prayer for costs, including reasonable attorneys' fees, under 28 U.S.C. § 1920 and 42 U.S.C. § 1988.

29.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims herein arose in this District.

30.     Any and all conditions precedent to the bringing of this suit have been satisfied, and Mrs. Reading's claims are ripe for review and decision.

31.     This complaint is filed within the applicable statutes of limitations and repose for all claims asserted herein.

32.     Defendants enjoy no lawful immunity, including qualified immunity, from the claims asserted in this complaint.

## ALLEGATIONS COMMON TO ALL COUNTS

### Mrs. Reading's Protected Speech

33.     On November 21, 2022, Mrs. Reading attended "Math Night" at Upper Elementary School in the Northern Burlington County Regional School District.  With Mrs. Reading at the school were her two young daughters, ages six and seven.

34.     Walking through the hall of the school, Mrs. Reading and her daughters noticed the wall covered with posters, seemingly created by students.  When they looked closer, they saw many of the posters had sexual terms, including "polysexual," "pansexual," and "genderqueer." One of Mrs. Reading's daughters then asked her what "polysexual" meant.  Mrs. Reading was shocked and did not know how to respond to her young child's question about a complex issue of sexuality and found this sexual language to be inappropriate in an elementary school.

35.     Mrs. Reading took action to address the inappropriate posters by contacting a parent of one of the children who created the posters, contacting a school board member, and having her husband arrange a meeting with the school Superintendent, Defendant Payne. Despite Mrs. Reading's diligent efforts, she was met with resistance from all three parties she contacted.  They dismissed her concerns and told her that the posters were "not a big deal" due to the common exposure of similar content in daily conversations and social media.  Mrs. Reading was advised to accept the presence of this inappropriate sexual content in elementary schools, despite her objections.

36.     Dissatisfied with the North Hanover Township School District's refusal to act, on November 22, 2022, Mrs. Reading then made a post in the Facebook group named "NJ Fresh Faced Schools."  A true and correct copy of Mrs. Reading's Facebook post is attached hereto as **Exhibit 1.**

37.     A photograph of one of the student posters was included in the post, with the name of the student blacked out by Mrs. Reading.

38.     Mrs. Reading's Facebook post did not violate any law or part of the Facebook code of conduct or terms of use.

39.     Mrs. Reading's Facebook post did not name any student, staff member, or school. It noted only that the school at which the photograph was taken is located in North Hanover Township.

40.     Mrs. Reading's post respectfully expressed her concerns, but it did not call for any person to take any form of action or make a response.

41.     Mrs. Reading did not threaten anyone or provoke or incite violence.

42.     Mrs. Reading's post stressed that she was expressing her own opinion as a mother of children in the local school district, in which she held no office, and was *not* speaking as a member of the Northern Burlington County Regional School Board, which was not involved in the controversy at the local school.

43.     Mrs. Reading's post was wholly lawful and fully protected by the First Amendment to the U.S. Constitution.

44.     Mrs. Reading's post was wholly lawful and fully protected by the Constitution of the State of New Jersey.

45.     Despite the constitutionally protected status of Mrs. Reading's post and her lack of any connection to the U.S. Armed Forces, various individuals at the Joint Base began to leverage their power to activate local police and state agencies, including the New Jersey Office of Homeland Security and Preparedness, the Burlington County (NJ) Prosecutor's Office of Counter-Terrorism, and the New Jersey State Police Regional Operations Intelligence Center, in a concerted effort to suppress and chill Mrs. Reading's right to free speech and right to free exercise of religion.

46.     Mrs. Reading's exercise of her rights, protected under federal and state law, motivated the censorship of her speech and the retaliatory actions of the Defendants described in this Complaint, including Defendant Duff as Chief of Police of North Hanover Township,

10

Defendants Grimmett, Hall, Lesher, Schiller and Vazquez as personnel of the Joint Base (hereafter also referred to collectively as "the Joint Base Actors"), and Defendants Adams and Wisniewski as their superior officers in the Joint Base chain of command (hereafter also referred to collectively as "the Joint Base Superiors").

**The Actions of Defendants
Grimmett, Hall, Lesher, Schiller, Vazquez, and Duff**

47.     On November 23, 2022, Defendant Schilling, then using his personal email account, attacked Mrs. Reading's Facebook post in an email to parents and local school staff members, complaining (among other things) that, according to him, Mrs. Reading did not understand that the term "polysexual" means "simply an attraction to many genders and identities"—as if to say that impressionable young children should be acquainted with this bizarre and sexually freighted concept.  A true and correct copy of this email is attached hereto as **Exhibit 2**.

48.     Schilling's November 23rd email, part of a tranche of documents produced in response to Mrs. Reading's OPRA request to the Northern Burlington County Regional School District, was the first in a chain of personal emails from Schilling that were only a prelude to his use of his military email account and position to involve Joint Base personnel, including the Security Commander, Defendant Grimmett, in the censorship of, and retaliation against, Mrs. Reading's protected speech.

49.     On November 25, 2022, in another email to parents and school staffers, Schilling called for an ethics complaint against Mrs. Reading because her Facebook post was supposedly "stirring up right wing extremists…".  A true and correct copy of this email is attached hereto as **Exhibit 3.**

50.     On November 27, 2022, Schilling sent an email to the same group advising that he was "reaching out to other resources in the area to gather support for this issue" – meaning, to

gather support against Mrs. Reading, which was likely when he began involving military personnel in his vendetta. A true and correct copy of this email is attached hereto as **Exhibit 4.**

51.     On November 29, 2022, Schilling sent another email to the group falsely alleging that Mrs. Reading's protected speech violated the School Ethics Act and school district policy, even though her Facebook post clearly stated that she was merely expressing her own opinion on social media, which policy expressly permits. A true and correct copy of this email is attached hereto as **Exhibit 5.**  This was followed on the same date by another personal email revealing that he had asked the Northern Burlington Regional School District superintendent Andrew Zuckerman to remove Mrs. Reading's Facebook post and that "more positive things are going to happen tomorrow."  A true and correct copy of this email is attached hereto as **Exhibit 6**.

52.     In the same email of November 29, 2022, Schilling told the group "I think we need to *keep the pressure on* until her [Mrs. Reading's] disruptive and dangerous actions cease, so *please share any historical items to help us shape our messaging* for those not aware..." (Emphasis added.) In other words, Schilling is asking Mrs. Reading's fellow citizens to gather and report "evidence" against her that he will be using under his military title in combination with other military personnel in the coming effort to censor and retaliate against Mrs. Reading because of her protected speech.  That is, Schilling is asking the group to dredge up *other protected speech* as "evidence" against Plaintiff, even though it was never the subject of any public controversy.  This evidences that Schilling intended to use every means at his disposal, including abuse of his position as a military officer, to censor and silence Mrs. Reading's point of view.

53.     Thus, on the same date of November 29, 2022, Schilling, now acting under his military title and using his official military email account, emailed Defendant Lesher (with a cc to Defendant Hall) about Mrs. Reading's Facebook post.  A true and correct copy of this email is

attached hereto as **Exhibit 7**. This email was part of a tranche of documents obtained via Mrs. Reading's separate OPRA request to the Township of North Hanover (as distinct from the North Hanover Township Public School District, which is resisting public records disclosure, evidently at the insistence of Defendant Payne, as pleaded below). In the same email thread, Lesher advised Schilling that "[A]s we discussed, I will forward your concern to Chief Duff (North Hanover PD) for awareness. *Thank you for bringing us in the loop….*" (Emphasis added.)

54.     For no reason other than he disagreed with it, Defendant Schilling's military email of November 29 labeled Mrs. Reading's post a security threat, even though he knew that his doing so was without legal basis and that his action would trigger severe adverse consequences for Mrs. Reading. This blatant mischaracterization was made to suppress Mrs. Reading's speech and cause her emotional harm and other injuries—in keeping with Schilling's earlier declaration that "we need to keep the *pressure* on" until Mrs. Reading ceases to express her point of view.

55.     In the same email of November 29, 2022, noted above, Defendant Lesher, also under his official title and using his official military email account, replied to Defendant Schilling (with a cc to Defendant Hall) stating that he was sorry "you guys" (meaning military personnel) had to be exposed to Mrs. Reading's free speech objecting to the manner in which young children were exposed to inappropriate sexual content in an elementary school.  A true and correct copy of this email is attached hereto as **Exhibit 8**.

56.     On November 30, 2022, apparently dissatisfied with the police and military response up to this point, Defendant Schilling, again under his official title and using his military email account, emailed Defendant Lesher (with a cc to Defendant Hall) to share an online comment by someone who claimed to be  "horrified" by Mrs. Reading's protected speech. A true and correct copy of this email is attached hereto as **Exhibit 9**.

57. This unnamed commenter falsely claimed that Mrs. Reading had "endanger[ed] our children" because *Chaos and Control,* an education advocacy site, wrote about the public posters hanging on the wall of an elementary school in a N.J. school district. Schilling evidently considered this comment as sufficient "evidence" to support the Joint Base Actors' ongoing assertions that Mrs. Reading's protected speech was a threat to children.

58. Without any proof, this anonymous "parent" labeled *Chaos and Control's* newsletter a "far right extremist publication." Defendants Schilling, Lesher, and Hall each appeared to take the word of this unidentified individual at face value, without any investigation into the veracity of the claims made, apparently because the claims accorded with the predetermined narrative they and the other involved personnel wished to propagate, and because the claims of an anonymous individual might supply a pretext for action against Mrs. Reading.

59. Also on November 30, 2022, Defendant Lesher responded to Defendant Schilling via official military email, with a cc to Defendants Hall and Vazquez, that he would *again* "push" the issue to Defendant Duff, North Hanover Township's Chief of Police, and include in these efforts Defendant Vazquez as Installation Antiterrorism Program Manager at the Joint Base. A true and correct copy of this email is attached hereto as **Exhibit 10.**

60. On the same date, using his personal email account, Defendant Schilling advised the aforementioned group of parents and school staffers that "*I am actively working with the base leadership over the past few days and they are working to support us in our efforts*" (emphasis added)—meaning efforts to censor and retaliate against Mrs. Reading because of her First Amendment-protected Facebook post. A true and correct copy of this email is attached hereto as **Exhibit 11**.

