UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| ANGELA READING,<br><br>               Plaintiff,<br><br>      v.<br><br>NORTH HANOVER TOWNSHIP, NEW JERSEY *et al.*,<br><br>               Defendants. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br><br>No. 1:23-cv-1469 (KMW-SAK)<br><br><br>**OPINION** |

**Christopher A. Ferrara, Esq.**
THOMAS MORE SOCIETY
420 Route 46 East, Suite 12
Fairfield, NJ 07004

*Counsel for Plaintiff Angela Reading*

**Matthew J. Behr, Esq.**
MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
15000 Midatlantic Drive, Suite 200
Mount Laurel, NJ 08054

*Counsel for Defendant Robert Duff*

**Michael V. Madden, Esq.**
MADDEN & MADDEN, PA
108 Kings Highway East, Suite 200
Haddonfield, NJ 08033

*Counsel for Defendant Helen Payne*

**Patrick J. Cucurullo, Esq.**
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
25 Market Street
Trenton, NJ 08628

*Counsel for Defendant Laurie Doran*

**COUNSEL FOR SCHILLING**

*Counsel for Defendant Christopher Schilling (in his individual capacity)*

**David Inkeles, Esq.**

U.S. ATTORNEY'S OFFICE DISTRICT OF
NEW JERSEY
970 Broad Street, Suite 700
Newark, NJ 07102

*Counsel for Defendants Colonel Wes Adams, Colonel Robert Grimmett, Lt. Col. Megan Hall, Major Nathaniel Lesher, Major Christopher Schilling (in his official capacity only), Joseph Vazquez, Colonel Mitchell Wisniewski, Kristi Noem, and Adam Stahl*

**WILLIAMS, District Judge:**

## I.    INTRODUCTION

This matter comes before the Court on multiple Motions to Dismiss filed by Defendants Robert Duff ("Defendant Chief Duff") (ECF No. 129), Helen Payne ("Defendant Superintendent Payne") (ECF No. 130), Laurie Doran ("Defendant NJOHSP Director Doran") (ECF No. 134), Christopher Schilling ("Defendant Major Schilling") (ECF No. 140), and the Federal Defendants[1] collectively (ECF No. 141). Plaintiff Angela Reading ("Mrs. Reading") opposed all of the motions (ECF No. 147). Defendants all provided a reply: Defendant Chief Duff (ECF No. 151), Defendant Major Schilling (ECF No. 153), Defendant NJOHSP Director Doran (ECF No. 154), Defendant Superintendent Payne (ECF No. 155), and the Federal Defendants collectively (ECF No. 156). Pursuant to Local Civil Rule 78.1 the Court decides the motions on the papers without oral argument.

## II.    BACKGROUND

### A.    Upper Elementary School and the Week of Respect Posters

---

[1] The Federal Defendants include: Colonel Wes Adams, Colonel Robert Grimmett, Lieutenant Colonel Megan Hall, Major Nathaniel Lesher, Major Christopher Schilling, Joseph Vazquez, Colonel Mitchell Wisniewski, Kristi Noem, and Adam Stahl.

The events giving rise to this dispute, somewhat ironically, stem from an elementary school's observance of a "Week of Respect." In November 2022, Upper Elementary School ("UES") in the North Hanover Township School District invited students to create posters designed to communicate that the school was "a safe place where everyone was accepted." (ECF No. 123-1 at p. 67.)[2] The student-made posters were displayed in the main entrance of the school and conveyed various messages. (*Id.*) Some of the posters espoused messages of general acceptance while others addressed specific topics, at least one of which was related to sexual orientation and gender identity. (*Id*; ECF No. 123 ¶ 35.)[3]

On November 21, 2022, UES hosted a "Math Night," which Plaintiff Angela Reading ("Mrs. Reading") attended with her two young daughters. (ECF No. 123 ¶ 34.) While walking into the school Mrs. Reading observed the display of student-made posters created for the Week of Respect. (ECF No. 123 ¶¶ 34–35.) One of the posters was decorated with various flags that were labeled with different sexual orientations and gender identities such as "pansexual," "polysexual," and "genderqueer." (ECF No. 123 ¶¶ 35; ECF No. 123-1 at p. 1–3.) The poster also included phrases like "different is cool," "you are who you are," and "Be YOU!!" (*Id.*) While passing the display, Mrs. Reading's seven-year-old daughter asked what the word "polysexual" meant. (ECF No. 123 ¶ 35.) Mrs. Reading was "livid." (ECF No. 123 ¶ 37.)

Mrs. Reading reached out to a parent of one of the offending posters, contacted a school board member, and met with the superintendent of the school district to address her concerns about the display. (ECF No. 123 ¶ 36.) She alleges that she was "met with resistance from all three parties," that they all "dismissed her concerns and told her that the posters were 'not a big deal.'"

---

[2] Second Amended Complaint Exhibits (ECF No. 123-1 at p. 67.)
[3] Second Amended Complaint ("SAC") (ECF No. 123 ¶ 34.)

(*Id.*) She further alleges that she was "advised to accept the presence of this inappropriate sexual content in elementary schools, despite her objections." (*Id.*)

### B.    Mrs. Reading's Facebook Post

Unhappy with the collective response to her concerns, Mrs. Reading took to social media and published a post in a public Facebook group titled "NJ Fresh Faced Schools." (ECF No. 123 ¶¶ 37.) Mrs. Reading's post stated in full:

> **I welcome respectful debate if you read my entire post. Also, the below statements are made in my capacity as a private citizen/mother.** Last night, I attended an elementary "Math Night" My 7 YO daughter, while reading posters at the school's main entrance, asked me what "polysexual" means. To say the least, I was livid.
>
> Why are elementary schools promoting/allowing elementary KIDS to research topics of sexuality and create posters? This is not in the state elementary standards (law) nor in the BOE-approved curriculum. It's perverse and should be illegal to expose my kids to sexual content. Look up the terms, and you will see they are sexual in nature.
>
> Also, how can my young children be accepting of people "who are sexually attracted to multiple genders"? They don't know what sex is! Are adults talking about their sexual life with my kids and looking for affirmation? Are there elementary students engaged in polyamorous or multi-gender sexual activity who need my kids to know about it and cheer them on? I am very confused and very angry.
>
> Kids should respect differences. Kids should show kindness to all. Kids should respect and understand there are various family structures. However, kids should not be forced to learn about and accept concepts of sexuality in elementary school.
>
> Below are some additional points:
>
> (1) My concerns do not come from a religious perspective. They are rooted in long-standing scientific principles of age-appropriateness, parental rights, and the health and safety of elementary children (key word - children).

(2) My concerns do not come from my personal views about individual sexual identities. I don't care what anyone does in their personal life. All people are deserving of respect and dignity. I don't care who you marry or who you love. I have instilled in my children a respect for differences without having to talk about sex. It's possible.

(3) I have been told (by parents and a current NH Board member) that I should accept this because my kids will see it on social media and hear it on the playground. My kids are not on social media. And kids are only talking about it on the playground because it's being forced on them by teachers, at home, and by unsupervised social media time. With that said, It does not mean it should be endorsed by the public school system. It also does not mean I should accept it.

(4) Parents have been told that they can opt out of the health curriculum. North Hanover has done an exceptional job of modifying the health curriculum to make it as appropriate as possible. Why go through all that trouble? Clearly, there is never going to be an opt-out. Our elementary children will be exposed to sexual content without consent, even if we opt out.

(5) There is no way elementary students knew the spelling and flags for each of these identities. This means the school had open internet, which exposed them to these concepts. That's very concerning. There are supposed to be online search protections.

The above statements are made in my capacity as a private citizen and not in my capacity as a board member. These statements are also not representative of the board or its individual members and solely represent my personal opinions. My statements are not authorized by or written on behalf of the board. This matter involves the local public school district, I do not serve on the board.

(ECF No. 123 ¶¶ 37; ECF No. 123-1 at p. 1–3.)

Mrs. Reading's Facebook post generated at least fifty-four comments. (ECF No. 123-1 at p. 3.)[4] Later, her Facebook post was the subject of a blog article titled "Kiddy Sex Posters in North Hanover Township" that was published on the online Substack *Chaos and Control*. (*Id*. at p. 14.)

## C.    *No Place for Hate Parent Committee* Emails from Major Chris Schilling

Mrs. Reading's post caught Major Christopher Schilling's ("Defendant Major Schilling") attention. Defendant Major Schilling was affiliated with nearby Joint Base McGuire-Dix-Lakehurst ("JB MDL"). (ECF No. 123 ¶¶ 17, 48.) On November 23, 2022, the morning after Mrs. Reading's post, Defendant Major Schilling wrote an email to the *No Place for Hate Parent Committee*, which was a parent group affiliated with the Regional School District.[5] (ECF No. 123 ¶ 48.) The email, which included parents, school staff, and the school principal, stated:

> Good Morning Everyone,
>
> I just wanted to share some thoughts after seeing Mrs. Reading's post. Her post is filled with too many logical fallacies to list. She continues to try to over sexualize things that don't need to be in an attempt to stir emotions of those that know little about the subject (such as herself) to give her arguments more power. She picked an isolated, outdated definition that leaves out physical and romantic attraction, while most organizations now define polysexual as simply an attraction to many genders and identities.
>
> She's getting upset and angry of her own ignorance on the matter and not having the proper resources and/or education on the matter upon

---

[4] Exhibit 1 of the SAC (ECF No. 123-1 at p. 1-3) is a screenshot of Mrs. Reading's original Facebook post. The post shows that there are eight varying "reactions" to the post and fifty-four comments to the post. There is also one comment to the picture of the poster that is the subject of the post. The Court cannot discern from the SAC, the Exhibits to the SAC, or any of the parties' papers, what day or time the screenshot was taken. Thus, the Court does not know how quickly or slowly these comments amassed, whether this was the final number of comments on the post or if more comments were made before the post was removed. Further, the Court cannot determine the number of individual user comments or content of the comments. None of the parties have provided the Court with any evidence or argument regarding the comments to the initial post or how those comments impacted their subsequent choices. The most information provided to the Court regarding the comments to the original post was in Superintendent Helen Payne's Motion to Dismiss (ECF No. 130-1), which stated that "Plaintiff's post received comments from Facebook users, which supported or criticized her concerns. Plaintiff's post and the response thereto was also the subject of a blog by *Chaos and Control*..." (*Id*. at p. 6.)

[5] Defendant Major Schilling wrote this email from his personal email. UES is not located in Regional School District.

which she is posting about. When you start with an incorrect definition it takes you on the incorrect path and this can be seen in her "additional points".

1) She makes claims stating they are based on scientific principles about health and safety but proper education on terms improves understanding and inclusiveness leading to a safer, healthier environment for everyone.

2) She states that it is possible to talk about differences without talking about sex, yet her whole her argument was based on sexualizing a term that doesn't need to be sexualized to understand it.

3) She's still focused on her sexual view of the term, this time attacking teachers and parents. She fails to consider what is actually taught about the term and that children at the school might come from a family that has members that identify as poly or something else that she doesn't have knowledge or experience in.

4) Again she talks about sexual content when the term does not need to be sexualized.

5) She makes the assumption that no students in the school come from a family, attends a church or has any connection to people that are LGBTQIA+ and therefore must have gotten it from the internet at school. This logical fallacy sets the foundation for future unnecessary restrictions on media. This is a very closed minded and ignorant view that also leads to increased HIB incidents.

While she also states that this post is made in her capacity as a private citizen, it shows her underlying views and thought process when making decisions on School BOE issues and that is very concerning.


Chris Schilling

(ECF No. 123-1 at p. 4.)

Two days later, on November 25, 2022, Defendant Major Schilling sent another email to the same group of parents and school staff regarding Mrs. Reading's post and suggested that Mrs. Reading's post may justify filing an ethics complaint against her in her capacity as a school board member for the Northern Burlington School District:

I hope everyone has a wonderfully full Thanksgiving!

I have found that Angela has posted her complaint on other Facebook pages with pictures of all the posters that show the school name and engaged in dialogue about how "horrible" and " disgusting" the display is, how upset her husband as BOE president is, and how she is pulling her children out of the school system.

At what point does this justify an ethics complaint? While she makes her required statement that these are her personal opinions, the danger her actions could pose for the community by stirring up right wing extremists is very concerning. While this was not confidential information, her sharing could needlessly injure the school and others in the community. If she had a complaint she knows the proper channels to seek redress but chose multiple social media groups.

Chris

(ECF No. 123-1 at p. 5.)

On November 27, 2022, Defendant Major Schilling sent an email to the group expressing his support for another parent whose daughter had created a poster:

Tina,

I will be there and have already prepared a statement in support of your daughter's poster. I have another statement to make at the Northern Burlington BoE meeting the night before. I am also reaching out to other resources in the area to gather support for this issue.

Chris

On November 29, 2022, Defendant Major Schilling wrote two more emails to the group. In the first email, which was sent in the early evening, he indicated that he believed that Mrs. Reading had violated the school district's policy regarding Board Member Social Media use:

I'm pretty sure she violated this district policy. I highlighted a person in the fifth paragraph. Let me know your thoughts.

Active Policies – 160 Mansfield Road East 1 Columbus, NJ 08022 1 Phone: (609) 298-3900 Board Docs® Pro

0169.02 BOARD MEMBER USE OF SOCIAL NETWORKS

8

In accordance with the School Ethics Act - N.J.S.A. 18A:12-21 et seq., Board of Education members must avoid conduct which is in violation of the public trust or which creates a justifiable impression among the public that such trust is being violated. To avoid conduct that may be in violation or perceived to be in violation of the School Ethics Act, the Board of Education adopts this Policy to provide guidance to Board members in their use of social networks.

For the purposes of this Policy, "social network(s) " shall include, but not be limited to: Internet blogs, electronic bulletin boards, emails, social networking websites, text messages, or any other online platform where people may post or communicate interests, opinions, or any other information that may be viewed by others with or without permission from the person making such post or re-publishing such post. " Social networks" also means an Internet-based service that allows individuals to: construct a public or semi-public profile within a bounded system created by the service; create a list of other users with whom they share a connection within the system; and view and navigate their list of connections and those made by others within the system.

For the purposes of this Policy, " use of a social network" shall include, but not be limited to: posting to a social network, reposting another person' s post to a social network, messaging, or any other publication of material on a social network.

Nothing in this Policy prevents a Board of Education member from using a social network. However, a Board member must avoid conduct on a social network that would violate the School Ethics Act - N.J.S.A. 18A: 12-21 et seq. , which includes the Code of Ethics for Board Members. Board members should be advised communications, publications, photographs, and any other information posted by the Board member or reposted by the Board member on a social network could violate the School Ethics Act and be cause for sanctions in accordance with the law.

While this Policy respects the right of Board members to use social networks, **Board members shall recognize they are held to a higher standard than the general public with regard to standards of conduct and ethics. A Board member's use of social networks shall not damage the reputation of the school district, employees, students, or their families.** Board members who use social networks shall ensure their conduct is appropriate for a Board of Education member. Board members should exercise care in setting appropriate boundaries between their personal and public online behavior, understanding what is private in the digital world often has the

possibility of becoming public, even without their knowledge or consent.

Board members should carefully review the privacy settings on social networks they use and exercise care and good judgment when posting content and information. When using social networks, Board members are advised to:

1.  Not post anything that would violate any of the district' s policies for Board members;

2.  Uphold the district's value of respect for any individual(s) and avoid making defamatory statements about the Board of Education, the school district, employees, students , or their families;

3.  Not disclose any confidential information about the school district or confidential information obtained as a result of being a Board member, about any individual(s) or organization, including students and/or their families;

4.  Not use or refer to their Board of Education title or position when soliciting for a business organization that he or she or any immediate family member has an interest in, as well as posting or referencing any confidential information regarding the Board of Education or the school district obtained through their Board membership, unless authorized by law;

5.  Refrain from having communications through social networks with other Board members regarding any Board of Education business to avoid any potential violation of the New Jersey Open Public Meetings Act;

6.  Not respond to any postings regarding Board of Education or school district business or respond to any question or inquiry posted to the Board member or posted on any social network regarding Board of Education or school district business and shall refer any such questions or inquiries to the Superintendent of Schools to address, as appropriate; or

7.  Not post any information on a social network determined by the New Jersey School Ethics Commission to be a violation of the New Jersey School Ethics Act.

A Board member shall comply with all Board policies regarding acceptable use of computers and computer networks whenever a Board member is using a Board of Education electronic device.

If the Board or Superintendent believes a Board member's activity on any social network may violate the Board's policies or the New Jersey School Ethics Act, the Board or Superintendent may request the Board member cease such activity.

This Policy has been developed and adopted by this Board to provide guidance and direction to a Board member to avoid actual and/or a perceived appearance of inappropriate conduct or conduct prohibited by the School Ethics Act while using social networks.