61. The same email further reveals that Schilling was "in steady communication with the 87th Security Forces (JB MDL Police) Commander (he's my next door [sic] neighbor) and he

is aware of what is going on talking with his surrounding police chiefs to insure heightened awareness on Angela's actions." On information and belief, Schilling was referring to Defendant Grimmett, as the Commander of the 87th Mission Support Group, who is also overall Commander of the 87th Security Forces at the Joint Base.

62.     Based on Schilling's personal emails and the military emails among Defendants Schilling, Grimmett, Hall, Lesher and Vazquez, and the surrounding context, it is apparent that the Joint Base Actors intended to target Mrs. Reading because they disagreed with the content and viewpoint of her speech, not any objectively reasonable concern for safety or security.  The Joint Base Actors further intended to and did use the prestige and influence of the United States military to secure the aid of local authorities in their efforts to target Mrs. Reading, despite having no objective evidence of any danger or threat to security from Mrs. Reading whatsoever.

63.     In point of fact, throughout these events, the only individuals who have faced any credible danger have been Mrs. Reading and her family; yet Defendants have failed to take any meaningful steps to ensure her safety.

64.     Also, on November 30, 2022, Defendant Vazquez, in his official position as the Installation Antiterrorism Program Manager at the Joint Base, and using his official military email account, emailed Defendants Schilling, Lesher, and Hall, stating that Mrs. Reading's protected speech "gets under my skin."  This comment—with which everyone in Defendants' military email chain agreed—provides clear evidence of constitutionally invidious animus toward Mrs. Reading due solely to the content and viewpoint of her speech.  A true and correct copy of this email is attached hereto as **Exhibit 12.**

65.     In that same email, Defendant Vazquez informed everyone on the military email chain that he was sending all of his material on Mrs. Reading to his "partners at the NJ Office of Homeland Security and Preparedness as well as the NJ State Police Regional Operations

Intelligence Center (ROIC)" because "[b]oth agencies analysts keep an eye on far right/hate groups."

66.     On information and belief, Vazquez, as "Antiterrorism Program Manager," had never so acted regarding any concern about "far left/hate groups," which further evidences the viewpoint and content-based discrimination at work in the targeting of Mrs. Reading's protected speech by the Joint Base Actors, acting in concert as shown by their official military email communications with each other.

67.     Defendant Hall, as Deputy Commander of the 87th Mission Support Group's Security Force, also acted in furtherance of the conspiracy with Defendants Schilling, Lesher, and Vazquez to censor and retaliate against Mrs. Reading's protected speech.

68.     On November 30, 2022, Hall emailed Defendant Helen Payne, Superintendent of the North Hanover Township School District, and Northern Burlington Regional Superintendent Andrew Zuckerman, from her official military email account, addressing Mrs. Reading's protected speech at length, and copying several military personnel. A true and correct copy of this email is attached hereto as **Exhibit 13.**

69.     One of these personnel was her superior, Defendant Grimmett, Commander of the 87th Mission Support Group who oversees the Joint Base Security Force—the same Colonel Grimmett with whom, as noted above, Defendant Schilling was apparently "in steady communication" while Grimmett was "talking with *his surrounding police chiefs* to insure heightened awareness on Angela's actions." (Emphasis added.)

70.     Defendant Hall also indicates in the referenced email that she has already provided Defendant Payne with various posts [regarding Mrs. Reading] for her information and will forward same to Dr. Zuckerman if he wishes. Defendant Hall went on to offer them more assistance if needed. Payne then forwarded Defendant Hall's email to Defendant Duff on the

same day, further indicating the cooperation of all three in the civil rights conspiracy pleaded below.

71.     Defendant Hall, who has no children in the North Hanover Township Upper Elementary School but acts as Joint Base liaison to the North Hanover Township School Board because some children of Base personnel attend the school, falsely described Mrs. Reading's original Facebook post of November 22, 2022 and related posts—all protected by the First Amendment—as "a concern for the safety of our military children and families as they could become targets from extremist personnel/groups."

72.     Hall knew that Mrs. Reading presented no such threat.   In order to create the false impression of a threat, however, Hall's November 30th email cited above falsely alleged that Mrs. Reading "exposed parents' names" in her posts, when no names are mentioned. Hall also falsely alleged that Mrs. Reading was speaking "in her capacity as a board member" [of the Northern Burlington County Regional Board of Education] when, as noted, Mrs. Reading's November 22nd Facebook post expressly disclaims any connection to her Board membership and stresses that she is merely expressing her personal opinion as a citizen with children in the North Hanover School District, of whose Board she was *not* a member.

73.     Revealing that she knew full well that she was attempting to quasi-criminalize Mrs. Reading's clearly protected expression of opinion, Hall's email frets that "Ms. Angela Reading encouraged people of like mindedness to attend the monthly BOE [Board of Education] meetings and *express the same view point* [sic]." (Emphasis added.)

74.     Defendant Hall's November 30th email to Defendant Payne goes on to suggest that Mrs. Reading is guilty of "ethics violations" and that she should resign from the Regional Board.   Said email was copied to the Northern Burlington Regional Superintendent Andrew

Zuckerman in an obvious attempt to have Mrs. Reading removed from the Board for expressing her "view point [sic]."

75.     It does not appear that Defendant Hall has ever taken similar actions against parents who criticized the local school system for other reasons on Facebook, even when they have explicitly mentioned classrooms and teachers online, as more particularly pleaded below. This disparate treatment indicates that Defendant Hall, along with the other Joint Base Actors, targeted Mrs. Reading for the particular viewpoint expressed in her Facebook post.

76.     In sum, without any evidence, the Joint Base Actors acted in concert to label Mrs. Reading a "far-right extremist" and a security threat, worthy of government surveillance, and urged state authorities to monitor and take other action against Mrs. Reading for no other reason than her making a simple, constitutionally protected objection on Facebook to age-inappropriate sexual content in an elementary school that directly impacted her own children.

77.     Also on November 30, 2022, following the above-noted military email from Defendant Hall to Superintendent Payne, Defendant Lesher, under his official title and using his military email account, emailed Defendant Duff "Per our discussion"—thus further evidencing the cooperation of the Joint Base Actors with Defendant Duff and local law enforcement in a conspiracy to target Mrs. Reading for censorship, investigation, and adverse official action against her.  A true and correct copy of this email is attached hereto as **Exhibit 14.**

78.     The prior "discussion" between Defendant Lesher and Defendant Duff revealed in said email is believed to have included a request that Defendant Duff attempt to have Mrs. Reading's Facebook post taken down.  This evidence dovetails with Defendant Schilling's personal email of November 29, 2022, noted above, in which he advised the group of parents and staffers that "more positive things are going to happen tomorrow."

79.     Upon information and belief, it was at this point that the federal and other Defendants came together to carry out an integrated conspiracy against Mrs. Reading aimed at censoring her speech and chilling and dissuading her from engaging in constitutionally protected conduct going forward by causing her to fear that she was under surveillance by, and subject to enforcement action from, elements of federal, state, and local government, including the United States military and the Department of Homeland Security, as shown below.

80.     As further pleaded below, Defendants Duff, Grimmett, Hall, Lesher, Schilling, and Vazquez, along with Defendant Payne, were each personally and directly involved in the resulting conspiracy, abusing the auspices and power of their positions to make overt acts in furtherance of this conspiracy with the intent to punish Mrs. Reading's exercise of her legally protected rights.

81.     Said conspiracy had (and continues to have) no legitimate or legal purpose but was instead motivated by opposition to the point of view expressed by Mrs. Reading and the exercise of her constitutionally protected right to express that point of view.

82.     Upon information and belief, the conspiracy between the Joint Base Actors, Defendant Duff and Defendant Payne continues to this day.  And, even if it has been momentarily suspended, it can be resumed at any time, making this case justiciable under the doctrine of capable of repetition, yet evading review.  In particular, evidencing this ongoing threat to the exercise of constitutional rights, the email dated November 30, 2022, from Defendant Vazquez to Defendants Schilling, Lesher, and Hall speaks of how the New Jersey Office of Homeland Security and Preparedness and the New Jersey State Police Regional Operations Intelligence Center "*keep an eye on* far right/hate groups." (Emphasis added.) A true and correct copy of this email is attached hereto as **Exhibit 15**.

**The Censorship of Mrs. Reading's Protected Speech**

83.     On November 30, 2022, the day after Defendant Schilling emailed parents and school staffers to advise that "more positive things are going to happen tomorrow," Defendant Duff, acting on behalf of Defendant North Hanover Township and at the instigation of the Joint Base Actors, contacted the Facebook group administrator Nicole ("Nik") Stouffer via Facebook messenger asking her to call him.  A true and correct copy of this Facebook message is attached hereto as **Exhibit 16**.

84.     Ms. Stouffer did so later that day and, in that call, Defendant Duff pressured Ms. Stouffer to take down the post, citing alleged fears of terroristic threats and school violence. In substance, Defendant Duff told Stouffer that students could die if she did not remove the post, drawing parallels to the devastating incidents at Uvalde Elementary School and the Colorado Springs nightclub. Defendant Duff also stated that the North Hanover police were working in cooperation with the U.S. Department of Homeland Security and military officials from the Joint Base concerning Mrs. Reading. Defendant Duff would later make the same representation directly to Mrs. Reading.

85.     Ms. Stouffer reacted to Defendant Duff by sending a Facebook message to Mrs. Reading that same day. Mrs. Reading had never previously met or spoken with Ms. Stouffer. Ms. Stouffer relayed what Defendant Duff had told her.  A true and correct copy of this correspondence is attached hereto as **Exhibit 17**.

86.     Because what Ms. Stouffer said to Mrs. Reading greatly concerned her, Mrs. Reading felt she had no choice but to agree with Ms. Stouffer's decision to take down her post. Specifically, Mrs. Reading feared that if she did not take down the post, local police and other levels of law enforcement, including military authorities, would take action against her on the theory that she was liable for inciting violence.