N.J.S.A. I 8A: 12-21 et seq.
N.J.S.A. 10:4-6 et seq.

(ECF No. 123-1 at p 7-8.) (emphasis in original.)

In his second email on the night of November 29, 2022, which he sent about five hours later, Defendant Major Schilling provided his continued support for the group to share their views and advised that he had filed a complaint against Mrs. Reading with Dr. Zuckerman, the Superintendent of the Northern Burlington County School District:

Anna,

I concur. It is great to hear that others are supportive. I know some are hesitant to speak out but the more we do and others will gain confidence to share their views. I think we need to keep the pressure on until her disruptive and dangerous actions cease, so please share any historical items to help us shape our messaging for those not aware and ones like myself that moved here recently.

Catherine,

Thanks for your thoughts . I also think Bond would be a great fit for President! I submitted a complaint to Dr Z tonight for him to request Angela to remove her posts for violating the District bylaws. More positive things are going to happen tomorrow and I will let the group know details once it happens.

Chris

(ECF No. 123-1 at p. 9.)

### D.    Communications Among Military Personnel Regarding Mrs. Reading's Facebook Post and Referral to Law Enforcement

Earlier in the day on November 29, 2022, Defendant Major Schilling, using his official military email, messaged Major Nathaniel Lesher[6] ("Defendant Major Lesher") about his concerns surrounding Mrs. Reading's post:

> Sir,
>
> Angela Reading's first post about the posters at UES was in a Facebook group named Northern Burlington (the first 4 attached pictures). She later posted in the Facebook group NJ Fresh Faced Schools. The first group is private limiting the visibility to its 129 members. The second group is a public group. Our initial concern is she needlessly listed the county and township of the school while sharing pictures of the posters that identify the school's name: UES. This gives a road map to anyone looking to make a statement, political, ideological, or even violent. Earlier today she took screenshots (Reading1.png attached) she received from someone in the (private) Northern Burlington Parents group and blacked out her friends' names and left the names of parents that did not agree with her views and added them to her public post. This places targets on many parents as well as the schools, their personnel and students. There is a growing concern among many parents at all of these schools that her rhetoric is going inspire someone to act out.
>
> For situational awareness: Angela is the current Vice President of the Northern Burlington BOE, Her husband's sister Kim is also a board member. Angela's husband (Bryan) is the current president of the North Hanover BOE.
>
> Very Respectfully,
>
> Christopher Schilling
> MAJ, EN
> Operations Officer

---

[6] Defendant Lesher was Commander of the 87th Security Forces Squadron at JB MDL and acted in a supervisory capacity.

(ECF No. 123-1 at p. 11.) Defendant Major Lesher responded using his official military email and copied Lieutenant Colonel Megan Hall ("Defendant Lt. Col. Hall"), Deputy Commander of the 87th Security Forces Squadron:

> Christopher,
>
> Thank you for sharing as we discussed I will forward your concern to Chief Duff (North Hanover PD) for awareness. Thank you for bringing us in the loop and sorry you guys are having to deal with this.
>
> V/R,
>
> Nate
>
> NATHANIEL LESHER, Maj, USAF
> Commander, 87th SFS

(ECF No. 123-1 at p. 10.)

The next day Defendant Major Schilling sent a follow-up email to Defendant Major Lesher, again copying Defendant Lt. Col. Hall, reiterating his concern and advising that a website named *Chaos and Control* had written about Mrs. Reading's post:

> One of the NB Parents sent the below email showing how far reaching Angela's comments are now. The most recent commenter on her post on the NJ Fresh Faced Schools Facebook group was from South Carolina.
>
> "I am in agreement with everything in this email chain. As a proud parent of an LGBTQ+ student at Northern, I am horrified by Angela's words and actions. Because she posted in the NJ Fresh Faced facebook group, the story has been picked up and published in the Chaos and Control email newsletter this morning (a far right extremist on line publication).
>
> Caution-https://chaosandcontrol.substack.com/p/kiddy-sex-posters-in-north- hanover/comments<Caution-https://chaosandcontrol.substack.com/p/kiddy-sex-posters-in-northhanover/comments >

This is unacceptable and endangers our children."

Very Respectfully,

Christopher Schilling
MAJ, EN
Operations Officer

(ECF No. 123-1 at 13–14).

Defendant Major Lesher responded to Defendant Major Schilling and added Joseph Vazquez ("Defendant Vazquez"), the manager of the JB MDL antiterrorism program, to the email chain.

Chris,

Thank you for sharing I'll push this again to Chief Duff also added Joe to this string he is my AT program manager and works very closely with NJ DHS. I'll have him reach out to them as well about the situation.

V/R,

NATHANIEL LESHER, Maj, USAF
Commander, 87th SFS

(ECF No. 123-1 at p. 13.)

Shortly thereafter, Defendant Vazquez emailed Defendant Major Schilling, copying Defendant Major Lesher and Defendant Lt. Col. Hall, advising that he was going to forward Defendant Major Schilling's concerns to the New Jersey Office of Homeland Security and Preparedness (NJOHSP) as well as the New Jersey State Police Regional Operations Intelligence Center (NJ ROIC):

Sir, good afternoon. This really gets under my skin for sure…my thoughts are with the family.

I am sending this to our partners with NJ Office of Homeland Security and Preparedness as well as the NJ State Police Regional Operations

14

Intelligence Center {ROIC). Both agencies analysts keep an eye on far right/hate groups.

Wish I could do more.

v/r jkv

Joe Vazquez, Civ, DAF
Installation Antiterrorism Program Manager
87th Security Forces Squadron
Joint Base McGuire-Dix-Lakehurst

(ECF No. 123-1 at 15).

Following these communications, Defendant Major Lesher spoke with the Chief of Police for the North Hanover Police Department, Defendant Robert Duff ("Defendant Chief Duff"). (ECF No. 123-1 at 21-22.) As a follow-up "per [their] discussion," Defendant Major Lesher forwarded Defendant Chief Duff the email chain described above. (ECF No. 123-1 at 21.)

### E. Defendant Chief Duff's Involvement in the Removal of Mrs. Reading's Facebook Post

Mrs. Reading alleges that after speaking with Defendant Major Lesher and receiving the email chain between federal defendants, Defendant Major Schilling, Defendant Major Lesher, Defendant Lt. Col. Hall, and Defendant Vazquez, that state Defendant Chief Duff contacted the administrator of the "NJ Fresh Faced Schools" Facebook group, Ms. Stouffer. (ECF No. 123 ¶ 84; ECF No. 123-1 at p. 24.) Initially, Defendant Chief Duff sent Ms. Stouffer a Facebook Message that said, "Any chance you could call me?" and signed the message "Chief Duff" of the "North Hanover Twp Police". (ECF No. 123-1 at p. 24.) The phone number Defendant Chief Duff provided was for his phone at the police station. (*Id.*)

When Ms. Stouffer called Defendant Chief Duff at the police station, Mrs. Reading alleges that he "pressured [her] to take down the post" and that in the conversation he indicated that the

post posed a risk of school violence, referencing recent mass shootings, including one at an elementary school in Uvalde, Texas. (ECF No. 123 at ¶ 85.) Mrs. Reading further alleges that in substance, "Defendant Chief Duff told Stouffer that students could die if she did not remove the post." (*Id*.) She then alleges that Defendant Chief Duff intimated that if such violence occurred, Ms. Stouffer could be held liable. (ECF No. 123 at ¶ 89.) Further, he allegedly advised Ms. Stouffer that the police department was working with federal agencies such as the U.S. Department of Homeland Security ("DHS") and the military "concerning Mrs. Reading," which he later also told Mrs. Reading directly. (ECF No. 123 at ¶ 85.) On the call with Ms. Stouffer, Defendant Chief Duff allegedly "directed Ms. Stouffer to take down the Facebook post." (*Id*. at ¶ 91.) Ms. Stouffer then allegedly removed Mrs. Reading's post while speaking with Defendant Chief Duff. (ECF No. 123-1 at p. 30.)

That same day, after speaking with Ms. Stouffer, state Defendant Chief Duff emailed federal defendants, Defendant Major Lesher, Defendant Major Schilling, Defendant Lt. Col. Hall, and Defendant Vazquez, advising that he had spoken with Ms. Stouffer and that the post had been removed:

> Good Afternoon,
>
> I wanted to let everyone know that the North Hanover Township Police takes this issue very seriously. I have made contact with the group administrator of the "NJ Fresh Faced Schools Facebook Page" and explained our concerns about the post. The admin for the Facebook Page respectfully removed the post from Facebook as I explained to her our concerns with that the Town and Location of the school was listed in the post. I will continue to see if I can get additional posts removed from other social media posts. I will keep you all advised.
>
> Chief Robert Duff
> North Hanover Township Police

(ECF No. 123-1 at p. 30.)

**F.     Superintendent Helen Payne's Involvement**

On the evening of November 28, 2022, Helen Payne ("Defendant Superintendent Payne"),

Superintendent of the North Hanover Township School District,[7] text messaged Defendant Chief

Duff:

> **Payne**: Hi Chief. I am being very proactive reaching out, but in light of recent events in Colorado Springs, I just want to make you aware of a situation. Do you have a few minutes to talk, either now or early tomorrow?
>
> **Duff**: Sure. Give me a call.

(ECF No. 123-1 at p. 70.)

Defendant Chief Duff later text messaged Defendant Superintendent Payne:

> I saw the post on NJ fresh face schools last night, and I will keep an eye on it. I will be at the school every morning in the lobby and will stay there until everybody is in the building and secure.

(ECF No. 123-1 at p. 70.)

He subsequently texted Defendant Superintendent Payne:

> Baffles my mind that this person that has started this whole thing sits on a school board and her husband is on our schoolboard. I will also be in attendance at the next school board meeting.

(ECF No. 123-1 at p. 70.)

On the morning of November 30, 2022, Defendant Lt. Col. Hall, who was the JB MDL

school district liaison emailed Defendant Superintendent Payne:

> Ms. Payne,

---

[7] UES is located in North Hanover Township School District, which is the school district that Defendant Superintendent Payne presides over.

I'm going to put together a more in-depth formal email to both you and Dr. Zuckerman but wanted to give you heads up on a situation that is causing quite an uproar and concern from our military parents for the safety of their children.

It's all centered around social media post by Ms. Angela Reading and her recent visit to Math Night at one of your school. Over the last couple of days I've had several parents reach out to me, our SLO, and law enforcement agencies worried these post could make the school a target for extreme groups. Ms Reading has also made statement where she is speaking on behalf of her husband (your board president) as well.

If you need the threads I can share. They appear to be on both private and public social media outlets. I think parents would just prefer she remove the post and not make anymore that specifically ID a school or individual by name. Not sure if you have any influence to discuss with Dr Zuckerman before this grows bigger that it already has but I wanted to send you the note ahead of time.

Please let me know if you want to discuss in person or over the phone.
Thanks
V/r
Megan

(ECF No. 123-1 at p. 69.)

Defendant Payne responded shortly thereafter:

Hi Lt. COL Hall:
I am definitely aware and have been working it exclusively. Is it easier to talk? I would like the threads. I have seen some but maybe not all. I am in close contact with Dr. Zuckerman and the NHTPD.
Helen

Later that day Defendant Lt. Col. Hall emailed Defendant Superintendent Payne and Dr. Andrew Zuckerman:

Ms. Payne and Dr. Zuckerman,

I hope all is well with you and that you had a great Thanksgiving. I wanted to reach out to the both of you to make you aware of parent

concerns regarding recent social media posts presented by Ms. Angela Reading. While I understand she serves as a board member for the Northern Burlington School District, her recent posts to social media impacts military families/students in North Hanover's School District. Ms. Reading has posted several times in both private and public forums expressing how "livid" (her words), she was after seeing a bulletin board display during the recent Math Night at Upper Elementary School. She posted pictures of the children's art work and expressed her belief that the school is "perverse to expose my kids to sexual context." She further proceeded to tell the community there "is never going to be an opt-out" of the health curriculum, and she speaks of this as a private citizen and in her capacity as a board member. In an additional post, she states she is speaking on behalf of her husband Mr. Bryan Reading, who 1 understand serves as a board member for North Hanover School District, and his thoughts on the subject.

These posts have created a concern for the safety of our military children and families as they could become targets from extremist personnel/groups. The posts are specific in nature to the school, the issue, and some posts exposed parents' names. Furthermore, Ms. Angela Reading encouraged people of like mindedness to attend the monthly BOE meetings and express the same view point. Her initial posts have grown to more groups and recently landed an article tilled "Kiddy Sex Posters in North Hanover Township" by Chaos and Control.

Site: https://chaosandcontrol.substack.com/p/kiddy-sex-posters-in-north-hanover/comments

I would like to respectfully request that you both look into this matter to ensure the safety of all members moving forward. I asked our concerned parents as to what they thought the right outcome should be and they provided everything from "she should excuse herself for potentially violating ethics violations" to just "removing the post all together with none further."

I have provided Ms. Payne sample posts and can provide to you, Dr. Zuckerman, if needed. Please let me know if you need anything further

V/r
mfh

(ECF No. 123 ¶ 69.)

Later that night Defendant Chief Duff text messaged Defendant Superintendent Payne regarding Mrs. Reading's reaction to her post being removed:

> **Duff**: Apparently Mrs. Reading called the station and wanted to speak to me about why I had her post taken down. I didn't talk to her yet. I guess she contacted the admin of the page and the admin told her the police had called. I didn't ask to have the post removed but the admin agreed with my concerns and took it down. Reading told my officer that she wants to speak with me and will be contacting her attorney. Lol
>
> **Payne**: How did she know? I literally just sent a briefing…10 minutes ago that was labeled CONFIDENTIAL. Let me see how I phrased that.
>
> **Duff**: This happened earlier
>
> **Payne**: Oh wow. Who else knew? Because when ol talked to you no one else was even in my office. They were all gone.
>
> **Duff**: I think the admin of the Facebook page reached out to her…
>
> **Payne**: Ohhh. That would make sense.

(ECF No. 123 ¶ 90.)

On December 1, 2022, the day after Mrs. Reading's Facebook post had been removed, Defendant Superintendent Payne issued a "Letter to the Community" addressing community concerns stemming from Mrs. Reading's Facebook post:

> Dear NHTSD Parent/Guardians and Staff:
>
> I am writing to you to provide you with some information about recent events that are impacting our school district. As part of the "Week of Respect", students at our Upper Elementary School (UES) were invited to create a poster that demonstrated that UES was a safe place where everyone was accepted. The activity was voluntary and open-ended, and has been offered to students for the past three years. There was no instruction associated with it.
>
> Some students chose to represent the multitude of ethnicities in our school, some depicted hands of different colors, some displayed messages in sign language, some displayed messages of general

acceptance and kindness, and some included content that was supportive of the LGBTQ+ community. On a couple of the posters, this included flags that were labeled for various groups like transsexual, bisexual, lesbian, pansexual, polysexual, etc, along with messages that all people were accepted at their school.

These specific terms from the posters are not part of our curriculum. However, students are continuously exposed to information in their lives beyond what they learn in our schools. These student-created posters represent information that is important to these students, are used in a way that is supportive and kind, and as such represent protected speech under the First Amendment. I have reviewed the recent and historic case law, along with advice from the school board attorney and accordingly find nothing about this student "speech" that would give the district cause to censor it.

We are aware that there have been numerous social media postings about this issue on a variety of pages and sites, some of which identified our students, our school and our community. We are aware that there are strong opinions. Although these opinions are being widely shared by adults outside of our school, I want to assure you that there has been no impact on student learning within the school. School is operating normally.

We are also aware that this has caused safety and security concerns for many families. The safety and security of our students and staff is always of primary importance, and ensuring that has been my first priority, even as we responded to this situation over the past couple of days. I assure you that I have been in continuous close contact with the North Hanover Police and they have been very supportive and present for us. They are taking any risks very seriously, are aware of our concerns and have been working on their end to provide any support we need.

Thank you for your ongoing support of our school district.

Helen Payne

(ECF No. 123-1 at p. 67-68.)

G.     **Defendant Major Schilling's Actions Following Removal of Mrs. Reading's Facebook Post**

After Mrs. Reading's Facebook post was removed, Defendant Major Schilling created a Facebook post in a group for Northern Burlington Parents that stated:

> The current situation involving Mrs. Reading's actions has caused safety concerns for many families.
>
> The Joint Base leadership takes this situation very seriously and from the beginning have had the Security Forces working with multiple state and local law enforcement agencies to monitor the situation to ensure the continued safety of the entire community.

(ECF No. 123 ¶ 103; ECF No. 123-1 at p. 47.)

In the same Facebook group, Defendant Major Schilling responded to a post by another Facebook user that provided a link to a petition supporting Mrs. Reading:

> Jason Stamp multiple false claims and omissions of fact that have been disputed multiple times. Did you even read the superintendents letter? Because you obviously don't have kids in the district.