87.     Later that day, Mrs. Reading emailed Defendant Duff registering her objections to this interference with her free speech rights. Neither Defendant Duff nor anyone else from Defendant North Hanover Township replied to this email. A true and correct copy of this email is attached hereto as **Exhibit 18.**

88.     Later in the afternoon, at 4:00 PM on November 30, 2022, Defendant Duff emailed Defendants Hall, Lesher and Vazquez to inform them that he had succeeded in getting Mrs. Reading's constitutionally protected Facebook post taken down, as the military had requested, and that "*I will continue to see if I can get additional posts [by Mrs. Reading] removed from other social media posts*"—thereby continuing the conspiracy. (Emphasis added.) A true and correct copy of this email is attached hereto as **Exhibit 19.**

89.     On December 1, 2022, Defendant Duff called Mrs. Reading from the police station.  He confirmed that he had directed Mrs. Stouffer to take down the Facebook post and stated he had received emails from the Joint Base calling her an "extremist."  When asked to provide those emails, Defendant Duff declined, making the frivolous and knowingly false claim that the emails were "classified."  As noted above, these "classified" emails, some of which are exhibits to this complaint, were disgorged by North Hanover Township (but not the North Hanover Township School District, which is resisting disclosure) pursuant to Mrs. Reading's request under OPRA.

### Defendants' Continued Effort to Censor Mrs. Reading and Chill Her Protected Speech

90.     Having succeeded in using Defendant Duff as their "cat's paw," the work of Defendant Schilling and the other Joint Base Actors was not done. On or about December 1, 2022, their efforts to suppress Mrs. Reading's protected speech went even further when they tried to gin up fear and suppress another of her Facebook posts which simply shared screenshots of others' Facebook comments.  In an email to Defendant Lesher (Nate) on that date, Defendant

Schilling falsely claimed that this second post constituted a security threat and used his position and power to try to have it, too, removed.  A true and correct copy of this email is attached hereto as **Exhibit 20.**

91.     Furthermore, on December 1, 2022, Defendant Vazquez, again acting in his official capacity as the Joint Base Installation Antiterrorism Program Manager, emailed Defendant Duff to ask him to forward Mrs. Reading's lawful, constitutionally protected, and non-threatening Facebook post to the Mansfield, New Jersey, Police, thereby involving a *second* local police department.   A true and correct copy of this email is attached hereto as **Exhibit 21**.

92.     In the same email, Defendant Vazquez revealed that he had forwarded Mrs. Reading's post and Defendant Schilling's "concerns" to the New Jersey Office of Homeland Security and Preparedness and the New Jersey State Police in "hopes of getting an IDR [*i.e.*, an Incident Detection and Response] sent to schools and police departments."  That is, in furtherance of the continuing conspiracy, Defendant Vazquez intended to trigger a preposterous widespread law enforcement investigation and state of alarm over Mrs. Reading's protected speech as if it were an "incident" of potential (or even actual) criminality.

93.     The military's decision to send emails to the New Jersey Office of Homeland Security and Preparedness and the New Jersey State Police about a citizen's social media posts when there was no actual or credible threat is an abuse of power and had a clear chilling effect on Mrs. Reading's exercise of rights guaranteed by the Constitution and laws of the United States, particularly the First Amendment.

94.     Two more key emails were sent on December 5, 2022. The first concerning Mrs. Reading was from the New Jersey Office of Homeland Security and Preparedness (NJOHSP) to Defendant Vazquez and others, indicating the NJOHSP would "loop in the Burlington County Prosecutor's Office Counter-Terrorism Coordinator for situational

awareness".  The second was from Defendant Vazquez to Defendant Duff *thanking him for his support*, and informing Duff that he has been working with a "Threat Working Group" concerning Mrs. Reading. A true and correct copy of the email exchange containing these two emails is attached hereto as **Exhibit 22.**

**Further Actions of Defendant Duff
Following National News Coverage**

95.    On December 7, 2022, Mrs. Reading was faced with a difficult decision as she sought to defend her reputation against the vicious attacks by the Defendants. With little choice, she courageously took to the airwaves of the Fox News network to expose the unjust actions of the Joint Base Actors against her, including unwarranted surveillance and censorship. Despite her reservations, Mrs. Reading agreed to appear on the Tucker Carlson Show because Fox News—having received information from a credible New Jersey Substack article—was determined to run the story.

96.    Apparently stung by the national news coverage of his unlawful actions in cooperation with the Joint Base Actors, Defendant Duff, evincing malice, attempted to find evidence that Mrs. Reading's children had not viewed the student posters with sexual language. He improperly accessed and viewed a recording of the elementary school's surveillance footage, evidently supplied by Defendant Payne, showing Mrs. Reading and her children on the night in question. Duff had no legitimate law enforcement purpose for this retaliatory action, and his actions were contrary to the law.

97.    Defendant Duff then proceeded to claim to others, including one of Mrs. Reading's neighbors, that the video revealed that Mrs. Reading's daughter had *not* read or seen the posters in the hallway and that Mrs. Reading was a liar. That claim is false.

98.    In what was apparently a further effort to justify his actions, even though it was not required or justified by any objectively reasonable law enforcement need, Defendant Duff

coordinated a multi-jurisdictional show of force for the December 13, 2022 meeting of the North Hanover Township Board of Education, which Mrs. Reading attended as a citizen and parent.  In an unprecedented move for the Board's meetings, attendees were subjected to metal detectors and the searching of bags. Moreover, Defendant Duff had law enforcement personnel line the walls of the meeting room.

99.    During the meeting, various speakers—whipped into a frenzy by Defendants' campaign against Mrs. Reading—engaged in unacceptable behavior by using abusive language, including vulgar and disrespectful name-calling, falsely accusing Mrs. Reading of jeopardizing the safety of the schools when no "threat" had ever materialized. It was wholly out of order, as well as unprecedented for a board of education to permit attendees to engage in disruptive and offensive behavior by launching personal attacks and making disparaging remarks about a resident and parent in the community, who was also present at the meeting and holds no elected position and wields no decision-making power in the local school district.

**Further Actions by Defendant Schilling**

100.    Defendant Schilling—emboldened by Defendant Duff's success in his actions against Mrs. Reading—made social media posts about her that appeared to be official U.S. government statements concerning her original Facebook post.  Using inflammatory rhetoric and making unfounded charges, Defendant Schilling referred to Mrs. Reading as an "extremist" and a security threat. True and correct copies of several of these posts are attached hereto as collective **Exhibit 23.**

101.    One social media post from Defendant Schilling stated: "The Joint Base leadership takes this situation [*i.e.*, Mrs. Reading's protected speech] very seriously and *from the beginning have been working with multiple state and local enforcement agencies* to monitor the situation to ensure the continued safety of the entire community."  (Emphasis added.)

102.     Online statements by Defendant Schilling were intended to convey the impression that elements of the United States Armed Forces were taking official governmental action against Mrs. Reading and that he was speaking in an official governmental capacity about Mrs. Reading. Such statements are unconstitutionally retaliatory and have a chilling effect on the exercise of Mrs. Reading's constitutionally protected rights.

103.     In the climate of antipathy toward Mrs. Reading which all the Defendants—acting in concert—have created, a petition condemning her was circulated online at change.org. Mrs. Reading has received constant online harassment, and she now fears for the safety of herself and her family, especially after reporting to the police a truck sitting outside of her house for an extended period.  Her standing in the community has also been harmed by Defendants' concerted campaign, as government actors, to retaliate against her speech by depicting her as a "right wing extremist" and a threat to public safety.

104.     In response to this furor, an online petition *in support* of Mrs. Reading was created, noting the threats against her that the Defendants had incited.  In an email sent under his official title and using his official military account, dated December 5, 2022, with a copy to Defendant Duff, Defendant Schilling denounced the petition supporting Mrs. Reading.  A true and correct copy of this email exchange is attached hereto as **Exhibit 24.**

105.     Defendant Schilling's December 5 email complained that Mrs. Reading and a friend of hers were "mak[ing] comments on it to stir the pot." Defendant Schilling did not explain what he meant by "stir the pot" or how he knew the motives of those commenting.  In his reply email, Defendant Duff states, without explanation, that the threats to Mrs. Reading and her family were not "credible" and that he will "continue to monitor social media and take appropriate action if needed."  It is not clear against whom Defendant Duff might take action.

106.    In addition to his military-related emails to the other Joint Base Actors about Mrs. Reading, as set forth above, Defendant Schilling made additional online posts via Facebook attacking her, including one sharing the online petition calling her an "extremist" and another post falsely accusing her of lying about her daughter's exposure to the above-noted objectionable sexual material at the school.  Defendant Schilling knew his posts were false when he made them.   A true and correct copy of several of these posts is attached hereto as collective **Exhibit 25.**

107.    Defendant Schilling's additional actions, evincing malice, were intended to further retaliate against Mrs. Reading for her constitutionally protected conduct and to incite public animus against her, abusing the power and prestige of the United States military to achieve his ends.

### The Joint Base Coverup

108.    The Joint Base Actors acted with the assistance and/or approval of their respective Joint Base Superiors: Defendant Colonel Wes Adams as Base Commander, in charge of all the Joint Base Actors; Defendant Colonel Mitchell Wisniewski III as Deputy Commander in charge of Defendants Hall, Lesher, and Vazquez; and Defendant Colonel Robert Grimmett, one of the Joint Base Actors himself, as Commander of the 87th Mission Support Group and thus also head of the  Joint Base Security Forces Squadron, of which Defendant Hall was Deputy Commander.

109.    The Joint Base Superiors participated in, approved or ratified an official coverup of the Joint Base Actors' unlawful conduct, which they must have known was now the subject of national media publicity.  The coverup was designed to convey to the public the false impression that Defendant Schilling acted merely in his civilian capacity when said Superiors knew, or reasonably should have known, that Schilling had acted via his official military account.

110.    The Joint Base further falsely claimed to the media that Defendant Schilling was acting alone when in fact, he had acted with the other Joint Base Actors under the respective authority of their Joint Base Superiors. This is shown by the emails the Joint Base had hidden but were uncovered by Mrs. Reading's OPRA request to Defendant North Hanover Township and are described and attached as Exhibits to this Verified Complaint.

111.    More specifically, on December 7, 2022, Lt. Colonel Addie Leonhardt, Chief of Public Information for the U.S. Army Reserve Command Public Affairs Office, stated in response to an inquiry from Fox News that Defendant Schilling "posted as an individual" and that his statements "do not constitute an official Army Reserve statement."   The Joint Base thus misled the public by diverting attention to Defendant Schilling's personal Facebook posts, noted above, while ignoring the military email exchanges between Defendant Schilling, the other Joint Base Actors, Defendant Duff and other law enforcement agencies (via Defendant Vazquez) in connection with their scheme to "keep the pressure on" Mrs. Reading in order to censor and chill her speech and silence the expression of her point of view going forward.