(ECF No. 123-1 at p. 52.)

He then posted a link to a petition that allegedly opposes Mrs. Reading and below that post he stated:

> The Joint Base Security Forces are working with multiple law enforcement agencies to monitor the situation and ensure the continued safety of the entire community.

(ECF No. 123-1 at p. 47.)

Defendant Major Schilling further engaged with another Facebook user regarding Mrs. Reading:

> **Schilling**: Jason Stamp that shows how well she fooled you with her lies. Her daughter is in second grade and the poster was in a school that only has 4-6[th] grades. The police have received no threats to her or her family, another lie.
>
> **Darrah Greene**: Chris Schilling incorrect. All family events such as "math night", "family game night", etc. are held at the upper elementary school. All students preschool through 6th grade and their families are invited to these events. They occur regularly.

> **Schilling**: Darrah Greene his initial comment before edited it after my reply stated that the posters were at the elementary school that her daughter attends. But he corrected his statement after he was called out for another false statement. Notice his comment says "Edit"?

(ECF No. 123-1 at p. 53.)

On December 5, 2022, five days after Mrs. Reading's Facebook post had been removed, Defendant Major Schilling emailed Defendant Chief Duff about the dueling petitions and comments that had arisen as a result:

> Chief,
>
> A number of concerning posts (identifying the secretary of CB Lamb on NJ Fresh Faced Schools and one calling for breaking into the school to remove the posters by force) were posted over the weekend and brought to my attention by parents and one attorney that has been watching the situation last night. There was one petition started by a parent at NB calling for Angela Reading's resignation. Angela commented several times stating that you informed her that her original post was fine but she still removed it out of respect. After threats of legal action against the author of the petition, one of her "good friends" started a counter petition with the majority of her original post including pictures the student's poster and statements saying Angela has been receiving death threats. This counter petition has been circulated on many of the right wing sites and drawing quite hateful responses focused toward the school as Angela and her neighbor, a newly elected NH BOE member Anthony Grindlinger, make comments on it to stir the pot. I have attached the screenshots sent to me of the comments identifying the school secretary at CB Lamb and the comment referencing breaking into the school.

(ECF No. 123-1 at p. 49.)

Defendant Chief Duff responded:

> Thank you. This has already been brought to my attention and I'am working closely with the Superintendent. We as a department have not received any credible or reported death threats towards Mrs. Reading or her family. I have been in contact we Mrs. Reading etc and have explained to her to report any such incidents directly to the North Hanover Twp. Police. We will continue to monitor social media and take appropriate action if needed.

(ECF No. 123-1 at p. 49.)

## H.    North Hanover School District School Board Meeting

Fox News approached Mrs. Reading about appearing on the Tucker Carlson Show to speak about the situation. (ECF No. 123 at ¶ 97.) On December 7, 2022, seven days after her Facebook post had been removed, Mrs. Reading appeared on the Tucker Carlson Show "to expose the unjust actions of Duff and the Joint Base Actors against her." (*Id.*) In the midst of the growing online debate surrounding Mrs. Reading's Facebook post and the national news coverage, a North Hanover Township Board of Education meeting was scheduled for December 13, 2022. (ECF No. 123 at ¶ 100.)

On December 12, 2022, Mrs. Reading engaged in a Twitter conversation with Twitter user Jack Inrod ("Inrod"):

> **Inrod**: Congrats to this brave NJ mom speaking up against the pedophile woke agenda trying to turn innocent children into gays. We need to go support her at the board meeting tomorrow and show her she's got a village of really great people on her side. #TRUMP2024ToSaveAmerica

> **Reading**: While I love support to help kids. I don't support this rhetoric. We cannot make positive change by calling people pedophiles. I never called for anyone to attend any meeting. How did you know about a meeting?

> **Inrod**: Another NJ parent was tweeting the address and time for the meeting saying these groomers plan to show up in hives with matching shirts. You don't need to say a thing when you know you've awoken the silent majority.

> **Reading**: Yes. That is true. They plan to show up in matching shirts to advocate for keeping the posters and having more like them.

(ECF No. 123-1 at p. 46.)

On December 13, 2022, Defendant Superintendent Payne received an email from a "staffer" indicating that she received information that people from outside of the community would be attending the meeting that night:

> I'm sure you an the police are prepared for safety measures for tonight's meeting. You asked we share information we receive with you. Attached is a screenshot texted to me about tonight's meeting. It appears people outside of our community are planning on attending tonight's meeting. I hope all who attend tonight's meeting are safe and peaceful:

(ECF No. 123-1 at p. 44.)

Defendant Superintendent Payne and Defendant Chief Duff exchanged text messages that Mrs. Reading alleges were about the Board of Education meeting:

> **Payne:** Hi! Meeting tonight will be set up the same as last time. It has been very quiet so I am uncertain what to expect. Maybe nothing at all.
>
> **Duff:** I will be there with another [officer] going to keep it low-key
>
> **Payne:** Sounds good.
>
> **Duff:** I don't anticipate any problems I've been monitoring social media and so has the county we haven't seen or heard anything.

(ECF No. 123-1 at p. 43; ECF No. 123 at ¶ 100.)

At the Board of Education Meeting, Mrs. Reading alleges that attendees were subjected to metal detectors and bag searches. (*Id.* at ¶ 100.) Further, there was allegedly a "multi-jurisdictional show of force" whereby Defendant Chief Duff "had law enforcement personnel line the walls of the meeting room." (*Id.*) During the meeting, Mrs. Reading alleges that she was "assailed [with] verbal abuse" and "falsely accused [] of jeopardizing the safety of the schools." (*Id.* at ¶ 102.) Mrs. Reading alleges that the enhanced security measures at the meeting was unnecessary and unprecedented. (*Id.* at ¶ 100.) Further, she

alleges that it was also unprecedented for "a board of education to permit attendees to engaged in disruptive and offensive behavior by launching personal attacks and making disparaging remarks against a resident and parent in the community, also present at the meeting, who holds no elected position and wields no decision-making power in the local school district." (*Id.* at ¶ 102.)

## I.    Mrs. Reading Alleges Increased Security Protocols at the Airport

Mrs. Reading alleges that prior to her Facebook post she obtained TSA PreCheck and CLEAR status, which she and her husband continued to maintain after the Facebook post. (ECF No. 123 ¶ 186.) TSA PreCheck and CLEAR are trusted traveler programs designed to streamline airport security screening and reduce the need for additional identification and screening procedures. (ECF No. 123 ¶¶ 187–188.) TSA PreCheck allows participants to proceed through security checkpoints without removing shoes, laptops, liquids, belts, or light jackets. (ECF No. 123 ¶ 187.) CLEAR is a paid service that uses biometric technology to verify identity and permits travelers, once verified, to bypass traditional identification checks and proceed through TSA checkpoints after presenting a boarding pass. (ECF No. 123 ¶ 188.)

Beginning after the events described above, despite her TSA PreCheck and CLEAR status, Mrs. Reading was allegedly repeatedly subjected to additional screening procedures when traveling by air, including requests by TSA agents for additional identification and photographing. (ECF No. 123 ¶¶ 189–190.) These additional procedures are alleged to have occurred on multiple occasions, which Mrs. Reading began specifically tracking between December 2023 and October 2024. (ECF No. 123 ¶ 190.) Mrs. Reading alleges that none of the other travelers in her party, all of whom possessed the same trusted traveler credentials, were ever subjected to similar screening requirements. (ECF No. 123 ¶¶ 189–190.)

When Mrs. Reading asked a CLEAR representative why she was being subjected to additional screening, she was allegedly informed that the issue was not with CLEAR but that the request originated with TSA. (ECF No. 123 ¶ 191.) During one such incident, when she asked a TSA agent why she was required to undergo additional screening, the agent advised her that there appeared to be a "flag" on her record but did not provide additional explanation. (ECF No. 123 ¶ 192.)

During subsequent travel, Mrs. Reading was required to show identification, be escorted to TSA screening, and was presented with an alert indicating that she was "Ineligible" to proceed through CLEAR. (ECF No. 123 ¶ 193.) She alleges that the alert also referenced "randomization," but that she does not believe the repeated denial of trusted traveler benefits she experienced was random. (ECF No. 123 ¶ 195.)

## III.    STANDARD OF REVIEW

**Motion to Dismiss**

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted). Therefore, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 663 (citing *Twombly*, 550 U.S. at 556). A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" and a complaint will not "suffice" if it provides only "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).

The Third Circuit outlined three steps for courts to utilize in determining facial plausibility: (1) outline "the elements a plaintiff must plead to state a claim;" (2) "identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth,'" (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).

## IV. DISCUSSION

### A. § 1983 Civil Conspiracy Between Federal and State Actors

Section 1983 creates a cause of action against "person[s]" who act under "color" of state or territory law to deprive another of their constitutional rights. *See* 42 U.S.C. § 1983. Importantly, the statute creates this right when an individual acts under *state* law but does not create this right against someone acting under *federal* law. *Wilson v. City of Cherry Hill*, No. 10-cv-3866 2011 WL 3651274, at *6 (D.N.J. Aug. 18, 2011).

In this case, Mrs. Reading brings § 1983 claims of Conspiracy to Violate Civil Rights against federal officials[8] as well as state officials. As such, the federal officials sued in their

---

[8] There are two groups of federal defendants: the federal defendants sued in their official capacities ("Official Capacity Defendants"), and the federal defendants sued in their individual capacities ("Individual Capacity Defendants").

The Official Capacity Defendants include: Colonel Wes Adams, Colonel Robert Grimmett, Lieutenant Colonel Megan Hall, Major Nathaniel Lesher, Major Christopher Schilling, Joseph Vazquez, Colonel Mitchell Wisniewski, Kristi Noem, and Adam Stahl.

individual capacity ("Individual Capacity Defendants") first argue that they cannot be held liable under § 1983. Mrs. Reading contends that the federal defendants are liable because despite being federal officials, they acted under color of state law when they entered into a conspiracy with state officials to remove her Facebook post and engage in a retaliatory campaign of harassment.

The Individual Capacity Defendants then argue that even if a conspiracy with state actors could bring them within the scope of §1983, Mrs. Reading has failed to sufficiently allege such a conspiracy. Mrs. Reading argues that the SAC includes an "unparalleled level of detail" citing direct evidence of the conspiracy, which outlines the creation of an understanding between the parties involved, the timeframe of the conspiracy, and the object of the conspiracy.

Finally, the Individual Capacity Defendants argue that even if the Court were to find that they are amenable to suit under § 1983 and that Mrs. Reading has sufficiently alleged a Civil Conspiracy under § 1983, they are entitled to qualified immunity. Mrs. Reading argues that the law is clearly established and that the Individual Capacity Defendants do not enjoy qualified immunity.

For the reasons explained below, the Court finds that the Individual Capacity Defendants are amenable to suit under § 1983 if they acted in a conspiracy with state actors to deprive Mrs. Reading of her First Amendment rights. As to federal Defendant Colonel Grimmett, and state Defendant Superintendent Payne, the Court finds that Mrs. Reading has not plausibly established that they entered into an agreement with any of the other alleged co-conspirators to remove Mrs.

---

The Individual Capacity Defendants include: Colonel Robert Grimmett, Lieutenant Colonel Megan Hall, Major Nathaniel Lesher, and Joseph Vazquez and Major Christopher Schilling.

Mrs. Reading sues the Official Capacity Defendants seeking declaratory and injunctive relief for First Amendment speech censorship and retaliation as well as violations of the Free Exercise Clause of the First Amendment. These claims will be addressed below in Part IV(E)(1). Mrs. Reading sues the Individual Capacity Defendants for Conspiracy to Violate Civil Rights under 42 U.S.C. § 1983 seeking declaratory and injunctive relief as well as compensatory and punitive monetary damages. This claim will be addressed as to all Defendants in this part.

Reading's Facebook post. However, the Court then finds that Mrs. Reading has sufficiently plead that federal defendants, Defendant Major Schilling, Defendant Lesher, Defendant Lt. Col. Hall, and Defendant Vazquez, entered into an agreement with state defendant, Defendant Chief Duff to remove Mrs. Reading's Facebook post. Nevertheless, the Court finds that the conspiracy claim against the remaining federal defendants cannot proceed because federal official liability under § 1983 for Conspiracy with state officials to deprive another of their civil rights in the context of First Amendment speech censorship and retaliation is not clearly established and the federal defendants are entitled to qualified immunity.

### 1.    Federal Defendants' Amenability to § 1983 Liability

Despite § 1983's mandate that the deprivation of a federally protected right occur under color of state law, the Supreme Court has made clear that a party need not be a state official to be held liable under §1983. *Dennis v. Sparks*, 449 U.S. 24, 27 (1980) ("to act "under color of" state law for § 1983 purposes does not require that the defendant be an officer of the State.")  A party that willfully acts in concert with a state official to deprive another of their constitutional right is subject to liability under § 1983. *Id.* This means that private parties may be subject to liability under § 1983 if they choose to participate in a joint operation with state officials to deprive another of a federally protected right. *Id.*

Further, nowhere does the statute preclude a federal official from being held liable if they act under color of *state* law to deprive another of their constitutional right. Therefore, when a federal official conspires with a state official acting under color of state law to violate an individual's constitutional right, that federal official may be treated as though they are acting under color of state law. *Melo v. Hafer*, 912 F.2d 628, 638 (3d Cir. 1990), *aff'd,* 502 U.S. 21 (1991).

The Individual Capacity Defendants support their argument that they are not amenable to § 1983 liability by citing caselaw that is entirely distinguishable from this case. For example, quoting *Prosser v. Shappert*, they argue that "[F]ederal agencies and officers are facially exempt from section 1983 liability inasmuch as in the normal course of events they act pursuant to federal law." No. 23-2072, 2025 WL 215518, at *2 (3d Cir. Jan. 16, 2025). But in *Prosser*, all of the defendants were federal employees, and there were no allegations that any of the defendants acted under color of state law. *See generally Id.* In that case, the Court did not, nor could it have, addressed the question of whether federal officials act under color of state law when acting in concert with state officials. When all defendants are federal officials who are acting in the scope of their employment, which is authorized under federal law, of course those officials act pursuant to federal law and are facially exempt from liability under § 1983. But that is not the case alleged here.

The Individual Capacity Defendants then point to *Egbert v. Boule*, a recent Supreme Court case where the Court explicitly declined to extend a *Bivens* remedy for First Amendment retaliation, and in fact entirely foreclosed the possibility that a plaintiff could recover for First Amendment retaliation under *Bivens. Egbert v. Boule*, 596 U.S. 482, 498 (2022). ("we hold that there is no *Bivens* action for First Amendment retaliation.") Similar to *Prosser* though, *Egbert* is also a case that is brought solely against a federal agent, acting within the scope of their federal employment pursuant to federal law, and does not allege that any state official was involved at all. *See generally Egbert*, 596 U.S.

Still, the Court's reasoning in *Egbert* is informative. The Court explained that a *Bivens* claim is judge made law and cautioned courts against creating new causes of action that Congress has not expressly proscribed, including extending *Bivens* beyond the scope of what has already

been established. *Id* at 492. This is because the creation of laws and proscription of remedies is within the legislature's purview, not the judiciary's. *Id.* Further, the Court explains, not only is it the legislature's job to create laws and remedies, indeed, Congress is in a far better position to do it than the courts. *Id.* at 492. Thus, when a court considers whether to extend the right to proceed on a *Bivens* claim, it must seriously consider "whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.*

Notably, *Egbert* is not a case brought under § 1983, nor does it address § 1983 in any way. This case is brought under § 1983—a statue that explicitly establishes liability for the deprivation of constitutional rights. To be sure, many § 1983 defendants are state officials. But not always. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982); *Dennis* 449 U.S.; *Adickes v. S. H. Kress & Co.*, 398 U.S. (1970); *Diamond v. Pennsylvania State Educ. Ass'n*, 972 F.3d 262, 269 (3d Cir. 2020).

In the context of this case—a case that is brought under a federal statute where Congress has already created a private right of action—there is no need to consider whether Congress might be better equipped to create a damages remedy. Because it already has. And when Congress enacted § 1983 it did not take that opportunity, which it surely could have, to foreclose the possibility that a federal official could be held liable under the statute under any and all circumstances. Nor has the legislature amended the statute at any point to reflect such, despite its various codifications since its inception during the post-Civil War Reconstruction era.