112.    The Joint Base's December 7th statement to Fox News further misled the public by failing to mention that one of Defendant Schilling's Facebook posts, noted above, revealed that "**The Joint Base leadership** takes this situation [i.e., Mrs. Reading's protected speech] very seriously and from the beginning have been working with multiple state and local enforcement agencies to monitor the situation to ensure the continued safety of the entire community." (Emphasis added.)

113.    The December 7th statement to Fox News also conspicuously failed to deny Defendant Schilling's revelation that "the Joint Base leadership" regarded Mrs. Reading's protected speech "very seriously" as a matter of public "safety" warranting the intervention of

state and local enforcement agencies.  *The Joint Base has never denied Defendant Schilling's assertion.*

114.    In a subsequent email sent on February 16, 2023, to address Mrs. Reading's uncovering of the above-noted emails revealing the falsity of the Joint Base's December 7th statement, the public affairs office of the Joint Base (JB MDL/PA) responded to another inquiry from Fox News by again falsely claiming that no one but Defendant Schilling in his non-military capacity was involved in the actions against Mrs. Reading, contrary to the facts demonstrated in the preceding allegations of this Verified Complaint, which show the active involvement of several Joint Base personnel.

115.    The Joint Base statement of February 16th continued to mislead the public by falsely claiming that Defendant Schilling's now-uncovered email communications with Defendants Hall, Lesher, and Vazquez were merely "courtesy copying one or more individuals during e-mail communication… to ensure awareness and does not indicate a change in the decision making process." The February 16th statement does not indicate what "awareness" Defendant Schilling was supposedly ensuring.

116.    And as with the earlier statement of December 7, the Joint Base's February 16, 2023 statement continues to mislead the public by once again ignoring the substance of the military email exchange between the Joint Base Actors and law enforcement and security agencies, and by again diverting attention to Defendant Schilling's Facebook posts "from a personal account unaffiliated with the military," while still ignoring the fact that even one of Defendant Schilling's Facebook posts revealed that "***The Joint Base leadership*** takes this situation [*i.e.*, Mrs. Reading's protected speech] very seriously and from the beginning have been working with multiple state and local enforcement agencies to monitor the situation to ensure the continued safety of the entire community."  (Emphasis added.)

28

117.    The February 16th statement still further misleads the public by stating that "any information or concerns received from the public were passed onto the local civilian law enforcement responsible for jurisdiction" without revealing that said "information or concerns" *originated with the Joint Base Actors themselves*, not the general public.  The same statement impliedly admits, however, that military personnel—that is, the Joint Base Actors—improperly treated Mrs. Reading's First Amendment-protected Facebook post as a matter for law enforcement referral in a successful effort to censor, retaliate for, and chill her speech.

118.    Upon information and belief, the prompting to make these false and misleading statements to the media and the public came from, or was ratified after the fact, by Defendants Adams, Grimmett and Wisniewski, who had to be aware of the national news coverage to which the Joint Base was falsely responding.  Said Defendants thus concealed, protected, and perpetuated the Joint Base Actors' conspiracy against Mrs. Reading.

119.    By means of this coverup, the Joint Base Superiors themselves advanced the conspiracy against Mrs. Reading, thereby further ratifying, adopting, affirming, and endorsing the unlawful conduct of the Joint Base Actors under their supervision, direction, and control, whom they have failed to discipline in any way, upon information and belief.

120.    The Joint Base Actors were also involved in the coverup as they either authorized or allowed the Joint Base's false and misleading statements to the media to be published and disseminated to the public without correction, knowing the statements were false and intentionally misleading.

121.    The Joint Base's deceptive statements to the media evidence knowledge that the Joint Base Actors and their Joint Base Superiors knew the actions taken against Mrs. Reading were wrongful and that any "innocent" explanations proffered for their conduct are a false pretext.

122.     Furthermore, during the course of their conspiracy, Defendants would have been fully aware that (a) constitutionally protected speech cannot be censored by the government simply because government officials disagree with its content or viewpoint; (b) pursuant to the Posse Comitatus Act, 18 U.S.C. § 1385, the United States Armed Forces are prohibited from exercising domestic civil law enforcement jurisdiction, except as to the Army and Air Force National Guards in limited circumstances not present here; and (c) the claim that Mrs. Reading's Facebook post, or related speech or conduct by her, presented evidence of any kind of threat was patently absurd.

### The Actions of Defendant Payne

123.     On December 1, 2022, at the same time the Joint Base Actors were acting in concert to suppress and punish Mrs. Reading's protected speech, Defendant Helen Payne, abusing her title as Superintendent of the North Hanover Township School District, issued a totally unprecedented "letter to the community" that only further inflamed sentiment against Mrs. Reading.  A true and correct copy of this email is attached hereto as **Exhibit 26.**

124.     Defendant Payne sent the letter without prior review by the Defendant North Hanover Township School Board, of which Mrs. Reading's husband was then President.  In so doing, Defendant Payne knowingly departed from school board protocol, under which prior public-facing statements by Defendant Payne had been reviewed by the Board President before being published.  Moreover, if there had been a genuine security threat to the school, as opposed to the stirred-up panic over nothing that Defendant Payne had helped to create, Defendant Payne would at least have contacted the Board before acting, if not asked for an emergency Board meeting.  But Defendant Payne knew full well that the Board would have prevented her from issuing her inflammatory and unwarranted "letter to the community."

30

125.    Even though she knew otherwise, Defendant Payne's "letter to the community" falsely stated that the school may not legally decline to display student artwork with sexual language because it is "protected speech under the First Amendment".  Payne evidently did not have the same opinion as to Mrs. Reading's protected speech – clear evidence of viewpoint discrimination.

126.    The same letter also strongly implies that Mrs. Reading's Facebook post identified specific students, even though Defendant Payne knew that claim was false.  Defendant Payne clearly intended to make readers believe the falsehood that Mrs. Reading had identified specific students in her Facebook post in order to create the false impression that Mrs. Reading had engaged in or provoked "threats."

127.    Defendant Payne's letter further states that the school was working with the police to address threats to school safety, when in reality, no such threats existed. This letter deliberately misled and alarmed the community, while Mrs. Reading and her family were exposed to intense public condemnation, fueled by Defendant Payne's "letter to the community." Yet the school took no action to protect Mrs. Reading or her family. To the contrary, Defendant Payne and the local police, through Defendant Duff, doubled down on their efforts to target and intimidate Mrs. Reading, leaving her feeling unsafe in her own home and community.

128.    Defendant Payne's alarmist statement was given publicity by *The Philadelphia Inquirer* and other news outlets. The *Philadelphia Inquirer*, other media, and community members took Defendant Payne's statement as an indication that Mrs. Reading was directly endangering the lives of students, teachers, and school staff by merely expressing her protected opinion.  Defendant Payne's statement misled the public and caused baseless fear and panic.

129.    As evidence of her malice and viewpoint discrimination, Payne had never issued a "letter to the community" or expressed any other "security concerns" to address very severe and

specific criticisms of the school district and its personnel named in a Facebook Group called "JB MDL Vent Away."  "JB MDL Vent Away" is not fairly characterized as conservative or "right wing" in its political orientation, thereby evidencing Defendant Payne's intent to target and suppress Mrs. Reading's speech because of its content and viewpoint and not because of any legitimate "security concerns."

130.    When, on February 14, 2023, Defendant Payne finally responded via email to inquiries from Mrs. Reading asking Payne to explain her disparate, over-the-top treatment of Mrs. Reading's clearly protected speech, Payne falsely claimed, without evidence, that Mrs. Reading's constitutionally protected post of November 22, 2022, had "resulted in both general and specific threats against the District and its personnel"—in other words, that Mrs. Reading had been guilty of incitement to violence and was thus a threat to the District and the community.  In fact, no such "specific threats" ever existed, and Payne knew it.

131.    In her email to Mrs. Reading of February 14, 2023, Defendant Payne further attempted to explain her disparate treatment of Mrs. Reading's criticism of the District—as opposed to the far more numerous, condemnatory, and specifically identifying complaints from the "JB MDL Vent Away" Facebook group—with the non-explanation that "[t]he circumstances which arose following your social media post were different from those presented by the posts you attach."

132.    In fact, those "circumstances" were the creation of Defendant Payne herself, in combination with Defendant Duff and the Joint Base Actors, who together created an atmosphere of panic, fear, and loathing of Mrs. Reading based on nothing more than her clearly protected speech.

133.    Moreover, Defendant Payne had previously failed to issue any "threat warning" regarding severe condemnations of her District's schools by scores of parents, *who named*

*particular administrators, teachers, and staffers* regarding, among other things, the District's failure to ensure adequate discipline, leading to actual violence by students in the schools.

134.    In that regard, evidencing her malice and her viewpoint and content-based discrimination against Mrs. Reading's speech, Defendant Payne had never issued any official statement regarding a student who had stabbed a teacher with a pencil and threatened a school bus driver with lethal force by means of specifically identified guns. On information and belief, only after Defendant Payne had failed to act concerning this student did the bus driver report his threat to the police.   The police went to the student's home, found the very guns he had identified, and confiscated them. Yet Defendant Payne issued no statement regarding this clear threat to the school even though a school board meeting was packed with parents expressing concern and outrage over the school district's inaction.

135.    In her email of February 14, 2023, to Mrs. Reading, Defendant Payne offered the patently false excuse that she had issued no "letter to the community" regarding the threat posed by the violent student with access to guns because, unlike Mrs. Reading's protected speech devoid of threats, the student's specific and credible threat of gun violence "was an individual student matter.   Specifically, the conduct was not directed at any student, was not witnessed by any student, and was not directed at any school building. In other words, there was no security threat to the schools nor to any students or staff in them."   That claim was nonsense, and Payne knew it, because a death threat involving guns directed at a school bus driver also threatens the students on the bus.

136.    Thus, Defendant Payne, with malice aforethought, created panic in the school community over Mrs. Reading's constitutionally protected speech but stood mute when faced with speech that did *not* enjoy constitutional protection—namely, true threats of violence.