At its core, § 1983's purpose is to ensure that when the State, and those acting in concert with it, fails to protect the federally protected rights of individuals, and in fact perpetrates the deprivation of those federal rights, the injured party has an avenue for redress. Nothing in the language, intent, or legislative history of the statute suggests that when a federal official acts in

concert with the State to deprive an individual of their federal rights, they are immune from liability.[9]

Therefore, a plaintiff is required, as in any other case, to meet their burden of pleading all of the elements of the claim as to each defendant. The Third Circuit has determined that in this context, under this statute, that means that a federal official may be subjected to liability under § 1983 if the plaintiff establishes the elements of a conspiracy between the federal actors and state officials. *Melo*, 912 F.2d, 638. If Mrs. Reading successfully does so, then the claim may proceed against the federal actors. If she fails to do so, then it cannot.

### 2.    Sufficiency of Pleading Conspiracy

The Individual Capacity Defendants argue that even assuming a conspiracy between federal and state actors can subject federal officials to liability under § 1983, Mrs. Reading has not sufficiently established that such a conspiracy existed. They argue that Mrs. Reading's pleadings do not overcome the "presumption that where federal and state actors come together, they are acting pursuant to supreme [i.e., federal] law." (ECF No. 141-1 at p. 18.) (quoting *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 870 (10th Cir. 2016).) Further, they argue that Mrs. Reading has not established each element of conspiracy as to each Individual Capacity Defendant.

To establish a claim for a Conspiracy to Violate Civil Rights ("Conspiracy") a plaintiff is required to plead facts that plausibly show that "(1) two or more persons conspire[d] to deprive

---

[9] In *Dist. Of Columbia v. Carter*, the Supreme Court undertook a thorough analysis of the legislative history of § 1983. 409 U.S. 418, 426-33 (1973). The Court explained that in the time period preceding the 42nd Congressional session, State governments were either ill equipped or unwilling to enforce federally protected rights equally. *See Id.* 426-33. As such, during that session, Congress acknowledged that there was a need for federal intervention. However, without the "means nor the authority" for Congress to "exert any direct control, on a day-to-day basis, over the actions of state officials" it looked to the federal judiciary "to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies." *Id.* at 428-29. (quoting Monroe v. Pape, 365 U.S. 167, 180 (1961).)

any person of [constitutional rights]; (2) one or more of the conspirators perform[ed] ... any overt act in furtherance of the conspiracy; and (3) that overt act injure[d] the plaintiff in [her] person or property or deprives the plaintiff of any right or privilege of a citizen of the United States," with the added gloss under § 1983 that "the conspirators act 'under the color of state law.' " *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 294 n. 15 (3d Cir. 2018). (citing *Barnes Foundation v. Township of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001).) Thus, once a plaintiff establishes that the object of the alleged conspiracy was to deprive them of a federally protected right, she must then "provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Id.* at 295.

The plaintiff must plead the conspiracy with particularity. *Hauptmann v. Wilentz*, 570 F. Supp. 351, 382 (D.N.J. 1983), *aff'd,* 770 F.2d 1070 (3d Cir. 1985), and *aff'd sub nom. Appeal of Hauptmann*, 770 F.2d 1070 (3d Cir. 1985). This means that the pleadings must "set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." *Adams v. Springmeyer*, No. CIV.A. 11-790, 2012 WL 1865736, at *6 (W.D. Pa. May 22, 2012). However, direct evidence of the conspiracy is not required, circumstantial evidence may suffice if it leads to the plausible inference of an agreement to deprive an individual of a federally protected right. *Hauptmann* 570 F. Supp. at 382.

Federal officials are presumed to act under federal law in the normal course of their duties. *Hindes v. F.D.I.C.*, 137 F.3d 148, 158 (3d Cir. 1998). However, the Third Circuit has said that this presumption may be overcome by pleading specific facts that lead to the reasonable inference that federal officials were engaged in a conspiracy with state officials. *Id.* at 638 ("federal employees

who conspire with state officials to violate someone's constitutional rights are treated as acting under color of state law.")

Civil conspiracy is not an independently actionable claim. *PBA Loc. No. 38 v. Woodbridge Police Dep't*, 832 F. Supp. 808, 832 n. 23 (D.N.J. 1993). This is because a civil conspiracy under § 1983 "is merely a vehicle by which § 1983 liability may be imputed to those who have not actually performed the act denying constitutional rights." *Fioriglio v. City of Atl. City*, 996 F. Supp. 379, 385 (D.N.J. 1998), *aff'd*, 185 F.3d 861 (3d Cir. 1999). Therefore, to establish a claim for civil conspiracy under § 1983 the Plaintiff must plead facts that establish first that there was an agreement between two or more individuals acting under color of state law to deprive an individual of their constitutional right, and then that there was an actual deprivation of the underlying right by one or more of the conspirators. *Id.*

Thus, to subject the Individual Capacity Defendants to §1983 liability, Mrs. Reading must plead specific facts that indicate that each of the federal defendants came to an agreement with at least one of the state defendants to deprive Mrs. Reading of her First Amendment rights by removing her Facebook post and retaliating against her for the post. Once Mrs. Reading has established the agreement, she must plead facts that establish that at least one of the conspirators, while acting under color of state law, successfully deprived her of her First Amendment rights. Consequently, this is also what is required to establish the merits of her claim. Thus, the Court will analyze these arguments together.[10]

Mrs. Reading alleges that the federal Individual Capacity Defendants came to an agreement with the state defendants, Defendant Chief Duff and Defendant Superintendent Payne to censor

---

[10] Given that Mrs. Reading must establish that the federal defendants acted in concert with the state defendants, for ease of reference the Court will analyze the sufficiency of the pleading as to the Conspiracy claim against all Defendants in this part.

her protected speech by removing her Facebook post and to retaliate against her for that speech. She must plead facts that plausibly lead to the inference that the alleged conspirators came to an agreement to do so and then carried out the underlying deprivation of and retaliation for her First Amendment protected activity.

The SAC alleges that on the night of November 28, 2022, six days after Mrs. Reading's Facebook post was published, Defendant Superintendent Payne, a state official, text messaged Defendant Chief Duff,[11] another state official, to discuss Mrs. Reading's post. Later text messages indicate that they planned for Defendant Chief Duff to provide security at the school in the mornings until the building was "secure." (ECF No. 123-1 at p. 71.)

Meanwhile, the SAC alleges that federal Defendant Major Schilling spoke with federal Defendant Major Lesher regarding Mrs. Reading's Facebook post. Following their discussion, Defendant Major Schilling emailed Defendant Major Lesher on November 29, 2022, expressing his concerns that Mrs. Reading's post would place a target on the school, the parents, the students, and the personnel.[12] Defendant Major Lesher, who added Defendant Lt. Col. Hall to the email, responded that he would forward these concerns to state Defendant Chief Duff.

On the morning of November 30, 2022, after having been advised of Defendant Major Schilling's concerns regarding Mrs. Reading's Facebook post and Defendant Major Lesher's plan to involve state Defendant Chief Duff, Defendant Lt. Col. Hall, acting as the JB MDL liaison with the school district, emailed state Defendant Superintendent Payne in her capacity as the Superintendent of the North Hanover Township School District.[13] Defendant Lt. Col. Hall advised Defendant Superintendent Payne about Mrs. Reading's post, explained that there was concern

---

[11] The text of the messages between Defendant Chief Duff and Defendant Superintendent Payne has been reproduced in full *supra* Part II(F).

[12] The text of the emails between these defendants has been reproduced in full *supra* Part II(D).

[13] The text of the emails between these defendants has been reproduced in full *supra* Part II(F).

from military parents that the post would "make the school a target for extreme groups," and that she believed the parents would "prefer [Mrs. Reading] remove the post and not make anymore that specifically ID a school or individual by name." (ECF No. 123.-1 at p. 69.) The email also indicated that Defendant Lt. Col. Hall was "going to put together a more in-depth formal email to both you and Dr. Zuckerman"[14] and that she was "not sure if [Defendant Superintendent Payne] has any influence to discuss with Dr Zuckerman before this grows bigger tha[n] it already has," but that she wanted to "send [Defendant Superintendent Payne] the note ahead of time." (*Id.*) Defendant Superintendent Payne responded that she was aware of Mrs. Reading's post, that she was currently "working it exclusively" and suggested it might be easier to talk on the phone.

Before Defendant Lt. Col. Hall sent a formal email to Defendant Superintendent Payne and Dr. Zuckerman, Defendant Major Schilling sent another email to Defendant Major Lesher and Defendant Lt. Col. Hall wherein he reiterated his concerns and further advised that an article about Mrs. Reading's Facebook post, titled "Kiddy Sex Posters in North Hanover", had been published on the online substack *Chaos and Control*.

Shortly thereafter, Defendant Lt. Col. Hall sent a formal email to Defendant Superintendent Payne and Dr. Zuckerman addressing Mrs. Reading's post.[15] In the email she indicated that Mrs. Reading posted "as a private citizen and in her capacity as a board member."(ECF No. 123-1 at p. 19.) The email also indicated that Mrs. Reading made an additional post wherein she purports to be "speaking on behalf of her husband, Mr. Bryan Reading, who I understand serves a s a board member for North Hanover School District, and his thoughts on the subject." (*Id.*) She then said that Mrs. Reading "encouraged people of like mindedness to attend the monthly BOE meetings

---

[14] Dr. Zuckerman was the Superintendent of the Northern Burlington Regional School District, where Mrs. Reading was a member of the School Board of Education.
[15] The text of the emails between these defendants has been reproduced in full *supra* Part II(F).

and express the same view point." (*Id.*) Finally, she requested that the school administrators "look into this matter to ensure the safety of all members moving forward" and advised them that military parent reactions ranged from "removing the post all together with none further" to Mrs. Reading "excus[ing] herself for potentially violating ethics violations." (*Id.*)

After Defendant Lt. Col. Hall sent the formal email to the superintendents, Defendant Major Lesher responded to Defendant Major Schilling's second email, including Defendant Lt. Col. Hall and adding Defendant Vazquez, indicating that he would "push the issue again" with state Defendant Duff and that federal Defendant Vazquez, who was the manager of the antiterrorism program, would reach out to NJ DHS. In the emails that followed, the group expressed their thoughts and concerns about the post[16] and provided details about the official actions they would take in response.[17]

The SAC alleges that federal Defendant Major Lesher, spoke directly to state Defendant Chief Duff, and followed up by forwarding him Defendant Major Schilling's emails. After receiving the emails, Defendant Chief Duff, acting in his capacity as Chief of Hanover Township Police Department, allegedly contacted Ms. Stouffer, the administrator of the public Facebook page where Mrs. Reading posted her comment. When he spoke with Ms. Stouffer, the SAC alleges that Defendant Chief Duff expressed the collective concerns of the federal and state Defendants, advised that Ms. Stouffer could incur liability for the death or injury of students if someone acted violently in response to Mrs. Reading's post, and then directed her to remove the post, which she did while she was speaking with him.

---

[16] For example, Defendant Vazquez wrote "This really gets under my skin for sure…" (ECF No. 123-1 at p. 15.)
[17] For example, Defendant Lesher indicated that he added Defendant Vazquez to the email so that he would reach out to NJ DHS about Mrs. Reading's post. (ECF No. 123-1 at p. 13.) He also indicated that he would "push this again to Chief Duff" (*Id.*) Defendant Vazquez later stated that he would loop in NJOHSP and NJ ROIC because they "keep an eye on far right/hate groups." (ECF No. 123-1 at p.15.)

Following the removal of Mrs. Reading's Facebook post, state Defendant Chief Duff emailed federal defendants, Defendant Major Schilling, Defendant Major Lesher, Defendant Lt. Col. Hall, and Defendant Vazquez.[18] He told them that he had contacted Ms. Stouffer, that he "explained *our* concerns about the post" and that after he explained "*our* concerns" she removed the post. (ECF No. 123-1 at p. 21.) (emphasis added.) He then went on to state that he would continue to work to "get additional posts removed from other social media posts." (*Id.*)

The state defendants, Defendant Superintendent Payne and Defendant Chief Duff, also exchanged text messages[19] at different times regarding Mrs. Reading's reaction to the post being removed, their personal opinions of Mrs. Reading, the potential for safety concerns at an upcoming school board meeting and the security Defendant Chief Duff planned to implement to address those concerns.

In sum, when read in a light most favorable to Mrs. Reading, the SAC alleges that at least four federal officials and one state official, who did not agree with Mrs. Reading's viewpoint, actively worked together to have her Facebook post, which they do not dispute was protected speech, removed, and planned to continue to work to have additional posts that they did not agree with removed. All of these officials took overt acts that resulted in Mrs. Reading's speech being censored. The SAC particularly describes when the conspiracy started, that the purpose of the conspiracy was, at a minimum, to remove Mrs. Reading's Facebook post, and the overt acts that each of the conspirators took in furtherance of the conspiracy.

Mrs. Reading sufficiently pleads facts that lead to the reasonable inference that federal Defendants Schilling, Lesher, Vazquez, and Hall, entered into an agreement with state Defendant

---

[18] The text of the emails between these defendants has been reproduced in full *supra* Part II(E).
[19] The content of these text messages has been reproduced in full *supra* Part II(F).

Chief Duff, to remove Mrs. Reading's Facebook post thereby depriving her of her First Amendment right to free speech.

Since Mrs. Reading has sufficiently plead facts that establish the agreement and the overt acts taken, she must plausibly plead facts that establish that at least one of those defendants successfully deprived her of her First Amendment right. If Mrs. Reading sufficiently pleads the underlying deprivation by one of the conspiring defendants, then that deprivation will apply with equal force to all conspiring defendants.

### i.    Defendant Superintendent Payne

The SAC alleges facts that describe Defendant Superintendent Payne responding to information that she became aware of relating to school operations at least, or, at most, implicitly, if not explicitly, raising safety concerns for a school within her district. At best, the facts illustrate the steps that Defendant Superintendent Payne took six days after Mrs. Reading's post, which, by that time, had apparently become the subject of discussions amongst the Chief of Police, employees and parents within the school district who worked at neighboring JB MDL, parents of the children in the school district, and school district employees. (ECF No. 123-1 at p. 70) (Text message from Defendant Superintendent Payne to Defendant Chief Duff initiating a conversation about Mrs. Reading's Facebook post and the potential security implications); (ECF No. 123-1 at p. 11) (Email from Defendant Major Schilling to Defendant Major Lesher describing parental concern surrounding Mrs. Reading's Facebook post); (ECF No. 123-1 at p. 21) (Email from Defendant Major Lesher to Defendant Chief Duff advising him of parental concern surrounding Mrs. Reading's Facebook post); (ECF No. 123-1 at p. 69) (Email from Defendant Lt. Col. Hall to Defendant Superintendent Payne expressing military parent concern about Mrs. Reading's

Facebook post); (ECF No. 123-1 at p. 67-68) (Defendant Superintendent Payne's Letter to the Community.)

In particular, on December 1, 2022, Defendant Superintendent Payne issued a Letter to the Community[20] wherein she acknowledged the following:

- There were multiple social media posts that addressed the "Week of Respect" posters created by students at UES;

- These posts described the content of the posters, and debated the purpose of the posters and their relationship to the school curriculum;

- There were social media posts that identified students, the school, and the community; and

- The school district was working closely with the local police department to address safety and security concerns that had been raised to her.

(ECF No. 123-1 at p. 67-68.)

Mrs. Reading argues that Defendant Superintendent Payne's Letter to the Community was part of a retaliatory campaign of harassment that was instigated because of her Facebook post. However, Mrs. Reading seems to ignore Defendant Superintendent Payne's duties and responsibilities as the head administrator for the school district directly identified in her post. It is beyond cavil that Defendant Superintendent Payne's timely response to the growing adult rhetoric related to the "Week of Respect" posters was within her duties as superintendent. Mrs. Reading seems to suggest that Defendant Superintendent Payne do nothing in light of the widely known circumstances related to Mrs. Reading's post. Such a response would be untenable.

Further, Defendant Superintendent Payne's argument that public officials retain their own First Amendment rights to speak freely about matters of public concern is persuasive. *Brennan v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003). Specifically, for a public official's speech to be

---

[20] The content of the Letter to the Community has been reproduced in full *supra* Part II(F).

considered a retaliatory act, there must be some form of "threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow." *Mirabella* 853 F.3d at 651. (citing *McLaughlin*, 271 F.3d at 573.) Thus, Mrs. Reading's argument that Defendant Superintendent Payne retaliated against her by issuing the Letter to the Community also fails. Here, nothing in Defendant Superintendent Payne's Letter to the Community can be construed as a threat, coercion, or intimidation. Indeed, Defendant Superintendent Payne did not have any authority to impose any kind of sanction or adverse regulatory action on Mrs. Reading in any context. Absent such facts, the Letter to the Community cannot be considered a retaliatory act.