137.    An evasive response by Defendant North Hanover Township School District to Mrs. Reading's request under OPRA for documents relating to the suppression of her speech further reveals that Defendant Payne was in communication with Defendants Hall and Duff regarding this official censorship of protected speech. The communications between Defendants Payne and Hall would probably include in the email chain Defendants Schilling, Lesher, and Vazquez, the other Joint Base Actors, who were also participating in the conspiracy to punish Mrs. Reading's speech.

138.    The School District, on information and belief at the instance of Defendant Payne, has refused to disclose these documents—which include a long string of almost entirely redacted text messages between Defendant Payne and Defendant Duff—on the spurious ground, among others, that they involve "inter-agency advisory, consultative, deliberative material; and for security/safety reasons."

139.    This evasive response constitutes an admission that Defendant Payne was cooperating with both the local police department and the Joint Base Actors in unlawfully treating Mrs. Reading's constitutionally protected speech as if it were a security threat and a fit matter for censorship and criminal investigation.

140.    In her actions as described above, Defendant Payne acted without authority from the School Board, whose then President was Mrs. Reading's husband. Her actions were motivated by malice, based not only upon her animus toward the content and viewpoint of Mrs. Reading's speech, but also because of her prior dealings with Mrs. Reading and her husband. In particular, before the incidents complained of herein, Mrs. Reading had successfully sued Defendant Payne for pregnancy discrimination, while her husband had also refused to vote in favor of a five-year contract for Defendant Payne and had refused to approve her preferred choice for Principal of a District school.

141.    Thus, Defendant Payne allowed petty local politics and personal grievances against Mrs. Reading and her husband to motivate a personal campaign to portray Mrs. Reading as a "right-wing extremist" and a security threat to the students, teachers, and staff, alarming an entire school community under false pretenses and using Mrs. Reading's patently protected speech, which Defendant Payne knew to be protected, as a pretext to "cancel" Mrs. Reading and make her a pariah in the North Hanover Township Public School District, the larger community, and indeed the public arena generally.  In this unlawful endeavor, Defendant Payne and her co-conspirators succeeded.

### The Injuries to Mrs. Reading

142.    The suppression of Mrs. Reading's protected speech, the widespread and copious disinformation depicting her as a security threat—which all the Defendants have been responsible for disseminating—and the revelation of Defendants' retaliatory triggering of military, police and security agency investigations of her, have devastated Mrs. Reading by radically disrupting her life and that of her family and causing her extreme emotional distress and anxiety.

143.    Suffering extreme anxiety due to fear for the safety of herself and her family, Mrs. Reading removed her children from school for a week and could not take her law school exams when they were originally scheduled.

144.    Defendants have created a climate of hate and hysteria in the North Hanover Township community directed at Mrs. Reading.  As a result of Defendants' actions, Mrs. Reading has been made to feel unwelcome in the place she has long called home.  Unidentified individuals have been observed sitting outside her house, and she has received online harassment, causing her and members of her family to fear for their safety.

145.    Mrs. Reading and her husband no longer feel comfortable sending their children to their own public school.  They are looking for alternative schooling arrangements as soon as practicable, even though it will be costly.

146.    To protect her family from the continued threats, Mrs. Reading was forced to resign from her position on the Northern Burlington County Regional School Board on December 7, 2022, as her very appearance at Board meetings had become an untenable flashpoint for public animus, given Defendants' successful combined efforts to retaliate against her protected speech by depicting her as aligned with "far-right/hate groups" and a security threat.

147.    Upon her coerced resignation, Mrs. Reading was forced to relinquish not only her esteemed seat on the School Board and her role as its Vice President, but also her highly regarded positions on the Finance and Legislative Committees of the New Jersey School Boards Association. These prestigious appointments were a testament to her distinguished career as a local school board member and her unwavering dedication to the cause. The loss of these positions was a significant blow to her hard-earned reputation and her years of tireless service to the community.

148.    Faced with his wife's ostracism in the community, a direct consequence of the Defendants' actions, and the need to safeguard the well-being of his children, Mrs. Reading's husband was compelled to resign from his own position as President of the North Hanover Township School Board. This difficult decision was made out of a deep sense of responsibility to protect his family, and it came at a great personal cost, as he was highly respected for his leadership and commitment to the school board.

149.    Mrs. Reading's resignation under fire, along with that of her husband, was one of the goals of Defendants' anti-free speech conspiracy, as revealed by Defendant Schilling's email

36

on the need to "keep the pressure on" Mrs. Reading, and by Defendant Hall's email of November 29, 2022, noted above, to which Dr. Zuckerman promptly replied the following day, showing his full support of this civil rights conspiracy: "Thank you for your e-mail...I am actively looking into the situation and next steps. I can assure you that the safety of our students and staff are our top priority. Feel free to contact me to discuss…." To which Defendant Hall replied: "Thank you for your assistance."

150. Defendants' ultimate goal of forcing Mrs. Reading out of office was achieved only a week later, whereupon Dr. Zuckerman contacted Defendant Hall to advise her of same. A true and correct copy of this entire email thread is attached hereto as **Exhibit 27.**

151. The loss of her education-related positions was a crushing blow for Mrs. Reading, who has devoted her entire career to advancing the fields of education and education policy. With a B.A. double majoring in Psychology and Education, as well as multiple certifications, including those for Elementary School Teaching and Students with Disabilities, Mrs. Reading is exceptionally well-qualified. She has also earned an M.A. in education policy and leadership and holds prestigious New Jersey Principal and Supervisor Certificates. Throughout her career, Mrs. Reading has excelled in a variety of educational roles, showcasing her exceptional talent as a Special Education Teacher, Coach, Data Coordinator, Curriculum Developer, Teacher, and Advocate. She was even honored as the New Jersey Student Teacher of the Year for the 2010-2011 school year, a recognition of her brilliance and dedication to the field. With her recent internships at the New Jersey Attorney General's office for Education and a law firm that represents school boards, Mrs. Reading was poised to bring her extensive experience and expertise to the legal arena and dedicate her career to school law. However, Defendants' actions have caused irreparable harm to Mrs. Reading, threatening to derail her lifelong aspirations and denying the education community her valuable contributions.

152. The harm to Mrs. Reading's position and standing in her community has been extensive. The internet is now littered with disinformation, provoked by Defendants' concerted action, falsely depicting Mrs. Reading as an "extremist," a "terrorist," and a threat to the school system—all for raising a simple objection, as a parent of two small children, to sexual material she believes was not age-appropriate.

153. Defendants' actions have also effectively blacklisted Mrs. Reading in an effort to make her unemployable by calling her an "extremist" and a "terrorist" and by further placing her under continuous investigation by government authorities. Mrs. Reading fears that her employment prospects will suffer after she graduates from law school, given the welter of false accusations against her now easily accessible via Google.

154. Defendant's coordinated campaign to punish Mrs. Reading's protected speech has caused her severe emotional distress, including anxiety, worry, insomnia, headaches, and other physical symptoms associated with acute stress after a traumatic event. The symptoms of anxiety, including difficulty concentrating, restlessness, and sleep disturbances, have made it difficult for her to focus on law school, causing her to delay her exams and negatively affecting her GPA. Additional therapeutic intervention has been required to address a massive increase in anxiety that was already present given the normal pressures involved in attending law school while also handling the responsibilities of motherhood. These injuries were a reasonably foreseeable result of Defendants' actions.

155. Further, Mrs. Reading now has a reasonable fear of posting comments online on parent advocacy platforms, beyond a few small local community pages, due to the demonstrated threat of retaliation from the government and those influenced by the government to act against her. As a result, she has curtailed exercising her right to free speech and expressing her opinions on public platforms. This fear of adverse action has resulted in a chilling effect on her ability to

participate in online discussions and advocate for important issues affecting parents and children in her community.

156.    Mrs. Reading is also fearful of governmental "watch lists" and monitoring she may now be subjected to, even though she has violated no law and made no threat against anyone. That fear is reasonable given the evidence, including the revelations of FBI whistleblowers, that the Department of Justice, via the FBI, has been investigating parents opposing local school boards under "threat tags" precisely for their strong but First Amendment-protected criticism of activist boards.[1]  On February 3, 2023, the FBI was served a Congressional subpoena for information regarding this matter.[2]

157.    An FBI memo launching that "anti-terrorist" investigation of school board critics followed within days of a memo from the National School Boards Association (NSBA) complaining that "Concern over the current climate for school board members is also a top priority as disruptions at school board meetings grow and members face *growing threats*."[3] (Emphasis added.)  On information and belief, no actual "threats" were documented, as opposed to criticism which school boards and the FBI deem to be "threatening" based on the same content and viewpoint discrimination at issue in this suit.

158.    While the NSBA was forced to apologize for its memo, Attorney General Garland has refused to withdraw the DOJ's correlative memo launching the investigation of "threats" against school boards, claiming there was no connection between the two documents,[4] despite ample evidence that the NSBA memo was sent to the Biden administration in connection with

---

[1] *See* Letter to Garland from Congressman Jim Jordan, dated May 11, 2022, https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/legacy_files/wp-content/uploads/2022/05/2022-05-11-JDJ-MJ-to-Garland-re-threat-tags_Redacted.pdf.

[2] *See* Bulletin of House Judiciary Committee, https://judiciary.house.gov/media/in-the-news/house-judiciary-subpoenas-fbi-director-wray-targeting-parents-school-board.

[3] *See* https://defendinged.org/wp-content/uploads/2021/11/Communication-to-Members-Final-10.11.2021.pdf.

[4] Ron Blitzer, "Garland Refuses to Back Away from FBI Memo after school board [NSBA] apology," FOX News, https://www.foxnews.com/politics/garland-doj-politicization-senate-judiciary-hearing.

numerous contacts between the administration and the NSBA about parents speaking out against school boards.[5]

159.    All the injuries and damages incurred by Mrs. Reading described above were reasonably foreseeable consequences of the actions taken by Defendants, acting individually and in concert with one another with respect to the acts described in this Verified Complaint, proximately resulting in injury and harm to Mrs. Reading.

**Defendants' Malicious Conduct: Punitive Damages**

160.    As the foregoing facts demonstrate, the Joint Base Actors and Defendants Payne and Duff acted not only with reckless and callous disregard for Mrs. Reading's well-established constitutional rights, but also with the evil motive of silencing her speech and making her an outcast in the community so that she would fear to speak again, merely because they disagreed with her point of view or, in the case of Defendant Payne, for the additional evil motive of personal grievances against Mrs. Payne and her husband.