Next, as to the claim that Defendant Superintendent Payne was involved in a conspiracy to deprive Mrs. Reading of her First Amendment rights, none of the well plead facts lead to the inference that Defendant Superintendent Payne issued the Letter to the Community as part of an agreement with the other federal or state defendants to retaliate against Mrs. Reading for her Facebook post. In fact, nothing in the pleadings indicates that Defendant Superintendent Payne came to any agreement with any of the alleged conspirators regarding Mrs. Reading's Facebook post at all.

The facts alleged in the SAC indicate that Defendant Superintendent Payne was consistently acting in her capacity as superintendent of the school district. All of the communications with the alleged conspirators indicate that Defendant Superintendent Payne was either gathering information on or communicating information about an issue of significant community concern that directly involved one of the schools in her school district. These communications are indicative of Defendant Superintendent Payne working to carry out the administrative needs of the school district, identify and mitigate potential security concerns that could affect students and personnel, and address growing community concern surrounding issues

that impacted the school district. None of these types of allegations are sufficient to establish that Defendant Superintendent Payne came to an agreement with the alleged conspirators to retaliate against Mrs. Reading for exercising her First Amendment right to free speech.

Mrs. Reading's contention that Defendant Superintendent Payne's information gathering plausibly establishes her involvement in a conspiracy to retaliate against her for her Facebook post falls woefully short of establishing a claim for conspiracy. Therefore, the conspiracy claim against Defendant Superintendent Payne cannot proceed.

### ii.    Defendant Colonel Grimmett

The SAC does not allege that Defendant Colonel Grimmett took an active role in the conspiracy, rather it rests on a theory of supervisory liability. Under § 1983, a supervisor cannot be held liable under a theory of *respondeat superior*. *Murphy v. Middlesex Cnty.*, 361 F. Supp. 3d 376, 387 (D.N.J. 2019). Instead, there are two potential avenues to establish supervisory liability. First, the plaintiff must plead facts that show that the defendant supervisor was a policy maker that "established and maintained a policy, custom, or practice which directly caused [the] constitutional harm" while acting with "deliberate indifference to the consequences." *Id.* at 389. (citing *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004).)

The second theory of supervisory liability under § 1983 requires the plaintiff to plead facts that show that the defendant either "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinate's violations." *Id.* To establish knowledge and acquiescence the plaintiff must plead particular facts that show 1) the supervisor had "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents," and 2) the supervisor's "actions or inactions

communicated approval of the subordinate's behavior." *C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 202 (3d Cir. 2000).

Mrs. Reading argues that Defendant Colonel Grimmett knowingly acquiesced to the conspiracy which exposes him to liability under § 1983. (ECF No. 147 at p. 53.) The Individual Capacity Defendants argue that 'there is no well-pled allegation that [Defendant Colonel Grimmett] ever interacted with a state official, much less agreed to do anything as part of a conspiracy with them." (ECF No. 141-1 at p. 32.)

The SAC alleges, in general terms, that Defendant Colonel Grimmett "ratified," "approved," or "acquiesced in" the conduct of subordinate defendants and failed to intervene to prevent alleged constitutional violations. (ECF No. 123 ¶ 14.) These allegations, however, are not supported by any factual averments describing when Defendant Colonel Grimmett became aware of the challenged conduct, what information he possessed, or how he exercised authority in response. The Third Circuit has made clear that "personal involvement can be shown through allegations of...actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Conclusory assertions that a supervisory official "knew or should have known" of subordinate conduct are insufficient at the pleading stage. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130-31 (3d Cir. 2010). Plaintiff must allege specific facts that make it plausible that Defendant Col. Grimmett had knowledge of his subordinates' efforts to censor and retaliate against Mrs. Reading and that his action or inaction communicated that he approved of his subordinate's unconstitutional conduct. *Id.*

The SAC alleges that Defendant Colonel Grimmett was copied on emails between Defendant Lt. Col. Hall, Defendant Superintendent Payne, and Dr. Zuckerman. It does not allege

that Defendant Colonel Grimmett ever provided feedback to the emails, responded to the emails, or even acknowledged receipt of the emails at any point. The SAC does not allege any facts that lead to the inference that Defendant Colonel Grimmett even read the emails he was copied on. It does not point to any specific act, directive, communication, or decision by Defendant Colonel Grimmett that plausibly connects him to the alleged suppression of Mrs. Reading's Facebook post or retaliatory conduct because of Mrs. Reading's Facebook post. Absent such allegations, the claims as to Defendant Colonel Grimmett in his individual capacity cannot proceed.

### 3.    Qualified Immunity

Qualified immunity shields government officials from civil liability for money damages if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). The doctrine of qualified immunity arose from the tension that exists between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). As such, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The Supreme Court has established a two-prong framework for courts to analyze whether a government official is entitled to qualified immunity. *Pearson*, 555 U.S. at 232. At the motion to dismiss stage, the Court must determine whether the plaintiff sufficiently alleged facts that establish a violation of a constitutional right. *Id.* The Court must also determine if that constitutional right was "clearly established" at the time of the defendant's alleged misconduct. *Id.* If the Court determines that the plaintiff's constitutional right was violated and that the right was

clearly established, then the government official is not entitled to qualified immunity. However, if the Court determines either that there was no constitutional violation or that the constitutional right was not clearly established, then the government official is entitled to qualified immunity.

While in days past the Supreme Court required courts to apply the qualified immunity analysis by rigidly adhering to the proscribed sequence in its analysis, the Supreme Court has acknowledged that there is a benefit to allowing flexibility when courts are required to engage a case specific analysis to determine difficult legal questions. *See Id.* at 236-38. Accordingly, courts are permitted to begin the analysis with whichever prong best serves the case. *Id.*

In this case, the Court turns to whether Mrs. Reading's right was clearly established. A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Additionally, "in the light of pre-existing law the unlawfulness [of the challenged actions] must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Therefore, "existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). (cleaned up.) This precedential requirement mandates that "the rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018). (cleaned up.) Therefore, courts in the Third Circuit "look first for applicable Supreme Court precedent. If none exists, [courts] consider whether there is a case of controlling authority in [the Third Circuit] or a robust consensus of cases of persuasive authority in the Courts of Appeals." *New Jersey Chinese Cmty. Ctr. v. McAleer*, No. CV 21-08320 (GC) (RLS), 2025 WL 1564869, at *9 (D.N.J. June 3, 2025) (citing *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 449 (3d Cir. 2020).)

46

Further, a clearly established right cannot be defined "at a high level of generality" because the relevant question is whether the government official "acted reasonably in the particular circumstances that he or she face[d]." *Id.* The purpose of the clearly established prong is to ensure that government officials have "fair warning" that [their] conduct deprived [their] victim of a constitutional right." *Hope*, 536 U.S. at 740.

Here, Mrs. Reading alleges that the Individual Capacity Defendants are involved in a civil conspiracy with state actors to violate her First Amendment right to free speech and to freely exercise her religion. It is not enough to say that Mrs. Reading's right to speak freely, especially on matters of public concern, is clearly established. Nor is it enough to say that it is clearly established that government officials cannot enter into a conspiracy to deprive an individual of their right to freely speak on matters of public concern. Rather, in light of the facts of the case, the Court must determine whether, based on the precedential law that existed in November 2022, a reasonable federal government official would have known that if they entered into an agreement with a state official to have Mrs. Reading's post removed from Facebook that they would be violating Mrs. Reading's right to free speech.

At the very core of this analysis the Court must determine whether there is any precedential law where a court has determined that a plaintiff sufficiently plead that federal and state officials were engaged in a civil conspiracy under § 1983. The Supreme Court has never held such. While there is Supreme Court precedent that establishes a theoretical legal framework for such conspiracies, the Court has never actually found that federal and state officials conspired together, nor has the Court ever explicitly approved this type of conspiracy. *Dennis*, 449 U.S. at 27 (holding that one need not be a state actor to be liable under § 1983); *Butz v. Economou*, 438 U.S. 478, 500

(1978) (finding that there is no basis for providing federal officials a higher degree of immunity than state officials when sued for constitutional infringement.)

While the Third Circuit has explicitly endorsed the potential for federal officials to be held liable under § 1983 when they conspire with state officials to deprive an individual of a constitutional right, it has never held that such a case has existed. *Hindes*, 137 F.3d at 158; *Melo*, 912 at 628; *Jorden v. National Guard Bureau,* 799 F.2d 99, 111 n. 17 (3d Cir.1986) (citing *Knights of the Ku Klux Klan v. East Baton Rouge Parish,* 735 F.2d 895, 900 (5th Cir.1984)). While many of the Circuit courts have acknowledged that the legal framework for such a conspiracy exists, the number of Circuit cases where the Court determined that such a conspiracy had been adequately alleged, let alone that one existed, is far from the "robust consensus of persuasive authority" that would put the Individual Capacity Defendants on notice that they had entered into such a conspiracy. *Wesby*, 583 U.S. at 63.

This goes directly to the heart of what the clearly established prong requires. The fact that there is a theoretical legal framework to hold federal defendants liable under § 1983 does not give them fair warning that their actions under the specific circumstances of this case would result in such a conspiracy that would subject them to liability that they are typically immune from. Given the complete dearth of precedential law regarding civil conspiracies between federal and state officials, let alone conspiracies to violate the specific constitutional rights alleged in this case, the Court must find that the Individual Capacity Defendants, including Defendant Major Schilling, are entitled to qualified immunity and are thus immune from suit.

**B.     First Amendment Speech Censorship[21]**

---

[21] The Court notes that Mrs. Reading brings claims for violations of the New Jersey Civil Rights Act (NJCRA) against Defendant Chief Duff and Defendant Superintendent Payne. The NJCRA creates a state remedy for civil rights violations and is modeled after § 1983. New Jersey courts routinely find that the state analysis under the NJCRA mirrors the federal analysis under § 1983. *Chapman v. New Jersey*, No. 08-4130, 2009 WL 2634888, at *3 (D.N.J.

48

The First Amendment prohibits the government from regulating a person's speech based on the content of the speech or the message it conveys. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). When the government targets not only a particular topic, but also the specific view taken by the speaker, it blatantly violates the First Amendment. *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992). It follows then, in the context of private speech, that the government cannot favor one viewpoint over another. *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984). Thus, "discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger* 515 U.S. at 828. Therefore, to sufficiently plead a First Amendment claim for censorship, a plaintiff must plausibly plead facts that show 1) the plaintiff engaged in protected speech,[22] 2) the government took adverse action that suppressed, penalized, or chilled that speech, and 3) the action was taken because of the content or viewpoint of the expression.

Whether speech is protected largely turns on whether the speech is of public or private concern. *Snyder v. Phelps*, 562 U.S. 443, 451, (2011). Speech on matters of public concern is "at the heart of the First Amendment's protection," and "occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protections." *Id.* (citations omitted). Speech on matters of private concern, however, are subject to "less rigorous" First Amendment protections. *Id.*

Speech that deals with matters of public concern include speech that relates to political, social, or community concerns. *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 146 (1983)).

---

Aug. 25, 2009); *Ingram v. Twp. of Deptford*, 911 F. Supp. 2d 289, 298 (D.N.J. 2012); *Killion v. Coffey*, 696 Fed. Appx. 76, 77 n1 (3d Cir. 2017); *Estate of Martin v. U.S. Marshals Serv. Agents*, 649 Fed. Appx. 239, 245 n.4 (3d Cir. 2016). As such, the Court will extend its analysis of the federal § 1983 claims to Mrs. Reading's state claims under the NJCRA as to both Defendant Chief Duff and Defendant Superintendent Payne.

[22] For the purposes of their Motions to Dismiss, none of the Defendants have disputed that Ms. Reading's speech was protected.

Additionally, speech related to matters of legitimate news interest or "that is, a subject of general interest and of value and concern to the public," falls within the scope of speech on matters of public concern. *Id.* (citing *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83-84)). That said, the character of the speech, specifically if it is inappropriate or controversial, is "irrelevant to the question whether it deals with a matter of public concern." *Id.* (citing *Rankin v. McPherson,* 483 U.S. 378, 387 (1987)).

While the First Amendment prohibits the government from censoring speech, there is no protection available when a private party censors speech. That said, government officials cannot end around the First Amendment by compelling private actors to censor speech that the government disfavors. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024). To be sure, government actors have their own right to free speech that allows them to "share [their] views freely and criticize particular beliefs." *Id.* at 188. Further, they may even share those views "forcefully in the hopes of persuading others to follow [their] lead. In doing so, [they] can rely on the merits and force of [their] ideas, the strength of [their] convictions, and [their] ability to inspire others." *Id.* However, they cannot "use the power of the State to punish or suppress disfavored expression." *Id.*

The distinction between "permissible attempts to persuade and impermissible attempts to coerce" is not a novel concept. *Id.* The Supreme Court addressed this idea over six decades ago in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). In *Bantam Books* the Court determined that a state commission impermissibly coerced a publication distributor to stop selling and displaying certain publications that the Commission had deemed "objectionable" because "they threatened 'youthful morals.'" *See Bantam Books*, 372 U.S at 59-62, 71. The Commission created a list of the publications to be blacklisted and sent official notices to the distributor which highlighted the

Commission's duty to recommend violations of the State's obscenity laws to the Attorney General. *Id* at 59-62. Additionally, the notice advised the distributor that local law enforcement had been provided with the list and that if the distributor removed the blacklisted items from circulation, it would "eliminate the necessity" of referral for prosecution. *Id.* at 62-63. Local police followed up with the distributor to ensure compliance, and the distributor took steps to stop circulation of the publications out of fear of facing repercussions from the government. *Id.*

The publishers of the blacklisted publications sued the Commission, alleging First Amendment censorship. *Id.* at 66. The Court held that the Commission had violated the publisher's First Amendment rights, reasoning that the government may not rely on the "threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" to suppress disfavored speech. *Id.* at 67.

The Supreme Court revisited this issue recently in *Nat'l Rifle Ass'n of Am. v. Vullo*, where it approvingly cited the Second Circuit's test to determine whether a challenged communication can reasonably be understood to be a coercive threat. *Vullo* 602 U.S. at 189. This four-factor test considers "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id* at 189-90. The Court characterizes these four factors as non-exhaustive "helpful guideposts in answering the question whether an official seeks to persuade or, instead, to coerce." *Id.* at 190.

When considering the authority of the government actor, Courts should remember that while the power the official wields is "certainly not dispositive," the inquiry is relevant in determining "whether a reasonable person would perceive the official's communication as

coercive." *Id.* at 191. As such "the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." *Id.* at 192.

When a plaintiff seeks to establish a claim that the government violated the First Amendment through coercion of a third party, they must "plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.*

### 1.    Defendant Chief Duff

In the SAC, Mrs. Reading alleges that Defendant Chief Duff, acted in his official capacity to impermissibly coerce Ms. Stouffer into removing Mrs. Reading's Facebook post. Mrs. Reading contends this impermissible act violated her First Amendment right to Free Speech and amounts to government speech censorship.

Defendant Chief Duff argues that since he did not remove Ms. Reading's post, nor could he have, Mrs. Reading's censorship claim must plead facts that establish that he compelled a private party to censor her speech. (ECF No. 129-1 at p. 13).[23] Further, Defendant Chief Duff argues that since Mrs. Reading's allegations implicate Defendant Chief Duff's own First Amendment rights to free speech, she must allege that he engaged in conduct of a "particularly virulent character" such as threatening, coercing, or intimidating the third party, while "intimating that punishment, sanction, or adverse regulatory [action] will follow." *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001). *See* ECF No. 129-1 at p. 13-15. Defendant Chief Duff contends that Plaintiff has fallen short of her burden because the allegations in the SAC "do nothing more than describe Chief Duff exercising his own First Amendment rights to comment to Ms. St[o]uffer on

---

[23] Defendant Chief Duff's Brief in Support to Dismiss SAC at p. 13 (ECF No. 129-1)

the content and potential implications of Plaintiff's Facebook post, and to directly urge and persuade her to remove the post." *Id.* at p. 17.

Mrs. Reading argues that Defendant Chief Duff's conduct was precisely the type of conduct that implicates the First Amendment because he used his position of authority as police chief to intimidate Ms. Stouffer into removing Mrs. Reading's post under threat of liability if the post incited violent acts. (ECF No. 147 at p. 22-23.)[24]

At this stage, the Court must look to the pleadings, crediting all well plead facts as true, to determine whether Mrs. Reading has sufficiently pleaded a claim for speech censorship under the First Amendment. The SAC alleges that Defendant Chief Duff contacted Ms. Stouffer via Facebook Messenger on November 30, 2022, and requested that she call him. (ECF No. 123 at ¶ 84.) Defendant Chief Duff signed the message "Chief Duff" of the "North Hanover Twp Police" and provided his phone number at the police station. (ECF No. 123-1 at p. 24.) When Ms. Stouffer called Defendant Chief Duff at the police station, he allegedly "pressured Ms. Stouffer to take down the post, citing alleged fears of terroristic threats and school violence. In substance, Duff told Stouffer that students could die if she did not remove the post." (ECF No. 123 at ¶ 85.)