161.    As more particularly pleaded below, said Defendants are thus individually liable to punitive damages under the appropriate statute as to each.

**COUNT I**
**First Amendment Violation-Speech**
**28 U.S.C. § 2201; 42 U.S.C. § 1983; Fed. R. Civ. P. 57 & 65**
**(Against Defendants North Hanover Township and Duff)**

162.    The preceding paragraphs are realleged and incorporated herein by reference.

163.    The First Amendment to the United States Constitution, as applied to the States via the Fourth Amendment, guarantees, *inter alia*, the right to free speech.

164.    At all times relevant to this case, Mrs. Reading has engaged in conduct protected by the First Amendment.

---

[5] *See* Samuel Chamberlain, "National School Boards Association disavows letter that led to FBI parent crackdown," October 22, 2021, https://nypost.com/2021/10/22/national-school-boards-association-disavows-letter-that-led-to-fbi-parent-crackdown/.

165.    Such protected First Amendment conduct has included, but has not necessarily been limited to, posting her opinions about the actions of a government school on Facebook.

166.    Defendant North Hanover Township, acting via Defendant Duff as the "cat's paw" of the civil rights conspiracy pleaded below, directly censored and otherwise punished Mrs. Reading's speech, thus violating her federally protected rights.  Duff knew, or should have known, that he was violating well-established constitutional rights and would have no qualified immunity.

167.    Defendant Duff acted under color of state law, at the instigation of the Joint Base personnel, by compelling the removal of Mrs. Reading's Facebook post.

168.    Defendant North Hanover Township is derivatively liable under the *Monell* doctrine for Duff's conduct because Duff is the final decision-maker for the Township's police department, and Duff acted according to the municipal policy or practice he had established or, alternatively, because he directly committed the violation of Mrs. Reading's rights as final decision-maker.

169.    The group administrator who removed Mrs. Reading's Facebook post did not do so voluntarily, but under duress because of fear of what Defendants North Hanover Township and Duff, as well as other law enforcement agencies, would do if she did not submit to Duff's demand, including subjecting her to liability for student deaths that Duff claimed would result from Mrs. Reading's obviously First Amendment-protected Facebook post.

170.    As a direct and proximate result of Defendants' violations of Mrs. Reading's rights, Mrs. Reading has sustained injuries.

171.    The loss of First Amendment rights, even momentarily, constitutes irreparable harm.  Mrs. Reading will be irreparably harmed in the absence of injunctive relief pursuant as to

Defendants North Hanover Township and Duff to prevent future violations of her constitutional rights.

172.    Mrs. Reading is also entitled to prospective equitable relief in the form of a declaratory judgment because an actual controversy exists between the parties, and a declaratory judgment is necessary and appropriate as it would serve a useful purpose in clarifying and settling particular legal issues between the parties.

173.    As to Defendants North Hanover Township and Duff, Mrs. Reading is further entitled to compensatory damages and, as to Defendant Duff individually, punitive damages under 42 U.S.C. § 1983, given his callous and reckless disregard of Mrs. Reading's rights and his participation in the conspiracy to violate those rights, as pleaded below, for the evil motive of retaliating against Mrs. Reading and discouraging her from speaking out again.

## COUNT II
### First Amendment Violation-Speech
### 28 U.S.C. § 2201; Fed. R. Civ. P. 57 & 65
### (Against Defendants, Grimmett, Hall, Lesher, Schilling and Vazquez)

174.    The preceding paragraphs are realleged and incorporated herein by reference.

175.    The Joint Base Actors acted in concert to obtain the censorship of Mrs. Reading's protected speech by Defendant Duff, who acted as their "cat's paw."  Said Defendants knew, or reasonably should have known, that they were violating well-established constitutional rights as to which they would have no qualified immunity.

176.    The Joint Base Actors are directly liable to Mrs. Reading under the First Amendment for the deprivation of her First Amendment rights by means of this censorship.

177.    Mrs. Reading is thus entitled to injunctive and declaratory relief against the Joint Base Actors for the reasons stated above. In the absence of injunctive relief to prevent future violations of her rights by the Joint Base Actors, Mrs. Reading will be irreparably harmed.

## COUNT III
### First Amendment Violation-Free Exercise
### 28 U.S.C. § 2201; 42 U.S.C. § 1983 Fed. R. Civ. P. 57 & 65
### (Against Defendants North Hanover Township and Duff)

178.   The preceding paragraphs are realleged and incorporated herein by reference.

179.   At all times relevant to this case, Mrs. Reading has engaged in speech which, while argued publicly from a secular perspective, was nonetheless motivated by her sincere religious convictions concerning sexual morality, God's plan for marriage as solely between a man and a woman, and the need to protect the innocence of her children.

180.   Such protected First Amendment conduct has included, but has not necessarily been limited to, posting on Facebook her religiously-motivated opinions about the actions of a government school, opinions she felt obliged in conscience to express publicly.

181.   Defendant Duff, for whose actions North Hanover Township is liable, acted to censor Mrs. Reading's speech and take retaliatory actions against her under color of state law.

182.   Defendant Duff knew, or reasonably should have known, that he was violating well-established constitutional rights as to which he would have no qualified immunity.

183.   Defendant Duff's actions did not constitute a law or regulation of general applicability but rather a specific targeting of Mrs. Reading's speech because of its content, of which Duff and the other Defendants disapproved and aimed to suppress and punish.

184.   Even if Defendant Duff had acted according to a law or regulation of general applicability, he failed to apply it to comparable secular activity—i.e., non-religiously-motivated but controversial speech—and indeed has not, on information and belief, applied his notion of "threats" warranting law enforcement intervention to any speech at all beyond Mrs. Reading's religiously motivated speech.

185.   Therefore, Defendant Duff's policy or practice in acting against Mrs. Reading cannot survive the required strict scrutiny, at least as applied, because it did not serve any

compelling government interest and, even if it did, was not narrowly tailored to achieve any such hypothetical interest.

186.    As a direct and proximate result of said Defendants' violations of Mrs. Reading's free exercise rights, Mrs. Reading has sustained and will sustain injuries, and she is therefore entitled to (a) injunctive relief, without which she will be irreparably harmed; (b) a declaratory judgment because an actual controversy exists between the parties, and a declaratory judgment is necessary and appropriate as it would serve a useful purpose in clarifying and settling particular legal issues between the parties; (c) compensatory damages; and (d) as to Defendant Duff individually, punitive damages under 42 U.S.C. § 1983, given his callous and reckless disregard of Mrs. Reading's rights and his acting from evil motives as pleaded above.

**COUNT IV**
**First Amendment Retaliation**
**28 U.S.C. § 2201; 42 U.S.C. § 1983 Fed. R. Civ. P. 57 & 65**
**(Against Defendants North Hanover Township, Duff and Payne)**

187.    The preceding paragraphs are realleged and incorporated herein by reference.

188.    The First Amendment includes not only the affirmative right to speak, but also the right to be free from retaliation by public officials for the exercise of free speech rights.

189.    At all times relevant to this case, Mrs. Reading has engaged in conduct protected by the First Amendment.

190.    Defendants North Hanover Township, Duff, and Payne (in her individual capacity) engaged in acts of government retaliation for Mrs. Reading's protected speech, together with the Joint Base Actors.

191.    These retaliatory acts specifically included, but are not limited to, the following:

a.    Subjecting Mrs. Reading to a combined federal-state investigation for no other reason than Defendants disagreed with the content and viewpoint

expressed in a Facebook post by Mrs. Reading about the age inappropriateness of sexual content in a public elementary school;

b.  By Defendant Payne's "letter to the community" and otherwise, spreading disinformation to the public about Mrs. Reading, intended to paint her as an "extremist" and "terrorist" for no other reason than that Defendants disagreed with the content and viewpoint expressed by Mrs. Reading in a Facebook post about the age inappropriateness of sexual content in a public elementary school;

c.  Spreading disinformation to agencies of law enforcement, misleading them into investigating Mrs. Reading under false pretenses;

d.  Causing the public to believe Mrs. Reading was the subject of federal and state investigation, including by the U.S. military, as a threat to national and domestic security;

e.  Monitoring Mrs. Reading's activities in an effort to chill her exercise of legally and constitutionally protected rights;

f.  Conspiring and otherwise working to silence, chill, and intimidate Mrs. Reading from the exercise of her legally and constitutionally protected rights going forward so that, as Defendant Schilling admitted, her speech would "cease";

g.  Directly inciting public scorn, ridicule, insults, and threats to Mrs. Reading and her safety;

h.  Injuring Mrs. Reading's standing in her community;

  i. Causing Mrs. Reading to feel unsafe and unwelcome in her community and unable to discharge the duties of her elected office such that she felt compelled to resign;

  j. Causing Mrs. Reading to feel uncomfortable in sending her children to their own school such that they will have to be withdrawn;

  k. Causing Mrs. Reading to have well-founded fears of liability without legal cause;

  l. Directly and indirectly causing Mrs. Reading anxiety, fear, concern, and worry for the health, safety, and welfare of herself and her family; and/or

  m. Other means to be demonstrated in discovery or by the proof at trial.

192. Defendants' retaliatory actions against Mrs. Reading, which include the baseless threat of liability for violence at the school, are deterring Mrs. Reading from engaging in conduct protected by the First Amendment.

193. The retaliatory acts complained of would deter a person of ordinary firmness from continuing to engage in the protected conduct engaged in by Mrs. Reading, and Mrs. Reading's fear in that regard was and is reasonable.

194. Defendants North Hanover Township, Duff and Payne have thus chilled Mrs. Reading's exercise of the First Amendment right to free speech going forward.

195. There was a causal connection between Mrs. Reading's protected conduct and said Defendants' adverse actions; that is, the adverse action by said Defendants was motivated by Mrs. Reading's protected conduct.

196. Said Defendants knew, or reasonably should have known, that Duff was violating well-established constitutional rights as to which Duff would have no qualified immunity.

197.    As a direct and proximate result of said Defendants' retaliation against Mrs. Reading's exercise of her right to Free Speech under the First Amendment, Mrs. Reading has sustained injuries for which she is entitled to compensatory and punitive damages.