The SAC further alleges that Defendant Chief Duff intimidated Ms. Stouffer into removing Mrs. Reading's post using the "specious threat of liability for deaths at the school." (*Id.* at ¶ 89.) Additionally, the SAC alleges that Defendant Chief Duff advised Ms. Stouffer that the police department was working with federal agencies such as the DHS and the military "concerning Mrs. Reading." (*Id.* at ¶ 85.) According to the SAC he then "directed Ms. Stouffer to take down the Facebook post." (*Id.* at ¶ 91.) Ms. Stouffer removed Mrs. Reading's post while speaking with Defendant Chief Duff. (ECF No. 123-1 at p. 30.)

---

[24] Plaintiff's Memorandum in Opposition to Defendants' Motions to Dismiss (ECF No. 147 at p. 122-23.)

In sum, the SAC alleges that in his official capacity as the Chief of Police, Defendant Chief Duff contacted a civilian outside of his jurisdiction, expressed concern that Mrs. Reading's post could incite violence such as a school shooting, advised her that she could be exposed to liability for the death of children if Mrs. Reading's post did incite violence, and then directed her to remove Mrs. Reading's post, which she did.

To determine whether Defendant Chief Duff's communication with Ms. Stouffer was persuasive or coercive, the Court will first apply the *Vullo* test cited above. As to the word choice and tone, from the first communication Defendant Chief Duff chose to represent himself to Ms. Stouffer in his official capacity as the Chief of Police. From the outset this sets an authoritative tone. As to the rest of the conversation, the SAC alleges that during his conversation with Ms. Stouffer Defendant Chief Duff spoke in a manner that pressured Ms. Stouffer and attempted to incite fear as to the potentially devastating consequences that Mrs. Reading's Facebook post could have on children. The SAC also alleges that Defendant Chief Duff intimated that Mrs. Stouffer was exposed to personal liability if she did not remove Mrs. Reading's post.

Second, as police chief he had authority to bring criminal charges for anything that occurred within his jurisdiction, which would include against those responsible for any violent acts committed at UES. As plead, the SAC alleges that Defendant Chief Duff advised Mrs. Stouffer that she was potentially liable for a future violent act that could occur at the school if someone was incited to violence by Mrs. Reading's Facebook post. While Defendant Chief Duff would have power to prosecute any individual responsible for violent acts committed at UES, it is questionable, at best, whether he would have the ability to hold Ms. Stouffer responsible for those acts.

Third, the SAC alleges that "Ms. Stouffer was intimidated into [removing Mrs. Reading's post] by Duff's specious threat of liability for deaths at the school." ECF No. 123 at ¶ 89. This

speaks to both the existence of a perceived threat and whether his speech referred to adverse consequences if Ms. Stouffer did not comply with Defendant Chief Duff's request to remove Mrs. Reading's post. If it is true, as the Court must presume it is at this stage, that Defendant Duff intimidated Ms. Stouffer into removing Mrs. Reading's Facebook post under the threat of liability for deaths at the school, then the reasonable inference drawn in Mrs. Reading's favor is that Ms. Stouffer could have perceived Defendant Chief Duff's words as a threat. Further, the implication that Ms. Stouffer could be personally liable for the violent acts of others clearly refers to adverse consequences if she did not remove Mrs. Reading's Facebook post.

Keeping in mind that "the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official," *Vullo* 602 U.S. at 191, the SAC plausibly alleges that Defendant Chief Duff, at minimum implied that Ms. Stouffer could be held responsible for the violent actions of another who was incited by Mrs. Reading's Facebook post if she chose not to remove it. Not only did he advise her as to her potential liability, the overall tone and content of the conversation as alleged could have reasonably suggested to Ms. Stouffer that he had the authority to invoke that liability.

At this stage, when the Court must accept the facts plead as true and draw all reasonable inferences in Mrs. Reading's favor, the SAC alleges facts that plausibly establish that Defendant Chief Duff coerced Ms. Stouffer into censoring Mrs. Reading's protected speech. Whether the evidence going forward will allow Mrs. Reading to maintain her burden in the future of the litigation remains to be seen.

### i.    Qualified Immunity

Defendant Chief Duff argues that he is entitled to qualified immunity because Mrs. Reading has not satisfied either prong of the qualified immunity analysis. Specifically, he argues

that Mrs. Reading has not established a constitutional violation but that even if she has based on the circumstances of this case the law is not clearly established.

Mrs. Reading first argues that qualified immunity is inappropriate at this stage of litigation because whether a right is clearly established is a fact intensive inquiry. She then argues that the law is clearly established.

The Court has already determined that Mrs. Reading sufficiently stated a claim of the deprivation of her constitutional right to Free Speech. Therefore, the Court turns to the question of whether the law is clearly established. To determine whether the law is clearly established, the court must determine if, based on the facts, the contours of the law is sufficiently defined and then determine if a reasonable official in those circumstances would know that they violated the law by engaging in the challenged conduct. *Anderson*, 483 U.S. at 640. The Third Circuit has instructed that "resolution of a qualified immunity defense is premature when there are unresolved disputes of historical facts relevant to the immunity analysis." *Stringer v. Cnty. of Bucks*, 141 F.4th 76, 88 (3d Cir. 2025). At the motion to dismiss stage, the Court only considers the pleadings. So to determine qualified immunity at this stage, the law must be clearly established based on the pleadings alone. *Id.*

In this case, there is no doubt that the SAC is voluminous. The SAC alone is 88 pages, and 310 paragraphs. There are 92 pages of exhibits attached to the SAC. However, the Court is not prepared to determine at this point that the law is clearly established. The pleadings, while voluminous, still leave questions open that could affect the qualified immunity analysis. For example, while the SAC alleges that Defendant Chief Duff intimidated Ms. Stouffer into removing Mrs. Reading's post, the details of what actually occurred in that conversation will shape the determination of whether, based on clearly established law, Defendant Chief Duff had fair notice

that his conduct would violate Mrs. Reading's rights. This is just one example of how discovery will develop the contours of the law going forward. As such, the Court declines, at this point, to engage a fully analysis of whether the law is clearly established, and cannot rule as a matter of law that Defendant Chief Duff is entitled to qualified immunity.

### C.    First Amendment Freedom of Speech Retaliation

In addition to First Amendment censorship, Mrs. Reading brings claims for First Amendment Retaliation. Government officials are not permitted to retaliate against a person for engaging in disfavored speech. To establish a claim for speech retaliation under § 1983, a plaintiff must show that (1) the plaintiff engaged in constitutionally protected speech, (2) the government took retaliatory action that was sufficient to deter a person of ordinary firmness from exercising their constitutional rights, and (3) there is a causal connection between the protected speech and the retaliatory action. *Cooper v. Menges*, 541 F. App'x 228, 232 (3d Cir. 2013).

Whether actions are sufficient to deter a person of ordinary firmness is an objective question that is not defeated if a specific plaintiff is not deterred. *Mirabella v. Villard*, 853 F.3d 641, 650 (3d Cir. 2017). When a retaliation claim involves a government official's own speech, the plaintiff must plead allegations that the nature of the speech included "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will immediately follow." *Noonan v. Kane*, 698 F. App'x 49, 53 (3d Cir. 2017). In the absence of such, the official's speech cannot be considered retaliatory, even if the speech included "criticism, false accusations, or verbal reprimands" or was defamatory. *Id.* (citing *Brennan*, 350 F.3d at 419.)

Courts have found that a plaintiff may establish the deterrence element by sufficiently pleading facts that, in their totality, result in a campaign of harassment. *Suppan v. Dadonna*, 203 F.3d 228, 234-35 (3d Cir. 2000) (holding that plaintiff sufficiently pled facts that would deter a

person of ordinary firmness from exercising their First Amendment rights when he alleged facts that amounted to a "campaign of retaliatory harassment."); *Thomas v. Indep. Twp.*, 463 F.3d 285, 290 (3d Cir. 2006). (holding that plaintiffs sufficiently pled a claim for speech retaliation when "the Individual Defendants have engaged in a campaign of harassment and intimidation against plaintiffs."); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982) (holding that plaintiff's complaint, which alleged "an entire campaign of harassment which though trivial in detail may have been substantial in gross" sufficiently stated a claim for speech retaliation under § 1983.) Further, the effect on plaintiff's speech may be small but cannot be *de minimis*. *Suppan* 203 F.3d at 235.

When establishing a causal connection for a speech retaliation claim, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019). Plaintiff may establish a causal connection by showing that there is either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir.2007). In the absence of a temporal connection, "the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation." *Id.* (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.2000).)

For the purposes of their motions to dismiss, Defendant Chief Duff and Defendant Superintendent Payne do not dispute that Mrs. Reading's Facebook post was constitutionally protected speech. Mrs. Reading's Facebook post expressed criticism of school-related policies and

practices and reflected her views. Such speech lies at the core of First Amendment protection. *See Mirabella*, 853 F.3d at 648–49.

Instead, Defendant Chief Duff and Defendant Superintendent Payne both argue that Mrs. Reading has not plausibly alleged retaliatory action sufficient to deter a person of ordinary firmness from engaging in protected speech. Defendant Chief Duff argues that Mrs. Reading cannot establish adverse action because she was never arrested, cited, prosecuted, or formally sanctioned. Defendant Superintendent Payne argues that the only conduct alleged as to her is that she issued a Letter to the Community addressing safety concerns that did not identify Mrs. Reading, did not impose any sanction, and did not contain a threat, coercion, or intimidation. Further, Defendant Superintendent Payne argues that Mrs. Reading attempts to improperly impute the conduct of others onto her. Finally, Defendant Superintendent Payne argues that Mrs. Reading has not established causation because Defendant Superintendent Payne's actions were motivated by independent safety concerns.

While the presence or absence of formal punitive sanctions is relevant to the Court's inquiry, the Third Circuit does not limit actionable retaliation to arrests or prosecutions. Rather, non-prosecutorial conduct may qualify as adverse action where it involves the misuse of official authority or would objectively deter protected expression. *See Suppan* 203 F.3d at 234-35; *McKee v. Hart*, 436 F.3d 165, 170–71 (3d Cir. 2006). Further, courts have found that the deterrence element has been satisfied when a plaintiff pleads facts that lead to the plausible inference that the defendant(s) committed multiple acts that "in gross" amounted to a "campaign of harassment". *Bart*, 677 F.2d at p. 625. Even though "the effect on freedom of speech may be small…there is no justification for harassing people for exercising their constitutional rights" so the effect on freedom of speech "need not be great in order to be actionable." *Id*.

Mrs. Reading alleges that Defendant Chief Duff, acting in his capacity as Chief of Police, directed Ms. Stouffer to remove Mrs. Reading's Facebook post under the threat of liability for the potentially violent actions of others, engaged law enforcement resources in an attempt to "get additional posts removed from other social media posts," and participated in escalating the matter to other federal and state governmental actors. At the pleading stage, the Court must consider these allegations collectively, not in isolation. Courts have repeatedly recognized that a series of actions, even if individually lawful or minor, may amount to a campaign of retaliatory harassment sufficient to deter a person of ordinary firmness. *Suppan*, 203 F.3d at 234–35; *Thomas*, 463 F.3d at 290; *Bart*, 677 F.2d at p. 625.

Defendant Chief Duff further contends that his conduct constituted protected government speech or legitimate law enforcement activity. However, Mrs. Reading's allegations extend beyond mere criticism or verbal disagreement, which would not be sufficient to objectively satisfy the deterrence element. The SAC alleges that Defendant Chief Duff not only used his own First Amendment right to voice his disagreement and criticism of Mrs. Reading, but he also invoked police authority and participated in governmental escalation that plausibly conveyed the possibility of adverse consequences flowing from her speech. At this stage, such allegations are sufficient to distinguish this case from those involving only protected counter-speech by government officials.

As to the alleged effects of Defendant Chief Duff's conduct, the Court cannot find as a matter of law that the pleadings amount to only *de minimis* injury. The Third Circuit treats the *de minimis* limitation narrowly and recognizes that even modest harms may be actionable when official power is implicated. *Suppan*, 203 F.3d at 235. Certainly, there are a set of facts under which Mrs. Reading would not be entitled to relief. But viewing the well plead facts in the light

60

most favorable to her, the Court cannot conclude at the pleading stage that the Defendant Chief Duff's conduct would be incapable of deterring a person of ordinary firmness.

Mrs. Reading must also plausibly allege that her protected speech was a but-for cause of Defendant Chief Duff's challenged conduct. *Nieves*, 587 U.S. at 398–99. At the pleading stage, causation may be established through unusually suggestive temporal proximity or a pattern of antagonism coupled with timing. *DeFlaminis*, 480 F.3d at 267.

Mrs. Reading alleges that Defendant Chief Duff's actions followed closely on the heels of her Facebook post and were directed specifically at her in response to that speech. She further alleges a pattern of escalating conduct treating her Facebook post as a threat. These allegations, taken as true, permit a reasonable inference that the alleged actions would not have occurred absent Plaintiff's protected speech. While Defendant Chief Duff asserts that his conduct was motivated by independent safety concerns, competing explanations for government action do not defeat causation at the pleading stage because at the motion to dismiss stage, the Court is obliged to accept a plaintiff's factual allegations as true and to draw reasonable inferences regarding causation in her favor.

As to Defendant Superintendent Payne, Mrs. Reading argues that her alleged participation in the claimed civil rights conspiracy with other government actors imputes the foreseeable actions of her co-conspirators in furtherance of the conspiracy onto her. As such, Defendant Superintendent Payne's direct actions must be viewed in the context of the coordinated actions of the group. Thus, Mrs. Reading's Retaliation claim against Defendant Superintendent Payne rises and falls with the conspiracy claim.[25]

---

[25] Mrs. Reading does not, nor can she, meaningfully argue that Defendant Superintendent Payne's individual actions can establish a claim for Retaliation. The Court engaged an analysis of Defendant Payne's Letter to the Community as a retaliatory act *supra* Part IV(A)(1)(i) and determined that the facts alleged are not sufficient to establish First Amendment Retaliation.

The Court discussed the sufficiency of the agreement element of conspiracy as to Defendant Superintendent Payne *supra* Part IV(A)(2)(i). Suffice it to say, Mrs. Reading has not plausibly plead facts that Defendant Superintendent Payne was in a conspiracy to violate her civil rights. As such, the First Amendment Retaliation claim against Defendant Superintendent Payne cannot proceed.

### D.     First Amendment Freedom of Exercise

States are bound by the Free Exercise Clause of the First Amendment through the Fourteenth Amendment. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 531, (1993). Under the Free Exercise Clause, the government is prohibited from either establishing a religion or "prohibiting the free exercise thereof." U.S. Const. amend. I. This means that, "first and foremost" the Free Exercise Clause protects "the right to believe and profess whatever religious doctrine one desires." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990). As such, the government is prohibited from compelling "affirmation of religious belief," punishing expression of religious doctrine, or imposing "special disabilities on the basis of religious views." *Id.*

To invoke the special protections afforded to the free exercise of religion, a plaintiff must demonstrate that a government action substantially burdened her exercise of a sincerely held religious belief. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022); *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972); *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 714 (1981). A plaintiff cannot simply assert that a religious belief was violated; she must explain what religious belief or practice is at issue and how the government action specifically burdened it. *Torres v. Davis*, 506 F. App'x 98, 101 (3d Cir. 2012).

Thus, to state a claim for a violation of the Free Exercise Clause, Mrs. Reading must plead facts that lead to the reasonable inference that a specific sincerely held religious belief was substantially burdened by the Defendants' actions.

Defendant Chief Duff argues that Mrs. Reading fails to plead facts that show that her Facebook post was rooted in a sincerely held religious belief. While the SAC states that her post was motivated by her sincerely held religious belief, Defendant Chief Duff argues that Mrs. Reading expressly denounced that her post was rooted in any religious belief at all.

Mrs. Reading argues that the SAC alleges that her post was motivated by a sincerely held religious belief that she chose to argue from a secular perspective to avoid the potential stigma attached to religious perspectives. She further argues that she alleged that her motive for the post was the same as her motive for opting out of the health curriculum, which she addressed in her Facebook post. Thus, she argues, the SAC sufficiently alleges facts that establish that she was motivated by her sincerely held religious belief.

Mrs. Reading does not provide any case law, and the Court could not independently identify any, that supports the notion that a plaintiff that explicitly denounces religious intent can then hold government officials liable for substantially burdening her freedom to exercise her religion. To the contrary, pleading facts that plausibly infer a sincerely held religious belief is a threshold requirement for a Free Exercise claim. Uniformly, when courts have found that a plaintiff has established a sincerely held religious belief, the facts include unmistakable indications of

religious motivation. *Yoder*, 406 U.S. at 215-219.;[26] *See Kennedy* 597 U.S.;[27] *Mahmoud v. Taylor*, 606 U.S. 522 (2025).[28] Perhaps more importantly, the facts in these precedential cases have never included a disclaimer, or any other type of action, that explicitly severed the plaintiff's words or actions from their religious beliefs.