198.    Mrs. Reading will be irreparably harmed in the absence of injunctive relief to prevent future retaliation against the exercise of her constitutional right to free speech.

199.    Mrs. Reading is thus entitled to (a) preliminary and permanent injunctive relief; (b) a declaratory judgment because an actual controversy exists between the parties, and a declaratory judgment is necessary and appropriate as it would serve a useful purpose in settling particular legal issues between the parties; (c) compensatory damages and, to Defendants Duff and Payne individually, punitive damages under 42 U.S.C. § 1983, given their callous and reckless disregard of Mrs. Reading's rights and their acting from evil motives as pleaded above.

## COUNT V
### First Amendment Retaliation
### 28 U.S.C. § 2201; Fed. R. Civ. P. 57 & 65
### (Against Defendants Grimmett, Hall, Lesher, Schilling and Vazquez)

200.    The allegations of the preceding paragraphs are hereby realleged and incorporated herein by reference.

201.    Aside from the direct censorship of Mrs. Reading's protected speech as pleaded above, Defendants Grimmett, Hall, Lesher, Schilling and Vazquez acted in concert to retaliate against her exercise of First Amendment rights.

202.    These retaliatory actions specifically included, but are not limited to the following actions by said Defendants:

a.   Subjecting Mrs. Reading to a combined federal-state investigation for no other reason than that Defendants disagreed with the content and viewpoint expressed in a Facebook post by Mrs. Reading about the age inappropriateness of sexual content in a public elementary school;

b. Spreading disinformation to the public about Mrs. Reading, intended to paint her in a false light as an "extremist" and "terrorist" for no other reason than that Defendants disagreed with the content and viewpoint expressed by Mrs. Reading in a Facebook post about the age inappropriateness of sexual content in a public elementary school;

c. Spreading disinformation to agencies of law enforcement, misleading them into investigating Mrs. Reading under false pretenses;

d. Causing the public to believe Mrs. Reading was the subject of federal and state investigation, including by the U.S. military, as a threat to public security;

e. Causing the public to view Mrs. Reading in a false light as an "extremist" and "terrorist" simply because of her traditional religious beliefs;

f. Monitoring Mrs. Reading's activities in an effort to chill her exercise of legally and constitutionally protected rights;

g. Conspiring and otherwise working to silence, chill, and intimidate Mrs. Reading from the exercise of her legally and constitutionally protected rights so that, as Defendant Schilling admitted, her speech would "cease";

h. Directly inciting public scorn, ridicule, insults, and threats to Mrs. Reading and her safety;

i. Injuring Mrs. Reading's standing in her community;

j. Causing Mrs. Reading to feel unsafe and unwelcome in her community and unable to discharge the duties of her elected office such that she felt compelled to resign;

48

k.  Causing Mrs. Reading to feel uncomfortable in sending her children to their own school such that they will have to be withdrawn;

l.  Causing Mrs. Reading to have well-founded fears of liability without legal cause;

m.  Directly and indirectly causing Mrs. Reading anxiety, fear, concern, and worry for the health, safety, and welfare of herself and her family; and/or

n.  Other means to be demonstrated in discovery or by the proof at trial.

203.  Said Defendants' retaliatory actions against Mrs. Reading, which include continuing surveillance (per Defendant Vazquez) and the baseless threat of liability for violence at the school, are deterring Mrs. Reading from engaging in conduct protected by the First Amendment.

204.  The retaliatory acts complained of would deter a person of ordinary firmness from continuing to engage in the protected conduct engaged in by Mrs. Reading, and Mrs. Reading's fear in that regard was and is reasonable.

205.  Said Defendants have thus chilled Mrs. Reading's exercise of her First Amendment rights going forward.

206.  There was a causal connection between Mrs. Reading's protected conduct and said Defendants' adverse actions; that is, the adverse action by said Defendants was motivated by Mrs. Reading's protected conduct.

207.  Said Defendants knew, or reasonably should have known, that they were violating well-established constitutional rights as to which they would have no qualified immunity.

208.  As a direct and proximate result of said Defendants' retaliation against Mrs. Reading's exercise of her right to Free Speech under the First Amendment, Mrs. Reading has sustained injuries for which she is entitled to compensatory and punitive damages.

209.    Mrs. Reading will be irreparably harmed in the absence of injunctive relief to prevent future retaliation against the exercise of her constitutional right to free speech.

210.    Mrs. Reading is further entitled to equitable relief in the form of a declaratory judgment because an actual controversy exists between the parties, and a declaratory judgment is necessary and appropriate as it would serve a useful purpose in clarifying and settling particular legal issues between the parties.

**COUNT VI**
**First Amendment Violation-Free Exercise**
**28 U.S.C. § 2201; Fed. R. Civ. P. 57 & 65**
**(Against Defendants Grimmett, Hall, Lesher, Schilling, and Vazquez)**

211.    The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

212.    At all times relevant to this case, Mrs. Reading has engaged in speech which, while argued publicly from a secular perspective, was nonetheless motivated by her sincere religious convictions concerning sexual morality, God's plan for marriage as solely between a man and a woman, and the need to protect the innocence of her children.

213.    Such protected First Amendment conduct has included, but has not necessarily been limited to, posting on Facebook her religiously-motivated opinions about the actions of a government school, opinions she felt obliged in conscience to express publicly.

214.    Defendants Grimmett, Hall, Lesher, Schilling, and Vazquez acted in concert to censor Mrs. Reading's religiously motivated speech and take retaliatory actions against her under color of law.

215.    Said Defendants knew, or reasonably should have known, that they were violating well-established constitutional rights as to which they would have no qualified immunity.

216.    Said Defendants' actions did not constitute a law or regulation of general applicability but rather a specific targeting of Mrs. Reading's speech because of its content, of which said Defendants disapproved and aimed to suppress and punish.

217.    Even if said Defendants had acted according to a law or regulation of general applicability, they failed to apply it to comparable secular activity—i.e., non-religiously-motivated but controversial speech—and indeed have not, on information and belief, applied their notion of "threats" warranting law enforcement intervention to any speech at all beyond Mrs. Reading's religiously motivated speech.

218.    Therefore, said Defendants policy or practice in acting against Mrs. Reading cannot survive the required strict scrutiny, at least as applied, because it did not serve any compelling government interest and, even if it did, was not narrowly tailored to achieve any such hypothetical interest.

219.    As a direct and proximate result of said Defendants' violations of Mrs. Reading's free exercise rights, Mrs. Reading has sustained and will sustain injuries, and she is therefore entitled to (a) injunctive relief, without which she will be irreparably harmed; and (b) a declaratory judgment because an actual controversy exists between the parties, and a declaratory judgment is necessary and appropriate as it would serve a useful purpose in clarifying and settling particular legal issues between the parties.

**COUNT VII**
**Religious Freedom Restoration Act – 42 U.S.C. § 2000bb et seq.**
**(Against Defendants Grimmett, Hall, Lesher, Schilling, and Vazquez)**

220.    The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

221.    The Religious Freedom Restoration Act, 42 U.S.C. § 2000BB-l, *et seq*., (RFRA) prohibits the government from substantially burdening a person's free exercise of religion even if

it results from a rule of general applicability, unless the rule is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest.

222. Defendants Grimmett, Hall, Lesher, Schilling, and Vazquez are federal government actors whose actions were, upon information and belief, known to and ratified by Defendants Adams, and Wisniewski as superior officers in charge of the Joint Base, and more particularly in charge of those Defendants and others at the base within their respective services, the Air Force and the Army/Army Reserve.

223. These Defendants' have imposed and continue to impose a substantial burden on Mrs. Reading's exercise of religion by the following:

 a. Demanding and causing the removal of a Facebook post expressing her religiously motivated objections to age-inappropriate sexual material in a public elementary school;

 b. Subjecting Mrs. Reading to a combined federal-state investigation for no other reason than that Defendants disagreed with the content and viewpoint expressed in a Facebook post by Mrs. Reading about the age inappropriateness of sexual content in a public elementary school;

 c. Spreading disinformation to the public about Mrs. Reading intending to paint her in a false light as an "extremist" and "terrorist" for no other reason than that Defendants disagreed with the content and viewpoint expressed by Mrs. Reading in a Facebook post about the age inappropriateness of sexual content in a public elementary school;

 d. Spreading disinformation to agencies of law enforcement, misleading them into investigating Mrs. Reading under false pretenses;

e. Causing the public to believe Mrs. Reading was the subject of federal and state investigation, including by the U.S. military, as a threat to national and domestic security;

f. Causing the public to view Mrs. Reading in a false light as an "extremist" and "terrorist" simply because of her traditional religious beliefs;

g. Monitoring and reporting Mrs. Reading's First Amendment-protected activity to law enforcement agencies, including the Department of Homeland Security, in an effort to chill her exercise of legally and constitutionally protected rights;

h. Conspiring and otherwise working to silence, chill, and intimidate Mrs. Reading from the exercise of her legally and constitutionally protected rights;

i. Directly inciting public scorn, ridicule, insults, and threats to Mrs. Reading and her safety;

j. Injuring Mrs. Reading's reputation and standing in her community;

k. Covering up their activity in this regard by falsely advising Fox News that Defendant Schilling had acted purely on his own and in his personal capacity;

l. Causing Mrs. Reading to feel unsafe and unwelcome in her community and unable to discharge the duties of her elected office such that she felt compelled to resign;

m. Causing Mrs. Reading to feel uncomfortable in sending her children to their school such that they will have to be withdrawn;

n. Directly and indirectly causing Mrs. Reading anxiety, fear, concern, and worry for the health, safety, and welfare of herself and her family;

o. Causing Mrs. Reading to have well-founded fears of liability without legal cause; and/or

p. Other means to be demonstrated in discovery or by the proof at trial.

224. By acting in concert to censor, retaliate against, harass, and intimidate Mrs. Reading, said Defendants were not pursuing any compelling governmental interest, or indeed any legitimate government interest at all; and even if they had been pursuing a compelling government interest, they did not do so by the most narrowly tailored means available.

225. Said Defendants knew, or reasonably should have known, that they were violating well-established constitutional rights as to which they would have no qualified immunity.