Yet, in her opposition Mrs. Reading argues that despite explicitly stating that her post was in no way connected to her religious beliefs, that same post was motivated by her constitutionally protected religious beliefs. Further, Mrs. Reading contends that because the SAC says that her post was motivated by her religious views, the Court must accept this as true and that this is sufficient to establish her sincerely held religious belief.

But that is not the standard. The federal courts are bound by the pleading standards the Supreme Court set in the often quoted cases of *Bell Atl. Corp. v. Twombly* and *Ashcroft v. Iqbal*. The so called "*Iqbal-Twombly*" standard of pleading guides the Court in determining whether a

---

[26] In *Yoder* the Court engaged in an analysis of several hundred years of the well-established religious practices of the Amish community to come to the conclusion that the plaintiff held a sincere religious belief. The Court stated: "Aided by a history of three centuries as an identifiable religious sect and a long history as a successful and self-sufficient segment of American society, the Amish in this case have convincingly demonstrated the sincerity of their religious beliefs, the interrelationship of belief with their mode of life, the vital role that belief and daily conduct play in the continued survival of Old Order Amish communities and their religious organization, and the hazards presented by the State's enforcement of a statute generally valid as to others." *Yoder*, 406 U.S. at 235. Never once in the relevant timeframe did the *Yoder* Plaintiffs publicly disavow the association of their words or actions to their religious beliefs.

[27] In *Kennedy* the plaintiff, a public-school football coach, engaged in a prayer at center field following the conclusion of each football game. After being admonished by the school district for impermissibly leading students in prayer, the plaintiff ceased leading group prayers but continued to say a silent personal prayer following each game. As a result, the plaintiff was ultimately disciplined and terminated by the school district. The Court found that in doing so, a "government entity sought to punish an individual for engaging in a brief, quiet, personal religious observance doubly protected by the Free Exercise and Free Speech Clauses of the First Amendment." *Kennedy*, 597 U.S. at 543. Never once in the relevant timeframe did the *Kennedy* Plaintiff publicly disavow the association of his words or actions to his religious beliefs.

[28] In *Mahmoud*, a school board established a new mandatory literary curriculum that interposed books about various LGBTQ+ topics including same sex marriage and gender identity. The school board explicitly denied parent requests to opt their children out of these lessons based on their religious beliefs and prohibited teachers from advising parents when the books would be taught in class. Parents voiced their objections specifically based on their varying religious beliefs. The Court found that the "Board's introduction of the "LGBTQ+-inclusive" storybooks, along with its decision to withhold opt outs, place[d] an unconstitutional burden on the parents' rights to the free exercise of their religion." *Mahmoud*, 606 U.S. at 569. Never once in the relevant timeframe did the *Mahmoud* Plaintiffs publicly disavow the association of their words or actions to their religious beliefs.

pleading sufficiently establishes facts that, if they are later proven true, lead to a cognizable claim or whether the pleading fails to allege facts that can plausibly lead to relief. But the plaintiff must allege facts, not conclusions. *Twombly*, 550 U.S. at 545; *Iqbal*, 556 U.S. at 678.

Indeed, when determining whether a plaintiff has met her pleading burden, the Court engages that analysis by identifying and striking any allegations in the pleadings that are simply conclusions because the Court need not credit them as true. *Id.* To emphasize, the Court is not required to accept a statement in a pleading simply because the plaintiff says it is true. This framing of the standard strangely attempts to shift the burden from the plaintiff's requirement to plead plausible facts to the Court's obligation to accept the plaintiff's conclusions. In reality, Mrs. Reading must plead facts that plausibly lead to the inference that she has a sincerely held religious belief, and that the government substantially burdened the practice of that belief.

Mrs. Reading's pleading falls far short of this standard. The only facts in the SAC that indicate that Mrs. Reading held any religious belief at all come from her own conclusory statements in the SAC that she was motivated by religion, despite having publicly announced in her Facebook post that she was not. The SAC does not even rise to the level of possibly stating a claim under the Free Exercise Clause let alone plausibly stating one. To hold otherwise would be to permit any plaintiff aggrieved by any government official to proceed on a free exercise claim by simply stating that their actions were motivated by a sincerely held religious belief and the government official's actions substantially burdened the practice of that belief.

As such, Mrs. Reading's claim for violations of the Free Exercise Clause cannot proceed.

## E.    Injunctive Relief

### 1.    Federal Official Capacity Defendants

The Official Capacity Defendants argue that the Third Circuit already determined that Mrs. Reading does not have standing to seek injunctive relief for her prior censorship and retaliation allegations. Relying on the Third Circuit's reasoning in its affirmance of this Court's denial of Mrs. Readings request for a preliminary injunction, they contend that Mrs. Reading has not sufficiently established that she has standing to "pursue forward-looking relief based on backward-looking allegations of censorship and threat-tagging." (ECF No. 141 at p. 35.)

Further, the Official Capacity Defendants argue that the amendments in Mrs. Readings SAC do not cure the standing defects that previously existed. They assert that Mrs. Reading's pleadings do not establish "plausible allegations tying Plaintiff's past inconveniences at the airport with her prior protected speech, or any alleged misconduct by Federal Official Capacity Defendants related to her speech." *Id.* at 37. Thus, they argue, Mrs. Reading has not sufficiently established that she suffered any injury-in-fact that is fairly traceable to the Official Capacity Defendants. They argue that Mrs. Reading's experiences at airport security are not a result of retaliation for her protected speech, they are the result of a "fuzzy mismatch" in Mrs. Reading's CLEAR credentials. They bolster this argument by submitting a declaration from TSA that states such.

Finally, the Official Capacity Defendants argue that even if the Court determines that Mrs. Reading does satisfy the standing requirements, her claims against the Official Capacity Defendants fail on the merits because they are too speculative to establish plausibility as required at the pleading stage.

Mrs. Reading responds that the Official Capacity Defendants' contentions regarding standing are bound up in the merits of the case and as such jurisdiction must be presumed. Mrs. Reading contends that the TSA Declaration is improper and cannot be considered for the purpose

of a Rule 12(b)(6) Motion to Dismiss. To the extent that it is considered under Rule 12(b)(1) for jurisdictional purposes, as the Official Capacity Defendants have proffered it to be, she has submitted her own declaration disputing the alleged failure to establish jurisdiction. Lastly, she contends that the well plead facts in her SAC, with the inferences from those facts drawn in her favor, sufficiently establish claims for relief against the Official Capacity Defendants.

### i.    Standing

Standing is a threshold jurisdictional issue that limits federal courts to resolving "cases" or "controversies." U.S. Const. art. III, § 2; *Tignor v. Dollar Energy Fund, Inc.*, 745 F. Supp. 3d 189, 196 (W.D. Pa. 2024). When standing is at issue, the Court must address this challenge first. *Reading v. N. Hanover Twp., New Jersey*, 124 F.4th 189, 196 n. 2 (3d Cir. 2024). To establish standing, a plaintiff must "show that she has suffered, or will suffer, an injury that is concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024).

The traceability element works to ensure that there is a causal connection between the defendant and the alleged injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). If the plaintiff's injuries were solely caused by the actions of an independent third party, she does not have standing. *Id.* There is no "single standard for establishing this causal relationship." *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 158 (3d Cir. 2022). (quotations omitted.) Rather, the Third Circuit has held that both but-for causation and concurrent causation may sufficiently satisfy traceability. *Id.* Thus, traceability may be satisfied if the plaintiff can adequately plead facts that show either that the injury would not have occurred but-for the defendant's challenged conduct, or that the defendant's challenged conduct was a contributing factor to the plaintiff's injury, even

if other factors contributed as well. *See Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004).

Further, the plaintiff is required to satisfy each element of standing for each form of relief she seeks. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). When a plaintiff seeks forward facing injunctive relief for future harms, she must show that the anticipated injury is "certainly impending, or there is a substantial risk that the harm will occur." *Reading*, 124 F.4th at 196. (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).) It is worth noting that the plaintiff bears the burden of establishing and maintaining each element of standing throughout the suit. *Murthy* 603 U.S. at 58. Moreover, the plaintiff must do so "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan* 504 U.S. 555 at 561. Thus, at this stage of the litigation, Mrs. Reading must establish standing under the burden imposed at the pleading stage, no more and no less.

Therefore, Mrs. Reading's pleadings must allege sufficient facts that lead to the inference that she suffers from a "concrete, particularized" injury that is fairly traceable to the Official Capacity Defendants' challenged conduct, and that granting her injunctive relief would provide her relief from the alleged injury. *Murthy* 603 U.S. at 57. Further, she must allege facts that show that that there is a "substantial risk that, in the near future" at least one Official Capacity Defendant will censor her speech or retaliate against her because of her protected speech. *Id.* at 58.

It is true that a year ago, almost exactly, the Third Circuit affirmed this Court's denial of Mrs. Reading's request for a preliminary injunction. *See Reading* 124 F.4th at 199. The Third Circuit, analyzing the justiciability of Mrs. Reading's prayer for injunctive relief, found that she lacked standing for the injunction she sought because she could not "show a likelihood of future harm" and that she also could not "prevail on her theory of present self-censorship." *Id* at 198.

The Court, noting that Mrs. Reading "could not identify any unlawful acts by Defendants since the initial events nearly two years ago" reasoned that "any threat [to Mrs. Reading's First Amendment rights] had considerably subsided by the time she sued in March 2023." *Id.* at 197. (citation omitted). Thus, she was unable to establish that there was a "likelihood of future injury traceable to the Government defendants." *Id.* at 197. (citation omitted.) Further, the Court indicated that should Mrs. Reading seek to establish that she suffers ongoing harm as the result of being "stripped of her 'Trusted Traveler' status under the CLEAR Program" that without DHS or TSA as a named party, she would incur a redressability issue.[29] *Id.* at 198 n.5.

It follows then, that to establish standing for her claim for injunctive relief, Mrs. Reading must plead facts that show an ongoing injury resulting from the Official Capacity Defendants' violation of her Constitutional rights.

Assuming the facts in SAC as true, when Defendant Chief Duff initially spoke with Ms. Stouffer about removing Mrs. Reading's Facebook post, he advised her that the North Hanover police were working with DHS concerning Mrs. Reading. (ECF No. 123 at ¶ 85.) He then later conveyed the same information to Mrs. Reading. (*Id.*) Mrs. Reading alleges that prior to the Facebook post she obtained TSA Precheck and CLEAR, which she used consistently without issue. (ECF No. 123 at ¶ 186; ECF No. 147-1 ¶ 8-9.) Beginning sometime after Mrs. Reading's Facebook post was made, despite maintaining identical trusted traveler credentials, she was allegedly repeatedly subjected to additional screening procedures every time she flew out of Newark and when she returned from San Juan. (*Id.* at 189-190; Pl. Opp. at p. 50.) Allegedly, none of the other travelers in her party, all of whom had the same trusted traveler credentials, were ever subjected to additional screening procedures. (*Id.*)

---

[29] Presumably heeding the warnings of the Third Circuit as to redressability, Mrs. Reading added DHS and TSA as defendants to the suit in the SAC.

The SAC alleges that when Mrs. Reading asked a CLEAR representative why she was being subjected to additional screenings, she was advised that the additional screening request had not originated with CLEAR, but with TSA. (*Id.* at ¶ 191.) When escorted to a TSA agent to complete the additional screening, Mrs. Reading asked the TSA agent why TSA required additional screening procedures. (*Id.* at ¶ 192.) She was advised that there was a "flag" on her record. (*Id.*) During a subsequent trip when Mrs. Reading was again required to undergo additional screening, she took a photo of the alert, noting that she had been flagged as "Ineligible" to proceed through CLEAR. (*Id.* at ¶ 193.) In addition to "Ineligible" the CLEAR alert also included that the flag was the result of "Randomization." (*Id.* at ¶ 195.) Mrs. Reading does not believe that her allegedly consistent denial of the benefits of her trusted traveler status are random. (*Id.*) Instead, the SAC alleges that Mrs. Reading has been stripped of her trusted traveler credentials as a result of the retaliatory investigation initiated by Defendant Vazquez and his "Threat Working Group" including Defendant Noem as the head of DHS, Defendant Stahl as the head of the TSA, and Defendant NJOHSP Director Doran as the head of NJOHSP. (*Id.* at ¶ 196-97.)

In sum, when read in a light favorable to Mrs. Reading, the facts in the SAC state that as a result of her Facebook post, DHS was coordinating with Defendant Chief Duff concerning Mrs. Reading. After this coordination began, she became ineligible to proceed through airport security check points as a trusted traveler and had to undergo additional screening procedures. In essence, Mrs. Reading alleges that prior to her Facebook post she had never been required to undergo additional screening procedures. After her Facebook post she was required to undergo additional screening procedures every time she traveled. No one else she travelled with, who had the exact same credentials, was ever subjected to additional screenings. Mrs. Reading avers that her sudden

ineligibility was the result of a TSA directive, and that a TSA agent confirmed that Mrs. Reading had been "flagged."

Drawing all inferences in her favor, Mrs. Reading has sufficiently pleaded a concrete and particularized injury in fact that is fairly traceable to federal Defendants Noem and Stahl, which the granting of injunctive relief would redress.

However, as to federal Official Capacity Defendants, Defendant Wes Adams ("Defendant Colonel Adams"), Defendant Colonel Mitchell Wisniewski ("Defendant Colonel Wisniewski"), Defendant Colonel Grimmett, Defendant Lt. Col. Hall, Defendant Major Lesher, Defendant Major Schilling, and Defendant Vazquez,  Mrs. Reading fails to sufficiently establish standing for the same reason that the Third Circuit articulated in its opinion addressing the preliminary injunction. As to these federal defendants, Mrs. Reading's "primary evidence of future harm is the predictive value of Defendants' past conduct." *Reading*, 124 F.4th at p. 197. As the Third Circuit previously indicated, "even the strongest evidence of past censorship [cannot] show 'a likelihood of future injury traceable to' Government Defendants." (*Id.*)

The SAC does not provide any additional facts that allow this Court to draw the reasonable inference that Defendant Colonel Adams, Defendant Colonel Wisniewski, or any of the defendants under their command, continued to engage in any "unlawful acts...since the initial events" more than three years ago. *Id.* Mrs. Reading cannot, on these facts, show that there is a risk of future harm that is fairly traceable to these defendants that can be redressed by granting the injunctive relief she seeks. As such, she lacks standing to proceed on the claims against them.

### a.    The Walbridge Declaration

The Court notes that the Federal Official Capacity Defendants submitted the Declaration of Anne Walbridge ("Walbridge Declaration") (ECF No. 141-2), a TSA employee, contending

that it should be considered under Fed. R. Cv. P. 12(b)(1) since it goes to whether Mrs. Reading has standing. They argue that the Walbridge Declaration puts facts at issue that are dispositive as to Mrs. Reading's standing since the Walbridge Declaration attacks the veracity of her concrete, particularized, ongoing injury, specifically her trusted traveler credentials.

Mrs. Reading responds that the Official Capacity Defendants' "patently implausible, rank hearsay declaration" is a "rather desperate bid to preclude discovery on this issue by improperly interposing the self-serving declaration of Defendant TSA's employee" and that the declaration is "eight pages of bureaucratic mumbo-jumbo in support of Defendant's argument." (ECF No. 147 at p. 1, 48.) To counter the "patently unbelievable, indeed nonsensical" Declaration, Mrs. Reading submits her own ten-page Declaration. (*See* ECF No. 147-1 at p. 1-10.)

When a factual attack on jurisdiction is mounted under Rule 12(b)(1), a court is permitted to "weigh and consider evidence outside the pleadings." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). However, a "[j]urisdictional finding of genuinely disputed facts is inappropriate when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action." *Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2016) (citing *Sun Valley Gasoline, Inc. v. Ernst Enters., Inc.*, 711 F.2d 138, 139 (9th Cir. 1983).) Therefore, the Third Circuit has directed that "when a factual challenge to jurisdiction attacks facts at the core of the merits of the underlying cause of action, the proper procedure for the district court is to find that jurisdiction exists and to deal with the objection as a direct attack on the merits of the plaintiff's case." *Id.* (citations omitted).

Given the dueling Declarations that are so clearly disputed facts that go to the core of the merits of the case, the Court finds that Mrs. Reading has sufficiently established standing under the pleading standard against Official Capacity Defendants Noem and Stahl. That said, Mrs.

Reading is required to maintain standing throughout the case under the burden imposed at each stage of litigation. While the Court finds that Mrs. Reading has reached the low bar set to establish standing at the motion to dismiss stage, she must maintain such under the ever-rising burden as the litigation proceeds forward.