226. Said Defendants acted with callous or reckless indifference to Mrs. Reading's well-established constitutional right to free exercise of religion, and further with the evil motive of not only censoring her religiously motivated speech but also unlawfully intimidating her into ceasing to engage in that speech by "keep[ing] the pressure on" her.

227. Said Defendants' actions have caused, are causing, and will continue to cause irreparable harm and actual and undue hardship to Mrs. Reading from the violation of her sincerely held religious beliefs and the consequences pleaded herein.

228. Mrs. Reading has no adequate remedy at law to prevent the continuing violation of her constitutional liberties and sincerely held religious beliefs.

229. As a direct and proximate result of said Defendants' violations of Mrs. Reading's rights, Mrs. Reading has sustained the injuries aforesaid, and she is therefore entitled to (a) preliminary and permanent injunctive relief; (b) a declaratory judgment; (c) compensatory

damages under RFRA, jointly and severally against said Defendants, in their individual capacities; and (d) an additional award of punitive damages against said Defendants in their individual capacities.

**COUNT VIII**
**New Jersey Civil Rights Act – N.J. Stat. § 10:6-2**
**(Against Defendants North Hanover Township, Duff, and Payne)**

230.    The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

231.    Article, Sections 3, 4, and 5, of the New Jersey Constitution protect freedom of religion, including the right to be free from discrimination based on "religious principles."

232.    Article I, Section 6, of the New Jersey Constitution protects freedom of speech, including the right to "freely speak, write and publish his sentiments on all subjects[.]" That section further provides that "[n]o law shall be passed to restrain or abridge the liberty of speech or of the press."

233.    The New Jersey Civil Rights Act (NJCA), N.J. Stat. § 10:6-2c, provides a civil remedy for "[a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by *threats, intimidation or coercion* by a person acting under color of law[.]" (Emphasis added.)

234.    As the facts pleaded above show, Defendants North Hanover Township, Duff and Payne interfered with or attempted to interfere with the exercise of Mrs. Reading's federal and state constitutional rights by intimidation and coercion while acting under color of law.

235.    As a direct and proximate result of Defendants' violations of Mrs. Reading's rights, Mrs. Reading has sustained injuries, and she is therefore entitled to (a) declaratory and injunctive relief under the NJCA; (b) compensatory damages as to Defendants North Hanover Township, Duff and Payne (in her individual capacity), jointly and severally, and (c) punitive damages as to Defendants Duff and Payne in their individual capacities.

## COUNT IX
### Conspiracy to Violate Civil Rights; US Const. Amend. I; 42 U.S.C. § 1983
### (Against All Defendants)

237.    The allegations of the preceding paragraphs are realleged and incorporated herein by reference.

238.    Acting under color of state law, Defendants North Hanover Township, Duff and Payne ("the State Defendants") reached an agreement, either express or implied, to engage in a concerted effort, amongst themselves and with others, including the Joint Base Actors and their Joint Base Superiors, to deprive Mrs. Reading of rights protected by the Constitution and laws of the United States.

239.    Said agreement arose when the Joint Base Actors contacted the State Defendants on or about November 30 and December 1, 2022 as pleaded above.  The communications and dealings between and among all the Defendants—as shown, in part, by the emails annexed hereto as Exhibits—evidence continuation of the conspiracy to the present day respecting the conspirators' aim of "keeping the pressure" on Mrs. Reading so that, as Defendant Schilling stated, Mrs. Reading's "disruptive and dangerous actions cease"—meaning her protected speech with which Defendants disagree and which, without injunctive relief, Defendants intend to continue suppressing and retaliating against through the continuing abuse of their government offices.

240.    The agreed upon object of the conspiracy among the Defendants was to censor Mrs. Reading's constitutionally protected speech and retaliate against her for engaging in her exercise of federal and state constitutional rights, with the additional aim of preventing her from exercising those rights in the future by "keep[ing] the pressure on" her, as Defendant Schilling put it, until she ceased expressing her protected opinions.

241.    Abusing their respective powers and positions, Defendants carried out the agreed upon object of the conspiracy against Mrs. Reading by various overt acts in furtherance of the conspiracy, which included—but were not limited to—(a) loss of Mrs. Reading's First Amendment Rights to freedom of speech and the free exercise of religion by outright censorship of her speech; (b) placing her under official law enforcement investigation and surveillance to intimidate her and trigger possible liability without basis in law; (c) threatening her with liability for violence falsely attributed to her clearly protected speech; (d) making statements to the public and referrals to various law enforcement and security agencies to create the impression that Mrs. Reading was a threat to public safety who needed to be investigated, thereby provoking the desired extreme and traumatizing community backlash and fury against her, so as to "cancel" her in the community and before the public at large; and (e) covering up the conspiracy with false statements to the media from the Joint Base to the effect that Defendant Schilling had acted entirely alone and only in his civilian capacity, using only his personal email account.

242.    Said Defendants knew, or reasonably should have known, that they were violating well-established constitutional rights as to which they would have no qualified immunity.

243.    As a direct and proximate result of Defendants' conspiracy, for which each of the participants is liable for the conduct of the others in furtherance of the conspiracy, Mrs. Reading has suffered a deprivation of her constitutional rights to freedom of speech, has sustained injuries as a result, and is therefore entitled to (a) declaratory and injunctive relief as to the Joint Base

Actors and their Joint Base Superiors under the First Amendment; (b) injunctive relief as to the State Defendants pursuant to 42 U.S.C. § 1983; (c) compensatory damages as to Defendants North Hanover Township, Duff and Payne (in her individual capacity), and (d) punitive damages as to Defendants Duff and Payne in their individual capacities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Angela Reading respectfully prays that this Court grant the following relief:

1.  On Count I (First Amendment Violation-Speech - 42 U.S.C. § 1983), against Defendants Duff, North Hanover Township: (a) preliminary and permanent injunctive relief; (b) a declaratory judgment; (c) an award of compensatory damages against said Defendants, jointly and severally; (d) an award of punitive damages against Defendants Duff in his individual capacity.

2.  On Count II (First Amendment Violation-Speech) against Defendants Grimmett, Hall, Lesher, Schilling and Vazquez: (a) preliminary and permanent injunctive relief, and (b) a declaratory judgment.

3.  On Count III (First Amendment Violation-Free Exercise - 42 U.S.C. § 1983), against Defendants North Hanover Township and Duff: (a) preliminary and permanent injunctive relief; (b) a declaratory judgment; (c) compensatory damages; and (d) as to Defendant Duff individually, punitive damages.

4.  On Count IV (First Amendment Retaliation - 42 U.S.C. § 1983), against Defendants North Hanover Township, Duff and Payne: (a) preliminary and permanent injunctive relief; (b) a declaratory judgment;

(c) compensatory damages, jointly and severally; and (d) punitive damages as to Defendants Duff and Payne in their individual capacities.

5.   On Count V (First Amendment Retaliation - 28 U.S.C. § 2201; Fed. R. Civ. P. 57 & 65), against Defendants Grimmett, Hall, Lesher, Schilling and Vazquez: (a) preliminary and permanent injunctive relief; (b) a declaratory judgment.

6.   On Count VI (First Amendment Violation-Free Exercise), against Defendants Grimmett, Hall, Lesher, Schilling and Vazquez: (a) preliminary and permanent injunctive relief; (b) a declaratory judgment.

7.   On Count VII (Religious Freedom Restoration Act), against Defendants Grimmett, Hall, Lesher, Schilling, and Vazquez: (a) preliminary and permanent injunctive relief; (b) a declaratory judgment; (c) compensatory damages under RFRA, jointly and severally, against said Defendants in their individual capacities; and (d) an additional award of punitive damages against said Defendants in their individual capacities.

8.   On Count VIII (New Jersey Civil Rights Act), against Defendants North Hanover Township, Duff and Payne:   (a) preliminary and permanent injunctive relief; (b) a declaratory judgment; (c) an award of compensatory damages, jointly and severally; (d) an award of punitive damages against Defendants Duff and Payne in their individual capacities.

9.   On Count IX (Conspiracy to Violate Civil Rights), against all Defendants (a) a preliminary and permanent injunction and declaratory judgment as to Defendants Grimmett, Hall, Lesher, Schilling, Vazquez, Adams and Wisniewski under the First Amendment; (b) a preliminary and permanent

injunction and declaratory judgment as to the Defendants North Hanover Township, Duff and Payne pursuant to 42 U.S.C. § 1983; (c) compensatory damages as to Defendants North Hanover Township, Duff and Payne (in her individual capacity), jointly and severally, and (d) punitive damages as to Defendants Duff and Payne in their individual capacities.

10.     Prejudgment and post-judgment interest;

11.     Attorneys' fees and costs pursuant 28 U.S.C. § 2412, 42 U.S.C. § 1988 and N.J. Stat. § 10:6-2f, and as may be otherwise allowed;

12.     Taxing costs of this action against Defendants; and

13.     Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands trial by jury as to all issues so triable.

Respectfully submitted, this 15th day of March, 2023.

THOMAS MORE SOCIETY

Christopher A. Ferrara CF-7123
Special Counsel – Thomas More Society
420 Route 46 East – Suite 12
Fairfield, NJ 07004
Telephone: (973) 244-9895
cferrara@thomasmoresociety.org

Michael G. McHale[†]
Senior Counsel – Thomas More Society
10506 Burt Circle, Ste. 110
Omaha, NE 68114
Telephone: 402-501-8586
mmchale@thomasmoresociety.org

B. Tyler Brooks[†]
N.C. Bar No. 37604
Senior Counsel – Thomas More Society
P.O. Box 10767
Greensboro, NC 27404
Telephone: (336) 707-8855
Fax: (336) 900-6535
tbrooks@thomasmoresociety.org

[†] *pro hac vice* application to be filed.

*Counsel for Plaintiff Angela Reading*

## VERIFICATION

I, Angela Reading, declare as follows:

1. I am over the age of 18 and am a plaintiff in this action.

2. The allegations that pertain to me in this VERIFIED COMPLAINT are true and correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness I would and could do so competently.

3. Exhibit 1 annexed to this Complaint is a true copy of my Facebook post of November 22, 2022, at issue herein.

4. Exhibits 2-27 are true copies of emails produced by North Hanover Township or the North Burlington County Regional Board of Education pursuant to my requests under New Jersey's Open Public Records Act.

I declare under penalty of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Dated: 3/15/2023

Angela Reading

62