### ii.     The Merits of Mrs. Reading's Claims

Having determined that Mrs. Reading has standing to proceed, the Court turns to the merits of the claims. The Official Capacity Defendants argue that even if the Court determines that Mrs. Reading has established standing, her claims against them fail on the merits. They argue that Mrs. Reading's claims fail to plead a causal nexus between her protected speech and the restriction on her trusted traveler credentials.

To establish a causal link between the protected conduct and the alleged retaliatory act, the plaintiff must first plead facts that lead to the reasonable inference that the defendant was "aware of the protected conduct in the first place." *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 494 (3d Cir. 2002). Then the plaintiff must plead facts that show "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that proof the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation." *DeFlaminis* 480 F.3d at 267. (cleaned up.)

Many of the facts used to establish standing are relevant to the analysis of whether Mrs. Reading has sufficiently established a causal link between her protected speech and the restriction on her trusted traveler status. First, Mrs. Reading must allege facts that lead to the reasonable inference that DHS or TSA were aware of her post. Mrs. Reading alleges that Defendant Chief Duff advised Ms. Stouffer that the North Hanover police department was working with DHS

"concerning Mrs. Reading." Defendant Chief Duff advised Ms. Stouffer of this during a phone call about Mrs. Reading's protected speech. He later conveyed the same information not Mrs. Reading directly. From this the reasonable inference, when drawn in Mrs. Reading's favor, can be made that DHS was aware of her protected speech.

As to temporal proximity, Mrs. Reading alleges that she has had TSA precheck and CLEAR status since before the date of her Facebook post. After her Facebook post, when travelling she was required to undergo additional security screening despite her trusted traveler credentials. No one else she travelled with, who had identical credentials, has ever been required to undergo additional security screening. The SAC alleges that Mrs. Reading was subjected to additional security screening at least seven times since her Facebook post.[30] Upon investigation, Mrs. Reading discovered that she had been "flagged" by the TSA and that she was "Ineligible" for expedited security clearance under CLEAR.

In sum, Mrs. Reading has plead facts that show that she has consistently maintained the same trusted traveler credentials since before her Facebook post. After her Facebook post, despite those unchanging credentials, she began to be subjected to additional screenings, was "flagged" by the TSA, and that she was "Ineligible" under CLEAR. These facts, taken as a whole with inferences drawn in Mrs. Reading's favor, suggests temporal proximity between the protected activity and the alleged retaliation. As such, Mrs. Reading has sufficiently plead a causal link.

As the Court has determined that, at this point, Mrs. Reading has sufficiently established standing, and that her pleading meets the standard required, her claims against Official Capacity Defendants Noem and Stahl may proceed at this time.

---

[30] In her Opposition, Mrs. Reading indicates that she has been subjected to additional screening no less than twelve times. The SAC lists seven specific instances of enhanced screening.

### 2.    Defendant NJOHSP Director Doran

Mrs. Reading sues Defendant NJOHSP Director Doran in her official capacity as the Director of the New Jersey Office of Homeland Security and Preparedness, seeking declaratory and injunctive relief for speech censorship and retaliation as well as violations of the Free Exercise Clause of the First Amendment.

Defendant NJOHSP Director Doran argues that the claims against her should be dismissed because, based on the pleadings, Mrs. Reading does not sufficiently establish a single claim against her. Specifically, she contends that the SAC is devoid of any factual allegation to support the "speculative claim" that NJOHSP conducted a retaliatory investigation against her in response to Mrs. Reading's Facebook post. (ECF No. 134-1 at p. 9.)[31] Even more, Defendant NJOHSP Director Doran argues, the SAC does not contain any facts to support the existence of such an investigation, let alone that it was in retaliation for Mrs. Reading's Facebook post. *Id.*

Further, Defendant NJOHSP Director Doran argues that even if the Court were to determine that the SAC meets the standard required to proceed on the merits, Mrs. Reading lacks Article III standing as she is seeking injunctive and declaratory relief against NJOHSP, and she has not plead any facts that indicate that there is a danger of future harm.

Mrs. Reading argues, in substance, that Defendant NJOHSP Director Doran attempts to impose a higher pleading burden than is required. She asserts that because there is no "probability requirement" for a pleading, she is only required to plead facts that "raise a reasonable expectation that discovery will reveal evidence [for the claim]." (ECF No. 147 at p. 61.) As such, she contends that the facts she has alleged in the SAC meet the plausibility required under *Twombly* which is sufficient to defeat Defendant NJOHSP Director Doran's motion to dismiss. (*Id.*)

---

[31] Defendant Doran Brief in Support of Motion to Dismiss (ECR No. 134-1 at p. 9-11.)

### i.    Standing

As explained above, standing is a threshold jurisdictional requirement that must be satisfied as to each defendant and each form of relief sought. To establish standing for forward-looking injunctive or declaratory relief, a plaintiff must plausibly allege a concrete and particularized injury that is fairly traceable to the challenged conduct of the defendant and likely to be redressed by the requested relief. *Murthy* 603 U.S. 43 at 57; *TransUnion LLC*, 594 U.S. at 423.

Above, the Court concluded that Mrs. Reading sufficiently alleged standing as to federal Official Capacity Defendants Noem and Stahl. Drawing all reasonable inferences in her favor, the SAC alleges that after her Facebook post, DHS and TSA—entities with authority over airport screening and trusted traveler programs—coordinated with local officials and then flagged Mrs. Reading for enhanced screening, rendering her ineligible to proceed through CLEAR despite previously holding trusted traveler credentials without incident. Those allegations plausibly support traceability and redressability as to the federal Official Capacity Defendants, who are alleged to control the challenged screening decisions.

However, Mrs. Reading's allegations as to Defendant NJOHSP Director Doran, are materially different. The SAC does not allege that NJOHSP administers TSA screening, controls trusted traveler programs, or possesses authority to flag individuals for enhanced screening. Nor does it allege that Defendant NJOHSP Director Doran or any NJOHSP official transmitted Mrs. Reading's identifying information to TSA, requested enhanced screening, or issued any directive affecting her trusted traveler status. Instead, the SAC alleges that Mrs. Reading's enhanced screening was "likely an outgrowth" of a retaliatory investigation by NJOHSP and that NJOHSP "must have coordinated" with DHS and TSA. (ECF No. 123 ¶ 197.)

These allegations are insufficient to establish standing. Unlike the federal defendants, whose agencies are alleged to have directly imposed the "flag" that caused Mrs. Reading's alleged injury, Defendant NJOHSP Director Doran is connected to that injury only through speculation about interagency coordination. The SAC itself alleges that the screening directive originated with TSA and that TSA imposed the "flag" rendering Mrs. Reading ineligible for CLEAR. Where the pleaded facts identify a federal agency as the source of the injury, and where the plaintiff alleges no concrete action by the state defendant contributing to that injury, traceability is lacking. *Lujan*, 504 U.S. at 560; *Clemens*, 48 F.4th at 158.

Redressability is likewise absent. Even assuming ongoing injury stemming from "enhanced" TSA screening decisions, the SAC does not allege that injunctive or declaratory relief against NJOHSP would restore Mrs. Reading's trusted traveler status or prevent future screening. As the Third Circuit previously observed, claims predicated on the loss of trusted traveler credentials raise redressability concerns absent DHS or TSA as defendants. *Reading*, 124 F.4th at 198 n.5. That concern applies with equal force to Defendant NJOHSP Director Doran.

Accordingly, while Mrs. Reading has plausibly alleged standing as to the federal Official Capacity Defendants Noem and Stahl, she has not alleged facts sufficient to establish that her injuries are fairly traceable to Defendant NJOHSP Director Doran or that the relief she seeks would redress those injuries. She therefore lacks Article III standing to pursue injunctive or declaratory relief against Defendant NJOHSP Director Doran in her official capacity.

**F.    False Light Claim Against Defendant Major Schilling**

Mrs. Reading alleges in the SAC that Defendant Major Schilling portrayed her in a false light when he "distorted [Mrs. Reading's] protected speech, falsely claiming that it violated the School Ethics Act and school district policy." (ECF No. 123 at ¶ 305(b).) The SAC also alleges

that Defendant Major Schilling "falsely accused Mrs. Reading of 'deceiv[ing]' people 'with her lies', and refused to delete the false accusation even when proved wrong by another Facebook user who provided facts to the contrary." (ECF No. 123 at ¶ 305(d).)

New Jersey recognizes a privacy tort when a defendant publicizes information about another in a way that places the person in a false light.. *Herman v. Muhammad*, 329 A.3d 1072, 1081 (App. Div. 2024). (citing *Romaine v. Kallinger*, 537 A.2d 284, 290 (1988)). To establish a claim for false light, a plaintiff must plead facts showing that "(1) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (2) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 589 (2009). (citing *Romaine*, 537 A.2d at 294.)(quotations omitted.)

Where the published matter concerns a public figure or relates to a matter of public concern, the plaintiff must also establish that the defendant acted with actual malice. *Herman*, 329 A.3d at 1080. The actual malice standard is subjective and requires an inquiry into the particular defendant's state of mind at the time of publication. *Durando v. Nutley Sun*, 37 A.3d 449, 459 (2012). Facts that lead to inferences of hostility, aggression, or ill will towards the plaintiff do not sufficiently establish actual malice. *Neuwirth v. State*, 300 A.3d 274, 284 (App. Div. 2023). This is because "[m]alice in a defamation case does not refer to a 'bad or corrupt motive' or 'personal spite, ill will or a desire to injure [the] plaintiff.'" *Id.* Rather, "malice concerns the [defendant's] 'state of knowledge of the falsity of what he published, not at all ... his motivation in publishing it." *Trump v. O'Brien*, 29 A.3d 1090, 1102 (App. Div. 2011).

Thus, it is insufficient to allege that a reasonably prudent person should have known or doubted the accuracy of the published matter. *Durando* 37 A.3d. at 459. Actual malice requires

more than negligence, mistake, or failure to investigate. *Id.* The plaintiff must plead facts indicating that the defendant knew the statement was false or seriously doubted its truth. *Id.*

As Mrs. Reading's Facebook post addressed matters of public concern, she must plead facts that show that Defendant Major Schilling acted with actual malice when making the challenged statements.

In her Opposition, Mrs. Reading points to two facts in the SAC that she contends plausibly give rise to the inference that Defendant Major Schilling acted with actual malice. First, she argues that Defendant Major Schilling's statement that he was "pretty sure" she had violated an ethics policy demonstrates that he was uncertain as to the truth of that assertion, and thus supports an inference that he subjectively doubted the truth of the statement. Second, she points to a Facebook exchange in which Defendant Major Schilling engaged in an adversarial conversation with another Facebook user who disputed his accusation that Mrs. Reading had lied about her children's exposure to a hallway display. Mrs. Reading asserts that his failure to retract that accusation after being challenged constitutes evidence of reckless disregard for the truth.[32]

For his part, Defendant Major Schilling argues that the SAC fails to plead facts to sufficiently establish actual malice because the SAC is completely devoid of facts that indicate that he subjectively doubted the truth of the statements. Instead, he argues, the SAC relies entirely on conclusory statements, statements of an alleged vendetta, claims of escalation and refusal to

---

[32] The SAC also alleges that Defendant Major Schilling "baselessly accused Mrs. Reading of inciting 'right-wing extremists' in an email to parents and school staffers", that he "portrayed Mrs. Reading as engaging in 'disruptive and dangerous' actions in yet another email, which wrongfully suggested that she posed a threat to the well-being and safety of others", and that he "portrayed Mrs. Reading as a security threat to the entire community through Facebook posts insinuating they were official U.S. government statements." (ECF No. 123 at ¶ 305(a), (c) & (d).) However, Mrs. Reading does not provide any argument in her Opposition (ECF No. 147) as to how these statements were made with actual malice, and the Court cannot deduce any non-conclusory facts from the pleading that indicate that Defendant Major Schilling acted with actual malice as required to sustain a claim for False Light under these circumstances.

retract, none of which plausibly allege that he knew the statements were false or entertained serious doubts as to their truth, as required under New Jersey law.

The facts in the SAC do not plausibly show that Defendant Major Schilling had a subjective awareness of the probable falsity of the statements he made at the time he made them. To the contrary, the facts reflect that Defendant Major Schilling was confident in his statements when he made them. For example, in Exhibit 2 of the SAC, the morning after Mrs. Reading's Facebook post, Defendant Major Schilling emailed members of the *No Place for Hate* parent committee and questioned whether Mrs. Reading's Facebook post justified an ethics complaint against her in her capacity as a board member on the Northern Burlington School District Board of Education. (ECF No. 123-1 at p. 5.) In Exhibit 5 of the SAC, on November 29, 2022, seven days after Mrs. Reading's Facebook post, Defendant Major Schilling wrote another email to the same group. (ECF No. 123-1 at p. 7-8.) In this email he stated: "I'm pretty sure she violated this district policy," and then he pasted a highlighted copy of a policy titled "Board Member Use of Social Networks". (*Id.*) In Exhibit 6 of the SAC, again on November 29, 2022, Defendant Major Schilling emailed the same group about five hours later and advised that he had submitted a complaint to Dr. Zuckerman, the superintendent of Northern Burlington School District. (ECF No. 123-1 at p. 9.) He indicated that he asked Dr. Zuckerman to "request Angela to remove her posts for violating the District bylaws." (ECF No. 123-1 at p. 9.)

These exhibits show that Defendant Major Schilling contemplated an ethics complaint, researched and identified grounds for which he believed an ethics complaint was justified, and then followed through with submitting the ethics complaint. These facts lead to the inference that Defendant Major Schilling affirmatively believed that Mrs. Reading had violated the Board of Education ethics policies. Mrs. Reading's contention that Defendant Major Schilling's statement

that he was "pretty sure" she had committed an ethics violation is evidence that he doubted the veracity of his statement pales in comparison to evidence she submitted with the SAC.

Similarly, Mrs. Reading alleges that Defendant Major Schilling refused to retract his statement that she had made "multiple false claims and omissions of fact that have been disputed multiple times" during an adversarial Facebook exchange with a third party. (ECF No. 123-1 at p. 52.) Without more, that allegation does not support an inference of actual malice. The SAC and the exhibits attached do not allege that Defendant Major Schilling was presented with definitive proof that his statement was false, nor do they allege that he acknowledged such proof or expressed any doubt whatsoever about the truth of his accusation.

To the contrary, the SAC Exhibits show that when challenged by a third party supporting Mrs. Reading, Defendant Major Schilling responded, "that shows how well she fooled you with her lies." He then continued to argue that his characterization of the facts were accurate. He never once indicated that he was inclined to retreat from his position.[33] These statements by Defendant Major Schilling are inconsistent with the notion that he had a subjective awareness of the probable falsity of his statements. Instead, the facts reflect a continued confidence in the truth of his statements. This plainly does not satisfy the actual malice standard. Absent facts showing that Defendant Major Schilling was confronted with information that caused him to seriously doubt the veracity of his statements, a refusal to retract his statements does not establish actual malice.

More broadly, Plaintiff's theory of actual malice relies on allegations of hostility, escalation, persistence, and an alleged vendetta. But New Jersey courts have repeatedly held that such allegations, even if accepted as true, do not satisfy the subjective actual malice standard. *Neuwirth*, 300 A.3d at 284; *Trump*, 29 A.3d at 1102. Malice in this context concerns what the

---

[33] The text of this exchange was reproduced *supra* Part II(G).

defendant knew or believed about the truth of the published matter at the time the statement was made, not the defendant's motive, tone, or desire to counter or criticize the plaintiff's speech. *Id.*

Plainly, the SAC here does not plead facts showing that Defendant Major Schilling knew that Mrs. Reading had not committed an ethics violation and chose to make false statements that she had anyway. Further the facts in the SAC do not show that Defendant Major Schilling knew that his accusations regarding Mrs. Reading lying about her children seeing the poster, or anything else, were false and that he made those accusations anyway. Nothing in the SAC indicates that Defendant Major Schilling seriously doubted the truth of those challenged statements at the time he made the statements. Instead, the allegations describe disagreement, advocacy, and persistence—conduct that may reflect strong opposition to Mrs. Reading's speech, but which does not rise to the level of actual malice required to sustain a false light claim involving matters of public concern.

Accordingly, because the SAC fails to plead facts sufficient to establish actual malice, Mrs. Reading fails to state a claim upon which relief can be granted and the false light claim against Defendant Major Schilling must be dismissed.

## V.    CONCLUSION

For the reasons set forth above, Defendants Motions to Dismiss are **GRANTED** in part and **DENIED** in part. An order consistent with this Opinion will be entered.


Dated:   January 13, 2026

KAREN M. WILLIAMS
United States District Judge